

FILED

JUL 2 2 2008

RICHARD W. WIEKING
CLERK, U.S. DISTRICT COURT
NORTHERN DISTRICT OF CALIFORNIA

## PETITION FOR A WRIT OF HABEAS CORPUS BY A PERSON IN STATE CUSTODY

Name _____ BASILE _____ DAVID _____ MICHAEL _____
        (Last)              (First)           (Initial)

Prisoner Number _____ C-70016 _____

Institutional Address _____ SAN QUENTIN STATE PRISON, SAN QUENTIN, CA 94974

**(PR)**

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

**SBA**

**CV 08     3503**

    DAVID MICHAEL BASILE

Full Name of Petitioner              Case No.(To be provided by the
                                       clerk of court)

    vs.

    ROBERT AYERS JR., WARDEN (A)    PETITION FOR A WRIT OF HABEAS CORPUS

    Name of Respondent
    (Warden or jailor)

## Read Comments Carefully Before Filling In

### When and Where to File

    You should file in the Northern District if you were convicted and sentenced in one of these counties: Alameda, Contra Costa, Del Norte, Humboldt, Lake, Marin, Mendocino, Monterey, Napa, San Benito, Santa Clara, Santa Cruz, San Francisco, San Mateo and Sonoma. You should also file in this district if you are challenging the manner in which your sentence is being executed, such as loss of good time credits, and you are confined in one of these counties. Habeas L.R. 2254-3(a).

    If you are challenging your conviction or sentence and you were <u>not</u> convicted and sentenced in one of the above-named fifteen counties, your petition will likely be transferred to the United States District Court for the district in which the state court that convicted and sentenced you is located. If you are challenging the execution of your sentence and you are not in prison in one of these counties, your

petition will likely be transferred to the district court for the district that includes the institution where you are confined. Habeas L.R. 2254-3(b).

Who to Name as Respondent

You must name the person in whose actual custody you are. This usually means the Warden or jailor. Do not name the State of California, a city, a county or the superior court of the county in which you are imprisoned or by whom you were convicted and sentenced. These are not proper respondents.

If you are not presently in custody pursuant to the state judgment against which you seek relief but may be subject to such custody in the future (e.g., detainers), you must name the person in whose custody you are now and the Attorney General of the state in which the judgment you seek to attack was entered.

A. INFORMATION ABOUT YOUR CONVICTION AND SENTENCE

1.  What sentence are you challenging in this petition?
DENIAL OF PAROLE, AUG. 2007 PAROLE HEARING.

(a) Name and location of court that imposed sentence (for example; Alameda County Superior Court, Oakland):

| SANTA CLARA COUNTY SUPERIOR COURT | SAN JOSE, CALIF. |
|---|---|
| Court | Location |

(b)   Case number, if known ___93695___

(c)   Date and terms of sentence __25 YRS. TO LIFE__

(d)   Are you now in custody serving this term? (Custody means being in jail, on parole or probation, etc.) Yes X No

| Where? SAN QUENTIN STATE PRISON | SAN QUENTIN, CA. 94974 |
|---|---|
| (Name of Institution) | (Address) |

2.   For what crime were you given this sentence? (If your petition challenges a sentence for more than one crime, list each crime separately using Penal Code numbers if known. If you are challenging more than one sentence, you should file a different petition for each sentence.)

P.C. 187, FIRST DEGREE MURDER

3.   Did you have any of the following?

Arraignment: Yes X No __ Preliminary Hearing: Yes X No __ Motion to Suppress: Yes X No __

4.    How did you plead?

Guilty _____    Not Guilty __X__    Nolo Contendere _____

Any other plea (specify) _____

5    If you went to trial, what kind of trial did you have?

Jury _X_    Judge alone _____    Judge alone on a transcript _____

6.    Did you testify at your trial?  Yes __  No _X_

7.    Did you have an attorney at the following proceedings:

(a)    Arraignment   Yes _X_        No __
(b)    Preliminary hearing        Yes  X        No __
(c)    Time of plea  Yes _X_       No _
(d)    Trial  Yes __X        No __
(e)    Sentencing   Yes _X_       No __
(f)    Appeal       Yes _X_       No
(g)    Other post-conviction proceeding     Yes __        No _X_

8.    Did you appeal your conviction?  Yes _X_  No __

(a)    If you did, to what court(s) did you appeal?

Court of Appeal        Yes _X_        No __    1986 _____    DENIED _____
                                                (Year)                  (Result)

Supreme Court of
California             ~~Yes~~ _X_    ~~No~~ __    1987 _____    DENIED _____
                                                (Year)                  (Result)

Any other court        Yes _X_        No __    1989/1997 _____    DENIED _____
                                                (Year)                  (Result)

(b)    If you appealed, were the grounds the same as those that you are raising in this
petition?                          Yes __  No _X_

(c)    Was there an opinion?        Yes    No _X_

(d)    Did you seek permission to file a late appeal under Rule 31(a)?
                                   Yes        No _X_

If you did, give the name of the court and the result:

---

    9.    Other than appeals, have you previously filed any petitions, applications or motions with respect to this conviction in any court, state or federal?    Yes  X    No \_\_

I HAVE FILED APPEALS WITH THE STATE AND FEDERAL COURT REGARDING DENIAL OF PAROLE.

THIS IS THE SECOND ONE.

Note: If you previously filed a petition for a writ of habeas corpus in federal court that challenged the same conviction you are challenging now and if that petition was denied or dismissed with prejudice, you must first file a motion in the United States Court of Appeals for the Ninth Circuit for an order authorizing the district court to consider this petition. You may not file a second or subsequent federal habeas petition without first obtaining such an order from the Ninth Circuit. 28 U.S.C. § 2244(b).

     (a)    If you sought relief in any proceeding other than an appeal, answer the following questions for each proceeding. Attach extra paper if you need more space.

I.    Name of Court   SANTA CLARA COUNTY SUPERIOR COURT

    Type of Proceeding   HABEAS CORPUS

    Grounds raised (Be brief but specific):

    a.   Parole denial was arbitrary and capricious-violation of due process.

    b.   Parole denial for 3 yrs with 'no evidence'-due process violation.

    c.   "No evidence" petitioner is a threat-due process violation.

    d.   Parole denail based on commitment offense/prior history-due process vio.

    Result   Denied  (Exhibit "C")    Date of Result   Dec.24, 2007

II.   Name of Court   California Court of Appeal, Sixth District

    Type of Proceeding   Habeas Corpus

    Grounds raised (Be brief but specific):

    a.   Same as above.

    b.

    c.

    d.

    Result   Denied  (Exhibit "D")    Date of Result   May 7, 2008

III.   Name of Court   California Supreme Court

Type of Proceeding _____ Petition for Review. _____

Grounds raised (Be brief but specific):

a. _____ Same as previously stated. _____

b. _____

c. _____

d. _____

Result ___ Denied ___ (Exhibit "E") _____ Date of Result ___ July 9, 2008 ___

      (b)    Is any petition, appeal or other post-conviction proceeding now pending in any

court?    Yes _X_ No __

___ United States District Court for the Northern District of California. ___

(Name and location of court)


B. GROUNDS FOR RELIEF

    State briefly every reason that you believe you are being confined unlawfully. Give facts to

support each claim. For example, what legal right or privilege were you denied? What happened? Who

made the error? Avoid legal arguments with numerous case citations. Attach extra paper if you need

more space. Answer the same questions for each claim.

    Note: You must present ALL your claims in your first federal habeas petition. Subsequent

petitions may be dismissed without review on the merits. 28 U.S.C. § 2244(b); McCleskey v. Zant, 499

U.S. 467, 111 S. Ct. 1454, 113 L. Ed. 2d 517 (1991).

    Claim One: ___ See insert "A", page 1-3 _____

Supporting Facts: _____ See Insert "A" page 1-3. _____

_____

_____

_____

Claim Two: _____ See Insert "B" pages 4-7. _____

_____

Supporting Facts: _____ See Insert "B", page 4-7. _____

_____

_____

Claim Three: _____ See Insert "C", page 8-14. _____

_____

Supporting Facts: _____ See Insert "C" page 8-14. _____

CLAIM FOUR:  See Insert "D", page 15-20.

SUPPORTING FACTS:  See Insert "D" page 15-20.

_____

If any of these grounds was not previously presented to any other court, state briefly which

grounds were not presented and why:

_____ All of the claims and supporting facts were submitted to the previous _____

_____ named courts. _____

_____

8

List, by name and citation only, any cases that you think are close factually to yours so that they are an example of the error you believe occurred in your case. Do not discuss the holding or reasoning of these cases:

In re Elkins, supra 144 Cal.App.  If this man was found suitable for parole, petitioner claims he should as well.  Because he was not demonstates the arbitrary and capricious ways of the Parole Board.

Do you have an attorney for this petition?     Yes ___ No _X_

If you do, give the name and address of your attorney:

WHEREFORE, petitioner prays that the Court grant petitioner relief to which s/he may be entitled in this proceeding. I verify under penalty of perjury that the foregoing is true and correct.

Executed on ___July 15, 2008___          _David Michael Basile_
                Date                        Signature of Petitioner

( rev. 5/96)

INSERT A

## GROUND ONE

ON AUGUST 2, 2007 THE BOARD OF PRISON HEARINGS (BPH) VIOLATED PETITIONER'S STATE AND FEDERAL PROTECTED RIGHTS OF DUE PROCESS WHEN IT ARBITRARILY AND CAPRICIOUSLY IGNORED LEGISLATIVE INTENT OF PENAL CODE SECTION 3041 AND CCR TITLE 15 SECTION 2402, THAT PAROLE "SHALL NORMALLY" BE GRANTED UNLESS THE GRAVITY OF THE OFFENSE IS SUCH THAT IT CANNOT BE SET AT THAT (INITIAL) HEARING. THE BPH IS USING THE EXCEPTION AS THE RULE IN EVERY CASE AND IS DENYING PAROLE TO EVERY TERM TO LIFE PRISONER BASED ON THE OFFENSE, MAKING THE RELATIVE PAROLE LAW AND REGULATIONS MEANINGLESS AND UNCONSTITUTIONALLY VAGUE. THE BPH IS ILLEGALLY RESENTENCING PETITIONER TO LIFE WITHOUT THE POSSIBILITY OF PAROLE.

On August 2, 2007 the BPH found in part that, "The offense was carried out especially cruelly and callously in that on September 22, 1982, the victim Toni Rae Mahaffey, who was particularly vulnerable; under the guise of shooting her with heroin, the inmate carried out a plan he formulated with his brother. Robert Basile, petitioner's brother had purchased the $100,000.00 life insurance for the victim and had solicited numerous individuals in order to collect the money. The inmate was convicted of the victim's strangulation death. This offense was carried out in a dispassionate manner. The inmate had previously injected her with heroin. The victim was abused during this offense. Sir, you do have a history of narcotics violations, attempted burglary, and receiving stolen property. You did suffer juvenile time in jail. Your time in prison sir, has been minimal programming." (See Exhibit "A", BPH Decision 8/2/07).

The BPH decision can be read to indicate reliance of the fact that petitioner's crime was first degree with special circumstances (Penal Code 190.2, 190.4) "Especially heinous, atrocious, and cruel" is defined as an element that qualifies a defendant to a life without the possibility of parole or the death penalty, and must be found true by a jury. Yet, petitioner was not convicted of a capital crime. Petitioner was convicted for violating Penal Code 187, first degree murder and sentenced to 25 years to life in state prison with the possibility of parole for his part in the murder of Toni Rae Mahaffey. No enhancements, no special allegations were charged or proven to be true.

**INSERT A**

Petitioner's MEPD (Minimum Eligible Parole Date) is set at 12/09/99. The length of time the petitioner has already served combined with his goodtime/worktime credits already earned puts him beyond the matrix for the gravest first degree murders described in the matrix. (When a person convicted of a second degree murder is being punished as though the crime were first degree murder, then due process requires that the BPH's findings of exceptionality must be based on a comparison to instances of first degree murder. (In re Weider (2006) 145 Cal. App. 4th 570, 582-583.) Same reasoning holds true in the instant case. If petitioner had been found guilty of first degree murder that involved torture of a police officer, he would be eligible for parole after serving 21 years. (See CCR-15 section 2403, category D. IV.) If a comparison to first degree murder was not required in these situations, absurdly, petitioner would be better off if he had been convicted of first degree murder that involved torture, because then there would be no questioning that the same crime facts would have to be examined by the BPH to see if the murder was especially heinous for a first degree with torture, rather than a first degree with no enhancements. More logically, the crime must now be evaluated for exceptionality against the elements of first degree murder with torture.

Petitioner asserts that in this case Commissioner Bryson's conclusion that the victim had been abused would leave a reader of this document with with the impression that the victim was defiled, mutilated, or in some way sexually assaulted giving rise to a finding of unsuitability under CCR Title 15, 2402 (c). In no written manner contained in this record or for that matter, any previous parole consideration hearing, does the record contain any information that the victim was abused in that manner, thus giving rise to a due process violation (See Martin v. Marshall (2006) 431 F. Supp. 2d 1038). Due process violations occur when an inmate has been denied a constitutionally protected interest and the inmate was denied sufficient procedural protections. The BPH's reliance on the victim being abused is an unconstitutional use of an element that was not found to be true to deny parole. (See Apprendi v. New Jersey, 120 S. Crt. 2348, 147 L. Ed.2d 435,). The BPH's exclusive reliance on the severity of the offense to deny parole not only contravenes the discretionary scheme mandated by statutes, but also effectively constitutes an unauthorized resentencing of the defendant. See e.g. Matter of King v. New York State Division of Parole, 190 A.D. 2d 423, 432, 598, New York State 2d 245 [1993].

**INSERT A**

Petitioner requests that this Court take judicial notice of the several other cases currently

pending (Lewis #68038, Jameison #71194, Bragg #108543, and Ngo #127611) which raise

this same issue and in which proof was presented on this same point. (Evidence Code 452

(d).  See specifically, in the habeas corpus context, In re Vargus (2000) 83 Cal. App 4th 1125,

1134-1136, 1143, in which judicial notice was taken of the evidence in four other cases and

in which the court noted:  "Facts from other cases may assist petitioner in establishing a

pattern."  See generally McKell v. Washington Mutual, Inc. (2006) 142 Cal. App. 4th 1457,

1491:  "trial and appellate courts…may properly take judicial notice of…established facts

from both the same case and other cases."  And see AB Group v. Wertin (1997) 59 Cal. App.

4th 1022, 1036:  Judicial notice taken of other cases when matters are "just as relevant to the

present [case] as they are to others.")

Insert B

**THE BPH'S DECISION TO DENY PAROLE FOR THREE YEARS VIOLATED STATE AND FEDERAL DUE PROCESS LAWS IN THAT THE BPH ARBITRARILY AND CAPRICIOUSLY BASED IT'S DECISION ON "NO EVIDENCE" TO HAND DOWN A MULTIPLE YEAR DENIAL, THEREBY ABUSING IT'S DISCRETION IN MAKING PAROLE DECISIONS.**

Petitioner claims that nowhere in the record of the August 2, 2007 parole consideration hearing (See Exhibit A) is there any evidence which justifies the BPH's decision to deny petitioner's parole for three years. In addition, the hearing transcripts fail to provide petitioner with specific written findings stating the reason for a three year denial, thus violating their own regulations. (See Penal Code 3041.5 (b)(2)(A)), and CCR Title 115, Div 2, section 2268 (b); It shall make specific written findings stating the bases for the decision to defer the subsequent suitability hearing for two, three, four, or five years.

   Petitioner has been making significant progress each and every year of his last eighteen years of incarceration. Since petitioner's initial hearing in 1998, the BPH has made program recommendations in which have been equaled or exceeded in every area (See Exhibit B). At petitioner's initial hearing he was denied parole. At his 2002 hearing, petitioner was denied parole for two years as his behavior and self rehabilitation was commended for making significant gains geared toward an eventual finding of suitability. Petitioner's next appearance in front of the BPH was in 2004. At this hearing petitioner was again commended for his outstanding achievements in self-help, his exceptional work performance, and in particular obtaining an Associate in Science Degree. It should be noted that petitioner was not at a prison which had a "free from fees" college program. Not only did petitioner earn his degree academically, he also had to pay for it as if he were a citizen in society.

   The BPH apparently recognized petitioner's efforts at rehabilitation and denied parole for one year    . Petitioner's next appearance in front of the BPH was in 2005. At this hearing the nature of the commitment offense and questions that may never be answered due to

4

Insert B

the complex nature of this case was cited as findings for a one year denial. However, Commissioner Fisher commended petitioner for his efforts in rehabilitating himself in environments that lacked significantly rehabilitative measures. Commissioner Fisher stated in part, "keep up your efforts and you will work yourself out of here". (See Exhibit "B")

With this type of dialogue petitioner finds it unreasonable to think that at his next hearing why he would not be found suitable for parole. Having had two one year denials in a row indicates that the BPH panel is seriously considering suitability. CCR Title 15 Div 2, section 2270 (a) states in part, the hearing panel shall consider the same information considered at the initial parole hearing and any information developed since the last hearing. It points specifically to sections 2402 (c) (1), (A)-(E) through section 2405 (a) 1-9. Petitioner claims no new relevant information is found in the record to indicate such a drastic reversal of fortune. The record indicates that petitioner has maintained consistently his positive program and believes that if the BPH were to follow its own regulations such disparity would not occur. Penal Code section 3041 (a) states in part "The board shall establish criteria for the setting of parole release dates and in doing so shall consider the number of victims of the crime for which the inmate was sentenced and other factors in mitigation or aggravation." "At least one commissioner of the panel shall have been present at the last preceding meeting, unless it is not feasible to do so."

Petitioner claims that mitigating circumstances tending to show suitability were overlooked or ignored by the BPH during its decision making process;

1) Petitioner has no record of assaulting others as a juvenile.

2) He has maintained stable social relationships as indicated by support letters, and chronos that commend him for his positive attitude and relationship with staff and inmates alike.

5

Insert B

3) Petitioner has shown deep remorse for the murder of Toni Rae Mahaffey as demonstrated by self-help chronos which allude to his honesty, openness and willingness to talk about his crime. Additionally, petitioner arranged with lawyers to give the daughter of the decedent $50,000.00 on her eighteenth birthday so as to begin to make amends with his niece. It should also be noted that petitioner, upon the discovery of his brother Robert's death on November 26, 2006, has been maintaining a relationship with his niece in order to restore her to the family her father kept her from. This all came about through a victim/offender dialogue which took place in August 2007, where petitioner sat down with his niece and told her the truth about his role in the death of her mother as well as her father role.

4) The petitioner's motivation for this crime was due to significant stress in his life and in particular, stress brought about by his brother Robert's influence which will never ever occur again.

5) Petitioner lacks any history of violent crime.

6) Petitioner's plans for the future as stated in BPH hearings are realistic and viable.

7) Petitioner's institutional behavior over the last 15 years has been outstanding. Each and every year petitioner has done positive, progressive work in the hopes of demonstrating his insight to the behavior which led to the crime, and preparation in order to live and participate in society as a law abiding citizen.

The BPH, states the purpose of the hearing is to discuss suitability. However, an examination of the record clearly indicates that the primary topic was the offense itself and that the BPH said little if anything as it regards mitigating circumstances. Petitioner's Life Prisoner Evaluation reflected positive programming which included chronos' from his work assignment as a Dental Tech and three work supervisor reports all of which indicated exceptional worker. Petitioner

6

Insert B

received a chrono from his work supervisor for his job as Receiving and Release Sergeant's Clerk

indicating his positive behavior. Petitioner received chrono's from IMPACT program, the Victim

Offender Education Group, and a completion chrono for Anger Management. Petitioner's

Psychological Evaluation dated April 2007 supported parole. (See Exhibit "A" for Life Prisoner

Evaluation/Psychological Evaluation). At the August 2, 2007 hearing Commissioner Bryson

stated, "Sir, you have had minimal programming during your time is prison" (See Exhibit "A" pg 108

BPH transcripts). It is petitioner's contention that to make a finding such as this the BPH abused

its discretion and authority thus violating petitioner's due process rights and liberty interests. In

re Minnis (1972) 7 Cal.3d 639, 645. The California Supreme Court stated, "This court has

traditionally accepted its responsibility to prevent an authority vested with discretion from

implementing a policy which would defeat the legislative motive for enacting a system of laws".

Here, in the instant case, there is no question a determination was made in a manner that showed

clearly how arbitrarily and capriciously the BPH's decision was. By examining the prior record

of BPH decisions (Exhibit "B") of petitioner, and the current recorded decision, there clearly is no

significant change, circumstance or evidence to warrant a three year denial. In re Rutherford

(2006) remedial Plan, Marin CountySuperior Court case number SC135399A, The BPH is

prohibited from using multi-year denials following a one year denial, unless the BPH explains, on

the record, a significant change in circumstances to justify a longer denial.

INSERT C

**THERE IS NOT 'SOME EVIDENCE' OF A NEXUS BETWEEN THE COMMITMENT OFFENSE AND PETITIONER'S PRESENT DANGEROUSNESS. BY THE BPH CONCLUDING IN ITS FINDINGS THAT PETITIONER IS STILL A PRESENT THREAT TO SOCIETY WITHOUT 'SOME EVIDENCE' VIOLATES HIS PROTECTED DUE PROCESS RIGHTS.**

The BPH relied primarily on the exceptional cruelly and callousness of the crime to deny parole. As the decision pages of the parole hearing transcripts reflect, the BPH defined the crime as carried out in an "especially cruelly and callously" manner using the detailed standards and criteria set out in CCR Title 15, section 2402, (c)(1) A-E.  It did not use the crime simply as one of the pieces of reliable information as contemplated in section 2402, (b), where the crime need to be exceptional to be taken into account in the suitability determination.  (See Exhibit "A" page 107).

The BPH described the commitment offense thusly:

   a)   "The commitment offense was carried out in an especially cruelly and callously manner" Sec. 2402 (c)(1))

   b)   "This offense was carried out in a very dispassionate manner" Sec. 2402 (c)(1)(B))

   c)   "This victim was abused" Sec 2402(c)(1)(C)

The BPH describes the details of the crime and takes liberties in distorting facts not in evidence with the intent of portraying petitioner in the worst kind of light.  For instance, Petitioner did not suffer jail time as a juvenile, did not inject the victim previously, and certainly, the record will reflect petitioner has done extremely more than minimal programming during his time in prison.


The BPH than refers to the psychological report, which supports parole, verifiable and realistic residential parole plans; notes the objection of the D.A. and the Sunnyvale PD.  In summary the primary reason for the denial is the exceptional nature of the criminal offense.

8

INSERT C

Whatever else we can take from the seminal cases on point (In re Dannenberg, 34 Cal 4th 1061;

In re Rosenkrantz, 29 Cal. 4th 616), for sure current public safety is the issue and if the

exceptional egregiousness of the crime is cited, the crime factors must exceed the minimum

elements required for a conviction. (See In re Lawrence, 2007 Cal. App. LEXIS 803 (Cal. Ct.

App. 2007).) "Putting together the elements of the California "some evidence" due process test,

the appellate court can uphold the BPH or Governor's denial of parole if there is some evidence

the prisoner's commitment offense was "more violent and vicious than minimally necessary to

convict for that offense 'such that it provides "relevant evidence" that "public safety requires a

lengthier period of incarceration."" In re Lawrence, 2007 Cal. App. LEXIS 803 *41 (Cal. Ct.

App. 2007).

The BPH used Petitioner's crime as the primary reason to deny parole.

Penal Code section 3041 (b) provides in pertinent part: "The panel or the board, sitting en banc,

shall set a release date unless it determines that the gravity of the current convicted offense or

offenses, or the timing and gravity of current or past convicted offense or offenses, is such that

consideration of the public safety requires a more lengthy period of incarceration for this

individual, and that a parole date, therefore, cannot be fixed at this meeting."


And In re Dannenberg, 34 Cal 4th 1061, makes it clear that to comport with Penal Code section

3041 (b), and meet the standards set out in CCR Title 15, section 2402 (c) (1) (A-E), the BPH's

reliance on the gravity of the commitment offense must be based on facts of the crime which are

beyond the minimum elements of the offense. (See In re Dannenberg supra "Here the Board's

conclusion that Dannenberg remains too dangerous for parole because his offense was especially

callous and cruel, and was committed for a trivial reason, relied upon facts beyond the minimum

elements of second degree murder, and was supported by some evidence. The BPH's decision to

deny parole thus comports with the law." In re Dannenberg supra at 1071. But, petitioner argues

that this decision was also based on time served for the commitment offense. That to deny parole

9

based on the nature of the criminal offense maybe justified for a period of time. Johnson v. Finn (E.D. Cal. 2006 WL 195159, which stated at page 8, footnote 3, "the seriousness of the crime had predictive value for the dangerousness of petitioner's release for the first, second and perhaps third suitability hearing. But as the years go by, this factor loses its predictive value in light of the growing experience to the contrary (assuming petitioner's record in prison is exemplary)."

This Court's review of the BPH's decision will inform the Court that there is not "some evidence" that the gravity of Petitioner's commitment offense is such that public safety requires a lengthier period of incarceration. Without evidence of a factual nexus between the commitment offense and a current unreasonable threat to public safety occasioned by Petitioner's release, the decision must fail the Court's review.

The Elements of the Commitment Offense:

There are no elements of the crime that render it exceptional for a first degree murder. The crime was not committed in an "especially heinous, atrocious or cruel manner" by the standards and criteria of section 2402 (c)(1) (A-E)[1]

---

[1]The unconstitutional vagueness of the regulations is raised as ground one of the petition. If the BPH is unable to use the regulations to give proper effect to P.C. 3041 (b), the regulations are vague.as written; if the BPH is simply miss-using the regulations to support a pre-determined decision to deny parole, they are vague as they are being applied. In either case the standards of CCR section 2402, subds. (c)(1)(A-E) are unconstitutionally vague. In Maynard v. Cartwright, 486 U.S. 356, (U.S. 1988) the court inter alia considered a vagueness challenge to the section defining aggravating circumstances for capitol punishment in Oklahoma's death sentence law. The Court's opinion emphasized the limits placed on the adjudicator's discretion. "Claims of vagueness directed at aggravating circumstances defined in capitol punishment statutes are analyzed under the Eighth Amendment and characteristically assert that the challenged provision fails adequately to inform juries what they must find to impose the death penalty and as a result leaves them and the appellate courts with the kind of open-ended discretion which was held invalid in Furman v. Georgia,

INSERT C

Moreover, as difficult as it may well be for the BPH to distinguish between facts which render the crime "exceptional" and those which elevate it to a different, more serious crime; the BPH must make this distinction to give proper effect to its own regulation.

408 U.S. 238, 33L.Ed. 2d 346, 92 S. Ct. 2726 (1972). Furman held that Georgia's then standard-less capital punishment statute was being applied in an arbitrary and capricious manner; there was no principled means provided to distinguish those that received the penalty from those that did not. E.g., id., at 310 (Stewart, J., concurring); id., at 311 (WHITE, J., concurring). Since Furman, our cases have insisted that the channeling and limiting of the sentencer's discretion in imposing the death penalty is a fundamental constitutional requirement for sufficiently minimizing the risk of wholly arbitrary and capricious action. Gregg v. Georgia, 428 U.S. 153, 189, 206-207, 49 L.Ed. 2d 859, 96 S. Ct. 2909 (1976) (opinion of Stewart, Powell, and Stevens, JJ.); id., at 220-222 (White, J. concurring in judgment); Spaziano v. Florida, 468 U.S. 447, 462, 82 L.Ed. 2d 340, 104 S.Ct. 3154 (1984); Lowenfield v. Phelps, 484 U.S. 231, 244, 98 L.Ed. 2d 568, 108 S.Ct. 546 (1988)"(Maynard v. Cartwright, supra at 361-362).

In the case of section 2402, subds. (c)(1), (A-E), the guidance fails to adequately inform the BPH how to determine which crime factors render the crime "exceptional". Additionally, "A challenge to a law restricting personal liberties must be viewed with stringency. Vagueness challenges are considered under varying standards, depending upon the nature of the statute. Statutes which threaten to inhibit freedom of speech or other constitutionally protected rights face a more stringent vagueness test. Village of Hoffman Estates v. Flipside, Hoffman Estates, Inc, 455 U.S. 489, 498 & n. 7, 71 L. Ed. 2d 362, 102 S. Ct. 1186 (1982); Baggett v. Bullitt, 377 U.S. 360, 12 L. Ed. 2d 377, 84 S. Ct. 1316 (1964). Criminal statutes, in general, face a higher vagueness standard than do civil statutes: Hoffman Estates, 455 U.S. at 499, See Winters v. New York, 333 U.S. 507, 515, 92 L. Ed. 840, 68 S. Ct. 665 (1948). Petitioner has a compelling personal liberty interest in parole (McQuillion v. Duncan, 306 F.3d 895) and the regulations give effect to the criminal statute, P.C. section 3041; therefore the Court should review the regulations with stringency.

11

INSERT C

Petitioner was convicted of first degree murder.  However, with time in custody and custody

credits, Petitioner has served sufficient time to put him into the matrix for suggested base

terms for the most serious of first degree murder.  Accordingly for exceptionality Petitioner's

crime must be tested against other first degree murders.  Petitioner requests this court to take

judicial notice of  In re Elkins 50 Cal.Rptr.,3d  (Cal.App. 1 Dist. 2006) and In re Lawrence,

2007 Cal. App. Lexis (Cal Ct. App. 2007).  Both of these cases which were decided in favor

of the petitioner's are very similar to the instant case.  Petitioner's commitment offense can

be argued that it falls below the cruel and callousness manner of either Elkins or Lawrence.

Petitioner also asserts that his institutional rehabilitation equals or exceeds Elkins or

Lawrence.  With these observations petitioner believes the Court will see, that it can only lead

to the conclusion that each decision the BPH makes is totally subjective.  Made arbitrarily

and capriciously with reliance on which BPH panel one draws for their hearing.

<u>"Some Evidence" of a Threat to Public Safety absent</u>

Just as the nature of Lawrence's offense in the matter of In re Lawrence, 2007 Cal.App.

LEXIS 803 (Cal. Ct. App. 2007), "…. Does not supply "some evidence" rationally

demonstrating Lawrence's release would unreasonably endanger public safety". (In re

Lawrence supra *101), and In re Elkins supra, 144Cal. App. 4th pages 496-499. Despite the

violence of the act – striking the victim multiple times with a baseball bat, even coupled with

the robbery motive for the crime, dumping the body down a steep embankment deep into the

wilderness, and then fleeing the state to escape responsibility, the court found this

commitment offense failed to supply "some evidence" Elkin's release posed "an

unreasonable risk of danger to society.  The court then concluded, "Given the lapse of 26

years and the exemplary rehabilitative gains made by Elkins over that time, continued

INSERT C

reliance on these aggravating facts of the crime no longer amount to "some evidence"

supporting denial of parole.  In re Elkins, supra 144 Cal.App. 4th at page 498.  So, too there is

not "some evidence" that rationally demonstrates that Petitioner's crime is such that his

release would unreasonably endanger public safety.  Without such evidence, not in the

abstract but relating to petitioner in particular, the parole denial is improper.  (See In re

Rosenkrantz, 29 Cal. 4th 616 "We have explained that parole release decisions concern an

inmate's anticipation or hope of freedom, and entail the BPH's attempt to predict by

subjective analysis whether the inmate will be able to live in society without committing

more antisocial acts. (Strum, supra, 11 Cal. 3d at pg 266.)


Petitioner has expressed deep and sincere remorse for his crime with a understanding of the

impact his actions had on so many lives.  The Psychological Evaluation (See Exhibit "A" pgs

130 – 133) indicates insight and rehabilitative progress through self-help courses.  It also

rates petitioner as a low risk in all aspects of this diagnosis.  Petitioner has no prior history as

a juvenile or adult indicating assaultive behavior.  He does not have unstable relationships as

he still remains in touch with his previous wife, children, cousins and Chaplin.  Aside from

the CDC-115 Petitioner received in May 1993, he has remained disciplinary free.  Petitioner's

violence potential is estimated to be "low" if paroled to the community.

Petitioner's crime is reprehensible and deserving of the severe sentence which it

generated.  However the sentence includes the possibility of parole.. When Petitioner became

eligible for parole, that crime which justified the sentence could only justify the extra

punishment of a parole denial if, that same crime, alone or with past crimes, is especially

heinous, atrocious or cruel, judged by the standards of the regulation.  (Cal Penal Code 3041

[a] and [b]; Cal. Code of Regs. Title 15 section 2402 [c] [1][A-E].  To lawfully be judged

exceptional, justifying the additional punishment of further custody, that crime with prior

criminal conduct if any, must be indicative of future criminal conduct.

INSERT C

Petitioner has no history of prior violent crimes and his offense itself, evaluated by the criteria and standards set out by law, is not exceptional.

For the reasons set out above and in the memorandum of points and authorities and in petitioner's petition there is not "some evidence" that Petitioner's release at this time would pose an unreasonable risk of danger to society; the determination to the contrary by the BPH was based on unconstitutional vague regulations; and there are no other grounds upon which to lawfully deny Petitioner parole.

14

INSERT D

**THE BPH DENIED PETITIONER DUE PROCESS AND HIS FEDERAL PROTECTED LIBERTY INTEREST RIGHTS BY DENYING PAROLE BASED SOLELY UPON THE COMMITTED OFFENSE AND CONDUCT PRIOR TO  IMPRISONMENT.**

Petitioner states the BPH's sole supportable reliance on the commitment offense, the gravity of the offense, and conduct prior to imprisonment to justify denial of parole can be initially justified as fulfilling the requirements set forth by state law.  Over time however, petitioner continued to demonstrate exemplary behavior and evidence of rehabilitation.  Denying petitioner a parole date simply because of the nature of the crime and prior conduct before his incarceration denies petitioner due process and liberty interest for parole.  "A continued reliance in the future on an unchanging factor, the circumstances of the offense and conduct prior to imprisonment, runs contrary to the rehabilitative goals espoused by the prison system and could result in a due process violation" (Biggs v. Terhune, supra, 334 F.3r pgs 916-917).


Several federal district courts in decisions have considered parole denials at later stages of prisoner's incarceration and applied the standard of review announced in Biggs.  In doing so, those courts frequently have found the nature of the commitment offense alone, no matter how bad the circumstances of that offense, to be less than "some evidence" justifying a denial of parole to the prisoner involved, at least after 15 or more years of incarceration.  "While relying upon petitioner's crime as an indicator of his dangerousness may be reasonable for some period of time, continued reliance on such unchanging circumstances violates due process because petitioner's commitment offense has become such an unreliable predictor of his present and future dangerousness that it does not satisfy the "some evidence" standard.  After nearly 20years of rehabilitation, the ability to predict a prisoner's future dangerousness based simply on the circumstances of his crime is "nil". "Rosenkrantz v. Marshall, supra, 444 F.Supp. 2d at pg 1084.

**INSERT D**

Because Petitioner cannot change the past, denying petitioner parole based solely on the facts surrounding the crime itself effectively changes his sentence from a 25 years to life with the possibility of parole, to life without the possibility of parole. Martin v. Marshall, supra, 431 F. Supp. 2d pg 1086.

Petitioner claims a violation of due process has occurred when the BPH continues to rely on unchanging circumstances as it has for his last two parole consideration hearings. (See Exhibit A pgs 107-110 and Exhibit B pgs 28-31 ) The due process violations cause Petitioner to suffer as he sees the transformation of the commitment offense for which California law provides eligibility for parole turn into a de facto life imprisonment without the possibility of parole as the BPH's continued reliance of the commitment offense, coupled with distorted interpretations of Petitioner's prior criminal history.

There is nothing in the circumstances of Petitioner's crime that is going to change. The circumstances will always be what they were; however, the BPH continues to rely on the commitment offense and prior non-violent criminal history to deny parole. The Petitioner's record shows exemplary behavior and continued progress (See Exhibit B). The BPH willfully ignored these relevant factors of suitability and went so far as to say, "Sir, you have had minimal programming during your time in prison." (See Exhibit A pg 107). This is a deliberate distortion of the record. The BPH goes on to cite its usual boilerplate findings, but fail to cite "some evidence", any evidence, that the release of Petitioner would pose and "unreasonable risk" of danger to public safety. As a result, finding petitioner's murder was committed in an "especially cruelly and callously" manner, only supports a denial of parole to an otherwise suitable inmate.

16

INSERT D

"The commitment offense can negate suitability only if circumstances of the crime reliably established by evidence in the record "rationally indicate" that the offender will present an unreasonable public safety risk if released from prison" In re Scott (2005) 133 Cal App. 4th 573, 595. The fact that Petitioner does not have a violent prior criminal record, or a serial murderer, or sex offender, nor one who murdered for financial gain, but a crime of murder he participated in with his brother Robert during a period of emotional stress in his life not likely to occur again, coupled with the fact Petitioner is approaching 56 years of age, greatly reduces the risk he will pose a danger to public safety if released on parole.

There is a more fundamental problem with the BPH's finding about the nature of petitioner's commitment offense. Let us assume the BPH had "some evidence" sufficient to justify its findings that the murder Petitioner committed was "exceptionally cruelly and callously and in a dispassionate manner." Petitioner believes it would be difficult to find his commitment crime supplies "some evidence" rationally demonstrating he represents an unreasonable danger to the public safety at the present time. That is, how can it be said Petitioners commitment offense is more predictive of future dangerousness than the murders found insufficient for that purpose by appellate courts in In re Smith, In re Scott, In re Lee, In re Weider, In re Elkins, In re Lawrence, or the federal district courts published decisions of Rosenkrantz v. Marshall and Martin v. Marshall.[1]

In those cases, as here, the BPH labeled the murders in similar terms. Nonetheless, state appellate

_____

[1] Petitioner requests that this Court take judicial notice of the following cases which raises the same issue in which proof was presented on this same point. (Evidence Code Sec 452 (d), see specifically in the habeas corpus context.

**INSERT D**

courts or federal district courts found crimes so described as inadequate to provide the sole

primary "some evidence" of present dangerousness some 15 to 20 years later, at least, when in the

meantime, the prisoner had an exemplary record in prison.

In previous denials, the BPH in reviewing the motive for the crime, called it inexplicable or

trivial. This characterization is not supported by "some evidence" in the record. Rather, the only

relevant factor the evidence in the record supports is petitioner's culpability in the commitment

offense was due to stress created by his heroin use, petitioner's wife being eight months pregnant

and separated at this time, the recent attempted burglary charge and the unique dynamics of

petitioner's relationship with his brother Robert. Stress in his life which is unlikely to occur

again. A factor favoring a grant of parole. The BPH sought to diminish the emotional stress

factor by suggesting that, if true, it still does not reduce Petitioner's culpability for the murder.

But this confuses culpability for a past crime with the predictability of future crimes.


There is no doubt petitioner is culpable for the premeditated murder committed over two an a half

decades ago, despite the emotional stress petitioner was experiencing at the time. But whether

the fact petitioner was under a unique level of stress reduces the likelihood he would repeat the

conduct if released from prison 25 years later is a very different question. The appellate courts

found the emotional context of the murders in several of the cases Petitioner requested this Court

to take judicial notice of, especially In re Scott and In re Weider, failed to supply "some

evidence" the perpetrators were presently a danger to the community. Petitioner believes this

Court likewise will find he is no such threat.

18

**INSERT D**

As stated before in this petition, Petitioner has served far beyond the "minimum number of years required by his sentence." At this time petition is eight years beyond his minimum parole eligibility date, and if the BPH's decision were upheld, it would be eleven years past his minimum eligibility date before his next appearance in front of the BPH. Petitioner has a prison record equal to or exceeding a number of prisoners whom the courts warranted released on parole. Petitioner has been disciplinary free for close to 15 years, longer than some who have been granted parole. Petitioner attained an Associate in Science Degree and has four current marketable skills. At age 55, he is older than several of those prisoners who have been granted parole. Accordingly, whether focusing on the nature of the commitment offense or how much time has elapsed since it occurred, Petitioner is at least as deserving of release on parole as the other prisoners mentioned in this petition whose denials of parole were reversed by California state appellate courts or federal district courts during the past few years.

Moreover, in this case proper application of either the California or Federal "some evidence" due process standards requires reversal of the BPH's decision of 2007. That decision is simply not supported by "some evidence" rationally indicating Petitioner; David Michael Basile presently represents an unreasonable risk to public safety if released on parole.

For the reasons set out above in grounds one through four, there is not "some evidence" that Petitioner's release at this time would pose an unreasonable risk of danger to society; the determination to the contrary by the BPH was based on unconstitutional vague regulations; and there are no other grounds upon which to lawfully deny Petitioner parole. Wherefore, Petitioner respectfully submits that this petition should be granted and prays that this Court.

**INSERT D**

Issue an ordering directing the BPH to vacate its determination that petitioner is not suitable to be released at this time.

1) Issue an order directing that the Petitioner be taken back before the BPH for a finding of suitability within 10 days or in the alternative, order the Petitioner released on parole forthwith.

2) Issue an order directing the BPH to vacate its determination that Petitioner is not suitable for parole, and would not likely be found suitable within the next three year period.

3) Grant Petitioner whatever further or alternative relief as may be appropriate in the interest of justice.

I swear under penalty of perjury that the contents of this petition is true of my own knowledge.

Executed on
   Date: October 21, 2007

at San Quentin, Ca.

David Michael Basile

In pro per

20

INTRODUCTION

Petitioner, David Michael Basile was convicted for First Degree murder and sentenced to a term of twenty-five years to life in prison.  On August 2, 2007, Petitioner appeared before the Board of Prison Hearings (BPH) (See Exhibit A).  Petitioner was denied parole for three years because of the commitment offense, although Petitioner had met all the requirements for parole.

# EXHIBIT A

SUBSEQUENT PAROLE CONSIDERATION HEARING

STATE OF CALIFORNIA

BOARD OF PAROLE HEARINGS


In the matter of the Life )
Term Parole Consideration )
Hearing of:               )      CDC Number C-70016
                          )
DAVID BASILE              )
_____)


SAN QUENTIN STATE PRISON

SAN QUENTIN, CALIFORNIA

AUGUST 2, 2007

3:15 P.M


PANEL PRESENT:

Sandra Bryson, Presiding Commissioner
Pat Shields, Deputy Commissioner


OTHERS PRESENT:

David Basile, Inmate
Pat Fox, Attorney for Inmate
Ronald Rico, Deputy District Attorney
(via videoconference)
Correctional Officer(s), Unidentified


CORRECTIONS TO THE DECISION HAVE BEEN MADE

_____    No      See Review of Hearing
_____    Yes     Transcript Memorandum


**GITA SCHMITZ**

**FOOTHILL TRANSCRIPTION COMPANY, INC.**

INDEX

                                                               Page

Proceedings ...............................................  1

Case Factors .............................................  15

Pre-Commitment Factors ...................................  42

Post-Commitment Factors ..................................  53

Parole Plans .............................................  74

Closing Statements .......................................  97

Recess ..................................................  106

Decision ................................................  107

Adjournment .............................................  115

Transcriber Certification ...............................  116

--oOo--

1

**P R O C E E D I N G S**

1

2       **DEPUTY COMMISSIONER SHIELDS:**  We're on the record.

3       **PRESIDING COMMISSIONER BRYSON:**  Thank you, and

4    this is the fourth Subsequent Parole Consideration

5    Hearing for David Basile, CDC No. C, Charles, 70016.

6    Today's date is August 2nd, 2007, and the time is 1515.

7    We're located at San Quentin State Prison.  This inmate

8    was received November 16th of 1984 from Santa Clara

9    County.  The life term began November 16th of 1984 with a

10   minimum eligible parole date of December 2nd, 1999,

11   charging in Case No. 93695, Count One, controlling

12   offense Penal Code 187, Murder 1st, for which the inmate

13   received a term of 25 years to life.  This hearing is

14   being recorded.  For the purpose of voice identification

15   each of us will state our first and last name, spelling

16   the last name.  When it is your turn, sir, after you

17   spell your last name please state your CDC number.  I

18   will start and go to my right.  Sandra Bryson, B-R-Y-S-O-

19   N, Commissioner, Board of Parole Hearings.

20       **DEPUTY COMMISSIONER SHIELDS:**  Pat Shields, S-H-I-

21   E-L-D-S, Deputy Commissioner.

22       **PRESIDING COMMISSIONER BRYSON:**  And Mr. Rico?

23       **DEPUTY DISTRICT ATTORNEY RICO:**  Ronald Rico, R-I-

24   C-O, Deputy District Attorney, Santa Clara County by way

25   of video conference.

2

1        **INMATE BASILE:** David Basile, B as in boy, A-S-I-

2    L-E.  CDC No. is Charlie 70016.

3        **ATTORNEY FOX:** Pat Fox, F-O-X, attorney for Mr.

4    Basile.

5        **PRESIDING COMMISSIONER BRYSON:** And I note for the

6    record we have two correctional peace officers in the

7    room who are here for security purposes.  And sir, I need

8    to swear you in.  Will you raise your right hand please?

9    Do you solemnly swear or affirm that the testimony you

10   give at this hearing be the truth, the whole truth and

11   nothing but the truth?

12       **INMATE BASILE:** Yes, ma'am.

13       **PRESIDING COMMISSIONER BRYSON:** Thank you.

14   Commissioner Shields, is there any confidential material

15   in the file and if so will it be used today?

16       **DEPUTY COMMISSIONER SHIELDS:** The answer to both

17   questions is no.

18       **PRESIDING COMMISSIONER BRYSON:** Thank you, and

19   I've passed the hearing checklist marked Exhibit One to

20   your attorney, sir, to ensure that we're all proceeding

21   with the same set of documents, and Counsel, when you're

22   ready -- I notice you're checking off the documents you

23   do have.  Thank you.  Let me check while you're doing

24   that with the district attorney as to the checklist of

25   documents.  Our versions of that checklist, Mr. Rico,

3

1   show no checkmarks so I'm not sure what you have but you

2   feel you have all the documents?

3         **DEPUTY DISTRICT ATTORNEY RICO:**  I have a checklist

4   that is marked Subsequent Hearing and as you point out

5   none of the other boxes are checked.  At the bottom it

6   says Basile, D. with a CDC No. 70016, Institution SQ, and

7   I hope I have all of the documents.  It's been my

8   experience recently with San Quentin that one never

9   knows.  So I'm prepared to proceed and we'll deal with

10  whatever happens as it happens.

11        **PRESIDING COMMISSIONER BRYSON:**  Thank you.  And

12  when you're ready, Counsel, I'll be asking you do you

13  have all the documents.

14        **ATTORNEY FOX:**  Yes, I do have the documents.  I

15  checked -- although we did get served with the

16  psychological evaluation today I did have that on there.

17        **PRESIDING COMMISSIONER BRYSON:**  Oh, you did? All

18  right.  All right.  Well, we have not so (inaudible)

19  today.  Are there any additional documents to be

20  submitted?

21        **ATTORNEY FOX:**  Yes.  One to begin -- well, two

22  actually.  I believe the others are in the file but we

23  would reserve the right to submit additional

24  documentation if it becomes necessary during the course

25  of the hearing.

4

1          **PRESIDING COMMISSIONER BRYSON:**  Certainly.

2          **ATTORNEY FOX:**  Thank you.

3          **DEPUTY DISTRICT ATTORNEY RICO:**  Commissioner

4     Bryson?

5          **PRESIDING COMMISSIONER BRYSON:**  Yes, go ahead.

6          **DEPUTY DISTRICT ATTORNEY RICO:**  Also just for

7     informational purposes by -- with cover letter of January

8     3rd, 2007 our office submitted three copies of material

9     including coroner's investigation report, autopsy report,

10    death certificate, crime scene diagram, three photographs

11    of the victim in life, four crime scene photographs, and

12    four autopsy photographs.  So I don't know if that is

13    received and incorporated in that or not, but they were

14    submitted last January.

15         **ATTORNEY FOX:**  Some of the material does appear in

16    the sluff packets behind legal documents.

17         **PRESIDING COMMISSIONER BRYSON:**  Right.  Yeah, it

18    appears we do have at least some of those documents.  I'm

19    not seeing any photographs per se.  I'm seeing a diagram

20    of the crime scene.

21         **FEMALE:**  (Inaudible)

22         **DEPUTY DISTRICT ATTORNEY RICO:**  It may be that the

23    institution keeps a separate sluff file for any

24    photographs or anything like that so may be --

25         **PRESIDING COMMISSIONER BRYSON:**  Right, and --

5

1          **DEPUTY DISTRICT ATTORNEY RICO:**  -- somewhere

2    around there.

3          **PRESIDING COMMISSIONER BRYSON:**  Right, and we'll

4    be checking on that.

5          **DEPUTY COMMISSIONER SHIELDS:**  We do have those I

6    believe in his C-File.

7          **PRESIDING COMMISSIONER BRYSON:**  Okay.  I didn't

8    see that.  Okay.  Thanks, Ron.

9          **DEPUTY DISTRICT ATTORNEY RICO:**  All right.  Thank

10    you.

11          **PRESIDING COMMISSIONER BRYSON:**  Uh-huh.

12          **DEPUTY COMMISSIONER SHIELDS:**  (Inaudible) let me

13    say we have the envelopes.  I did not actually look at

14    the documents.

15          **PRESIDING COMMISSIONER BRYSON:**  In the envelopes?

16    Are you referring to these documents?

17          **DEPUTY COMMISSIONER SHIELDS:**  No, in the C-File.

18          **PRESIDING COMMISSIONER BRYSON:**  In the C-File

19.    itself?

20          **DEPUTY COMMISSIONER SHIELDS:**  Right.  There are --

21          **PRESIDING COMMISSIONER BRYSON:**  Well, maybe we --

22    we'll look into this a little bit later and --

23          **DEPUTY COMMISSIONER SHIELDS:**  Okay.

24          **PRESIDING COMMISSIONER BRYSON:**  All right?  Thank

25    you.  And sir, would you please read the document, ADA

6

1    statement, in front of you out loud?

2        **INMATE BASILE:**

3        "The Americans with Disabilities Act ADA is

4        a law to help people with disabilities.

5        Disabilities are problems that make it

6        harder for some people to see, hear,

7        breathe, talk, walk, learn, think, work, or

8        take care of themselves than it is for

9        others.  Nobody can be kept out of public

10       places or activities because of a

11       disability.  If you have a disability you

12       have the right to ask for help to get ready

13       for your BPT hearing, get to the hearing,

14       talk, read forms and papers, and understand

15       the hearing process.  BPT will look at what

16       you asked for to make sure that you have a

17       disability that is covered by the ADA and

18       that you have asked for the right kind of

19       help.  If you do not get help or if you

20       don't think you got the help -- the kind of

21       help you need ask for a BPT 1074 Grievance

22       Form.  You can also get help to fill it

23       out."

24       **PRESIDING COMMISSIONER BRYSON:**  Thank you.  Do you

25   understand what you read, sir?

7

1          **INMATE BASILE:**  Oh, yes, ma'am.

2          **PRESIDING COMMISSIONER BRYSON:**  All right.  Sir,

3     the record reflects that on March 20th of 2007 you signed

4     BPT Form 1073, the reasonable accommodation notice and

5     request in accordance with the provisions of the

6     Americans with Disabilities Act disabilities defined

7     under the ADA, and that shows that you have no

8     disabilities identified in the final review.  You have a

9     reading level of 12.9 and you have -- it's difficult to

10    read but it looks as though you have an AA degree.  Is

11    that correct, sir?

12         **INMATE BASILE:**  An Associate in Science degree,

13    yes, ma'am.

14         **PRESIDING COMMISSIONER BRYSON:**  AS degree.  Then

15    that must be what that is.  It's in the (inaudible).  All

16    right.  Sir, you are wearing glasses.  Do they

17    accommodate you for your reading and seeing?

18         **INMATE BASILE:**  Yes, ma'am.  Corrective vision.

19         **PRESIDING COMMISSIONER BRYSON:**  All right.  You

20    also don't appear to have any hearing difficulties.  Is

21    that correct?

22         **INMATE BASILE:**  That's correct.

23         **PRESIDING COMMISSIONER BRYSON:**  All right.  You

24    also don't appear to have any mobility issues getting to

25    hearing, and is that correct?

8

1          INMATE BASILE:  No mobility.

2          PRESIDING COMMISSIONER BRYSON:  All right.  All

3     right.  Thank you.  And have you ever been involved in

4     the Triple CMS or EOP programs?

5          INMATE BASILE:  No, ma'am.

6          PRESIDING COMMISSIONER BRYSON:  Have you ever

7     taken psychotropic medication either in prison or on the

8     streets?

9          INMATE BASILE:  No, ma'am.

10         PRESIDING COMMISSIONER BRYSON:  All right.  Do you

11    suffer from any disability you think might prevent you

12    from participating in today's hearing?

13         INMATE BASILE:  No.

14         PRESIDING COMMISSIONER BRYSON:  All right.  And

15    Counsel, do you concur?

16         ATTORNEY FOX:  Yes, I do.  Thank you.

17         PRESIDING COMMISSIONER BRYSON:  All right.  This

18    hearing is being conducted pursuant to Penal Code

19    Sections 3041 and 3042 and the rules and regulations of

20    the Board of Parole Hearings governing parole

21    consideration hearings for life inmates.  The purpose of

22    today's hearing is to consider your suitability for

23    parole.  In doing so the Panel will consider the number

24    and nature of the crimes for which you were committed,

25    your prior criminal and social history, your behavior and

9

1   programming since your commitment.  The Panel has had the

2   opportunity to review your Central File.  You will be

3   given the opportunity to correct or clarify the record.

4   The Panel will consider your progress since your

5   commitment, your counselor's report, psychological

6   report, and any other relevant information.  Any change

7   in parole plans should be brought to the Panel's

8   attention.  The Panel will reach a decision today and

9   inform you whether or not it finds you suitable for

10  parole and the reasons for its decision.  If you're found

11  suitable for parole the length of your confinement will

12  be explained to you.  Nothing that happens here today

13  will change the findings of the court.  The Panel is not

14  here to retry your case.  The Panel is here for the sole

15  purpose of determining your suitability for parole.  Do

16  you understand?

17          **INMATE BASILE:**  Yes, ma'am.

18          **PRESIDING COMMISSIONER BRYSON:**  This hearing will

19  be conducted in three phases.  I will discuss with you

20  the crimes for which you were committed, your prior

21  criminal and social history.  Commissioner Shields will

22  discuss with you your progress since your commitment,

23  your counselor's report and your psychological

24  evaluation.  I will then discuss with you your parole

25  plans and any letters of support or opposition that may

1    be in the file.  Once that is concluded the Panel, then

2    the district attorney/and then you will be given --

3    excuse me, then your attorney will be given the

4    opportunity to ask you questions.  Questions from the

5    district attorney shall be asked through the Chair and

6    you should direct your answers to the Panel.  Next, the

7    district attorney and then your attorney and then you

8    will be given an opportunity to make a final statement

9    regarding your parole suitability.  Your statement should

10   address why you feel you are suitable for parole.  The

11   Panel will then recess, clear the room and deliberate.

12   Once the deliberations are complete, the Panel will

13   resume the hearing and announce the decision.  The

14   California Code of Regulations states that regardless of

15   time served a life inmate shall be found unsuitable for

16   and denied parole if in the judgment of the Panel the

17   inmate would pose an unreasonable risk of danger to

18   society if released from prison.  You have certain

19   rights.  Those rights include the right to a timely

20   notice of his hearing.  Were you given timely notice of

21   this hearing, sir?

22        **INMATE BASILE:**  Yes, ma'am.

23        **PRESIDING COMMISSIONER BRYSON:**  And I believe your

24   attorney wishes to address the other issue of notice.

25        **ATTORNEY FOX:**  Yes, I do.  We were given timely

11

1    notice of the hearing and served with documents.

2    However, pursuant to Penal Code Section 3042A notices are

3    required to be sent to his file where indicates [sic] and

4    that did not happen in this case.  We are willing to

5    waive that irregularity today.

6         **PRESIDING COMMISSIONER BRYSON:**  Thank you, and

7    sir, we have discussed this with the head of records here

8    at San Quentin and they have acknowledged that in fact

9    they basically did drop the ball.  This was a notice that

10   should have gone out and they've apologized to me and I'm

11   expressing my apology to you from the California

12   Department of Corrections.

13        **INMATE BASILE:**  Apology accepted.

14        **PRESIDING COMMISSIONER BRYSON:**  All right.  You

15   also have the right to present relevant documents which

16   we will be doing at this hearing.  You also have the

17   right to be heard by an impartial Panel.  Do you have any

18   evidence that the Panel before you cannot be impartial on

19   your behalf today?

20        **INMATE BASILE:**  No.  No, I don't have any.

21        **PRESIDING COMMISSIONER BRYSON:**  Thank you.  All

22   right.  You'll receive a copy of the Panel's written

23   tentative decision today.  That decision will become

24   effective within 120 days.  It is also subject to review

25   by the governor.  A copy of the tentative decision and a

12

1    copy of the transcript will be sent to you.   The Board

2    has eliminated its appeal process.   If you disagree with

3    anything in today's hearing you have the right to go

4    directly to the court with your complaint.   You're not

5    required to admit your offense or discuss your offense if

6    you do not wish to do so.   However, this Panel does

7    accept as true the findings of the court and you're

8    invited to discuss the facts and circumstances

9    (inaudible) if you decide.   The Board will review and

10    consider any prior statements you have made regarding the

11    offense in determining your suitability for parole so

12    it's very simple.   Just tell the truth.

13         **INMATE BASILE:**  Yes.

14         **PRESIDING COMMISSIONER BRYSON:**  Are there any

15    preliminary objections, Counsel?

16         **ATTORNEY FOX:**  No, thank you.

17         **PRESIDING COMMISSIONER BRYSON:**  All right.  Will

18    the inmate be speaking with the Panel today?

19         **ATTORNEY FOX:**  Yes, he will as to all aspects.

20         **PRESIDING COMMISSIONER BRYSON:**  All right.  At

21    this time I'm going to incorporate by reference the

22    account of the crime as to the offense, which is given in

23    the most current Board report which we have which is the

24    January 2007 Board report.

25         **ATTORNEY FOX:**  Normally I object to statements of

13

1   fact that are derived solely from the probation officer's

2   report and that appears to be where that came from.  His

3   case did go by way of jury trial so there should be an

4   Appellate transcript.

5         **PRESIDING COMMISSIONER BRYSON:**  I don't believe

6   there is.

7         **ATTORNEY FOX:**  We don't have it in our slow

8   packet.

9         **PRESIDING COMMISSIONER BRYSON:**  No, we don't.  All

10  right.

11        **DEPUTY COMMISSIONER SHIELDS:**  This is where the

12  Deputy Commissioner kicks in.

13        **PRESIDING COMMISSIONER BRYSON:**  And for the record

14  the Deputy Commissioner is looking for the Appellate

15  decision in the C-File.

16        **ATTORNEY FOX:**  I'm advised by Mr. Basile that he

17  would commit (phonetic) the statement of facts.

18  (Inaudible) in the most current life prisoner evaluation

19  report to be used as long as his statement is also

20  included.

21        **PRESIDING COMMISSIONER BRYSON:**  We will do that

22  and then we will also --

23        **DEPUTY COMMISSIONER SHIELDS:**  Continue to look.

24        **PRESIDING COMMISSIONER BRYSON:**  Yes.  But let me

25  say too that we would like to hear his version today and

14

1   so we'll give you an opportunity, sir, to discuss that in

2   detail.  Let me note for the record that this -- I

3   incorporated at this moment from the January 2007 Board

4   report prepared by L. J. Tafoya.

5           **DEPUTY COMMISSIONER SHIELDS:**  Commissioner, let me

6   --

7           **PRESIDING COMMISSIONER BRYSON:**  Just one moment --

8           **DEPUTY COMMISSIONER SHIELDS:**  -- interrupt to say

9   --

10          **PRESIDING COMMISSIONER BRYSON:**  Just one moment.

11  This is L. J. Tafoya, T-A-F-O-Y-A, correctional counselor

12  one.  All right.  Go ahead.

13          **DEPUTY COMMISSIONER SHIELDS:**  I wonder if I found

14  the transcripts and you (inaudible) did you want to use

15  the Appellate Court decision?

16          **PRESIDING COMMISSIONER BRYSON:**  This is something

17  else.

18          **DEPUTY COMMISSIONER SHIELDS:**  Oh, okay.

19          **PRESIDING COMMISSIONER BRYSON:**  This is not --

20  it's another action.

21          **DEPUTY COMMISSIONER SHIELDS:**  Then I'd suggest why

22  don't you just proceed on the --

23          **PRESIDING COMMISSIONER BRYSON:**  (Inaudible) that

24  sound fine?

25          **DEPUTY COMMISSIONER SHIELDS:**  Okay.

15

1      **PRESIDING COMMISSIONER BRYSON:** If we discover the

2  Appellate decision we will be looking at that decision as

3  our reference for fact during deliberation. All right.

4      **ATTORNEY FOX:** Thank you.

5      **PRESIDING COMMISSIONER BRYSON:** Certainly. And

6  sir, it would be helpful -- although I know it's painful

7  for you but it would be helpful if you would walk us

8  through your version of what happened. First of all, how

9  did you come to be involved in this crime in the first

10  place?

11      **INMATE BASILE:** In August about a month prior I

12  discovered that my brother had called a friend of mine

13  and offered him $10,000 to kill Toni McCaffey (phonetic).

14  On this information I contacted my brother and told him

15  that he was nuts -- he was crazy. Just doesn't make any

16  sense. A period of 30 days had passed and there wasn't

17  much discussion about it. When I found myself an active

18  participant it was due to me getting arrested for an

19  attempted burglary charge in Sunnyvale. I found myself

20  in the county jail and at that time in my life it was

21  five years of methadone maintenance and about six months

22  of --

23      **PRESIDING COMMISSIONER BRYSON:** Excuse me. Five

24  years on methadone maintenance?

25      **INMATE BASILE:** Yes.

16

1          **PRESIDING COMMISSIONER BRYSON:**  All right.

2          **INMATE BASILE:**  And about six months of using

3     heroin.  When I got into the county jail I was going

4     through withdrawals and all -- my father had (inaudible)

5     this pizzeria and --

6          **DEPUTY DISTRICT ATTORNEY RICO:**  I'm sorry,

7     Commissioner.

8          **PRESIDING COMMISSIONER BRYSON:**  Yes?

9          **DEPUTY DISTRICT ATTORNEY RICO:**  The volume

10    dropped.  I'm wondering if a microphone got covered or

11    something.

12         **PRESIDING COMMISSIONER BRYSON:**  Actually, his

13    microphone is not ours.  Ours are for the actual

14    recording.  This is the microphone that --

15         **ATTORNEY FOX:**  I'm sorry.  I --

16         **PRESIDING COMMISSIONER BRYSON:**  Well, I didn't see

17    your papers on that but --

18         **FEMALE:**  That better, Ron?

19         **PRESIDING COMMISSIONER BRYSON:**  Can you hear us

20    now, Mr. Rico?

21         **DEPUTY DISTRICT ATTORNEY RICO:**  The voices fade

22    for some reason on it.  But anyway I don't know if

23    there's a way to adjust it -- probably not.  Let's try.

24         **INMATE BASILE:**  Okay.  I called my father in the

25    attempts of being bailed.  My brother Bob answered the

17

1    phone, informed me that my father is on vacation -- will

2    not be back.  I explained to him what the problem is and

3    he told me, "If you want me to bail out -- bail you out

4    you'll have to help me kill Toni."  This conversation

5    took about ten -- fifteen minutes going back and forth --

6    back and forth -- saying I won't do it, I'm not going to

7    do it -- just bail me out. Finally I made up my mind to

8    tell him anything just to bail me out, thinking that once

9    I was out what would it matter.  The next two days

10   (inaudible) on Saturday I had to go back to his

11   apartment, borrow some money so I could get my car out of

12   the impound and he says, "Man, we got to do this -- we

13   got to do this."  And I said, "Oh, come one.  There's got

14   to be another way."  And he says, "No, just --

15            **PRESIDING COMMISSIONER BRYSON:**  Why did he want to

16   -- was this an insurance policy deal?

17            **INMATE BASILE:**  No, ma'am.  Although insurance was

18   a factor in the trial I had no idea that Bob had

19   purchased an insurance policy and he didn't purchase the

20   insurance policy until 4 o'clock the day of the murder

21   and it wasn't that he went out and did it.  The insurance

22   agent who was in the mall where the pizza shop is came in

23   to the pizza shop and Bob initiated a contract at that

24   time.

25            **PRESIDING COMMISSIONER BRYSON:**  All right.  Let's

18

1    back up to where we were then.  Why did he want you to

2    kill her?

3        INMATE BASILE:  Well, the reason didn't come clear

4    to me for 17 years.  Bob put a lot of stuff out on the

5    street.  He was saying that Toni was telling the police

6    of the burglary activities that Gary Nix and me were

7    involved in.

8        PRESIDING COMMISSIONER BRYSON:  What did he tell

9    you as the reason that he wanted you to do this?

10       INMATE BASILE:  That he had to get rid of her.  He

11   didn't --

12       PRESIDING COMMISSIONER BRYSON:  Why?

13       INMATE BASILE:  He didn't give me a affirmative

14   reason.  Everything that he was saying to me was -- this

15   just can't be true because it just didn't make sense.  It

16   doesn't make sense -- how could it be true.  I didn't

17   logically conclude a reasonable response from him.

18       PRESIDING COMMISSIONER BRYSON:  (Inaudible) sir,

19   didn't you ask him -- if he said, "I want you to kill

20   Toni" why didn't you say why?

21       INMATE BASILE:  Well, of course I did, ma'am, but

22   --

23       PRESIDING COMMISSIONER BRYSON:  And what was his

24   response?

25       INMATE BASILE:  "I just got to get rid of her.  I

19

1    got to get rid of her."

2          **PRESIDING COMMISSIONER BRYSON:**  And you accepted

3    that?

4          **INMATE BASILE:**  I didn't accept none of it, but

5    due to the dynamics of my brother and my relationship,

6    okay?  And which I will allude to later I felt that I had

7    to and to follow through because he bailed me out and now

8    I find myself in this position and I can't shake him.

9    And I tried.  I tried to not -- everything I possibly

10   could do to not get involved in this.  And I ran from him

11   for the rest of Saturday and Sunday and Monday.  Then on

12   Tuesday, September 22nd he called me up.  I was at home

13   and it was at 6:30 and he says, "Come on over to the

14   pizza parlor."  I went over and picked up two pizzas that

15   were made that were not delivered and he says, "We got to

16   do it tonight."  Now, I had no idea that two and a half

17   hours previously he had talked to anybody regarding

18   insurance.  Wasn't even part of any conversation we ever

19   had, and I said, "Bob, look.  I am not going to go over

20   there, you know, unless you're there" and so we agreed.

21   We agreed to go over.  I got there about quarter to 8:00

22   and Bob came in about ten after 8:00 and --

23          **PRESIDING COMMISSIONER BRYSON:**  And this is where

24   Toni was?

25          **INMATE BASILE:**  This was in the apartment on

20

1   Kingfisher, yes, ma'am.

2        PRESIDING COMMISSIONER BRYSON:  Okay.  And the --

3   there was a little child involved too -- in the

4   apartment.  Is that correct?

5        INMATE BASILE:  Michaela was in the apartment and

6   she was in a bedroom that was adjacent to the living room

7   and we were in the dining room at the time so I didn't

8   even see her -- not while I was there.  She was asleep.

9        PRESIDING COMMISSIONER BRYSON:  Was anybody else

10  in the entire apartment then or just you and --

11       INMATE BASILE:  It was just me and Toni --

12       PRESIDING COMMISSIONER BRYSON:  And then the

13  daughter?

14       INMATE BASILE:  And Michaela at -- when I got

15  there.

16       PRESIDING COMMISSIONER BRYSON:  Right.  Okay.

17       INMATE BASILE:  But Bob came in about ten --

18  fifteen minutes after I arrived and during the fifteen

19  minutes that I was there with Toni I had some heroin

20  (inaudible) and we did some.  There's been -- we did

21  some.  I did probably 90 percent of it and I gave Toni

22  about ten percent of it.  When Bob came in he stood in

23  the doorway, he walked in and he motioned to me -- just

24  motioned to me with his eyes like, you know, do it and,

25  you know, just making these facial expressions like let's

21

1    do this.  And I went up behind Toni, put my arm around

2    her and began to choke her and when I got her to the

3    floor I let up.  I stopped.  And I told him, "I'm not

4    doing this" and I left Toni in the kitchen -- partially

5    in the kitchen and in the dining room and I walked out

6    the door and left Bob in the apartment with Toni and

7    Michaela at that time.

8        **PRESIDING COMMISSIONER BRYSON:**  Is that the last

9    time you saw Toni?

10       **INMATE BASILE:**  Was the last time I saw Toni

11   (inaudible)

12       **PRESIDING COMMISSIONER BRYSON:**  Was she dead?  Did

13   you kill her?

14       **INMATE BASILE:**  No.  When I --

15       **PRESIDING COMMISSIONER BRYSON:**  How do you know

16   you didn't?

17       **INMATE BASILE:**  Because when I took my arm off of

18   her throat she gasped like that.

19       **PRESIDING COMMISSIONER BRYSON:**  Are you an expert

20   in strangling people?

21       **INMATE BASILE:**  Absolutely not.

22       **PRESIDING COMMISSIONER BRYSON:**  So do you have any

23   idea whether that could have been some sort of

24   physiological reaction where she might have already died

25   anyway?  Is that a possibility?

22

1      **INMATE BASILE:**  I would say not and upon viewing

2    the position of where Toni was at and how Toni ended up I

3    would say certainly not.

4      **PRESIDING COMMISSIONER BRYSON:**  So you have no

5    idea how the -- some sort of scarf got around her neck --

6    is that correct?

7      **INMATE BASILE:**  I know that my brother had -- it's

8    like a stand -- not a coat stand -- well, it could be a

9    coat stand in his bedroom and on that stand there were

10    several bandanas and it does not seem unreasonable to

11    think that Bob tied the bandana around her neck and left

12    her in the dining room -- or excuse me, the living room.

13      **PRESIDING COMMISSIONER BRYSON:**  When you went

14    outside then did you leave at that time?

15      **INMATE BASILE:**  Yes, ma'am.  And where I was

16    living was in the apartment complex right next door that

17    was adjacent so you had my apartment, my brother's

18    apartment, and the pizza parlor all within the same

19    confined area, and I went back home.  At 9 o'clock I went

20    back to the pizza parlor and Bob was back in the pizza

21    parlor.

22      **PRESIDING COMMISSIONER BRYSON:**  Did you talk to

23    him?

24      **INMATE BASILE:**  Yes.  I asked him for $20 and he

25    told me at that point Toni was dead.

23

1        **PRESIDING COMMISSIONER BRYSON:**  Why did you want

2     $20?

3        **INMATE BASILE:**  So I could go get some heroin.

4        **PRESIDING COMMISSIONER BRYSON:**  What was your

5     reaction when he told you she was dead?  What did you do?

6        **INMATE BASILE:**  Well, I got the $20 and I went and

7     I got some dope and I went over to a man named Robert

8     Johanson's house and I told him that Toni was dead and I

9     need some dope and I shot some dope and I got pretty

10    numb.  It wasn't until about two days later when I really

11    felt the impact of what had happened.  I had to go down

12    to LA to pick up my mom and drive my mom back up to San

13    Jose and that was the most excruciating seven and a half

14    hour drive in my life.

15       **PRESIDING COMMISSIONER BRYSON:**  Why was that?

16       **INMATE BASILE:**  Well, because I knew what was

17    happening.  I knew what had happened and in her mind she

18    perceived somebody else had come in and did this to Toni

19    and I let the lie go on.

20       **PRESIDING COMMISSIONER BRYSON:**  So you were

21    actually picking her up and bringing her back for

22    services for --

23       **INMATE BASILE:**  I was bringing her back because

24    the whole family got together at my aunt's house who

25    lived in Los Gatos, and everybody was there and

24

1   discussing the situation and the circumstances and what

2   possibly could have happened, and I think Bob was

3   arrested three days after the event and then the family

4   rallied around him to support him.  It was awful knowing

5   the truth and having to kind of go along with the whole

6   lie to every member of my family.

7        PRESIDING COMMISSIONER BRYSON:  Okay.  So both you

8   and Bob were lying to the family.  Is that the way it was

9   presented?

10       INMATE BASILE:  I didn't have any contact with

11  Bob.  I don't know what he was saying.  After it happened

12  I didn't see Bob for a long, long time.

13       PRESIDING COMMISSIONER BRYSON:  So he didn't come

14  to this -- where the family gathered around?  He didn't -

15  - he wasn't there?

16       INMATE BASILE:  No.  He -- on the following

17  Wednesday he went back and opened up the pizza parlor

18  like nothing had happened, and I remember I flew down to

19  LA and then drove my mom back up to her sister's house

20  and there was discussion, you know, how could this happen

21  -- who could be involved, et cetera, et cetera.  Bob

22  wasn't with us during that time and it's just a long time

23  ago.

24       PRESIDING COMMISSIONER BRYSON:  But you played the

25  role and represented it like oh, dear, somebody must have

25

1    broken in and or something like that or what did you tell

2    your mother, or her mother?

3         **INMATE BASILE:**  This was our mother.

4         **PRESIDING COMMISSIONER BRYSON:**  Yes.

5         **INMATE BASILE:**  I told her I didn't know what

6    happened.  I said that Bob called me at 4 o'clock in the

7    morning.  He says that she was at Sunnyvale Police

8    Department and that his house had been -- was taped off

9    or whatever and could he spend the night with me.  He

10   came over about 4:30, got up at about 7:00, 7:30 and went

11   over to the pizza parlor, and I didn't see him again

12   until, I don't know, months -- nine or ten months.

13        **PRESIDING COMMISSIONER BRYSON:**  And so after this

14   family get-together then what happened (inaudible) your

15   perspective what was happening to you?

16        **INMATE BASILE:**  Oh, God.  Well, I hung out at

17   Robert Johanson's house and that was kind of like the

18   meeting area of (inaudible) Incorporated, if you will.  I

19   mean, every derelict and scandalous person do their thing

20   and hang out over at his house, and it was common

21   knowledge that, you know, what had happened to Toni

22   through the newspaper clippings and plus what I had to

23   say they would ask me do you know who did it and I'd say

24   I have no idea -- I have no idea and Bob of course was in

25   jail with no bail (inaudible) and I had my own problems

26

1    with this attempted burglary, which I was still, you

2    know, in the judicial system with that.  Not certain as

3    to what was going to happen there.  And there wasn't much

4    contact with my family.

5         **PRESIDING COMMISSIONER BRYSON:**  Were you working,

6    sir, at this time?

7         **INMATE BASILE:**  Yes.

8         **PRESIDING COMMISSIONER BRYSON:**  What were you

9    doing?

10        **INMATE BASILE:**  At that time I was working at

11   either L & M Vending or the Galactican Arcade, one of

12   those two.  I know that I had been working continually

13   since '77.

14        **PRESIDING COMMISSIONER BRYSON:**  What were you

15   doing (inaudible) happened?

16        **INMATE BASILE:**  Pardon me?

17        **PRESIDING COMMISSIONER BRYSON:**  What were you

18   doing for the (inaudible)

19        **INMATE BASILE:**  For L & M Vending I was fixing,

20   repairing, and placing food products in vending machines

21   like they have in companies in Silicon Valley in the

22   lunch rooms and things like that.  And for the Galactican

23   Arcade I was doing technical work -- electronical work on

24   their equipment there as well as running the (inaudible)

25   table.

27

1  **PRESIDING COMMISSIONER BRYSON:**  How did you do all
2 this as a heroin addict?
3  **INMATE BASILE:**  It was like living a couple of
4 different lives.  It wasn't easy.  Methadone was pretty
5 much a stabilizing force in my life when I held my job at
6 Syntex Pharmaceuticals but when I got married this is
7 where the problem started.  I didn't want to have that
8 ball and chain around my ankle.  I went to her parents'
9 house in Fresno and methadone would wear off and I'd
10 start getting sick and I went back to the clinic and told
11 them, you know, could you cut my dose, take me off -- I
12 want to get off of this and I did it at such accelerated
13 pace that I just became sick and I couldn't get back in
14 the program so I started using heroin.  That's how that
15 little event happened and wasn't until later that I
16 realized it takes like six to seven weeks to get that
17 stuff out of your system and you go through a lot of, you
18 know, discomfort.  And in my mind it's an amplified, you
19 know, it's magnified and, you know, kind of forced me out
20 the door to get involved in doing burglaries to support
21 this habit.
22  **PRESIDING COMMISSIONER BRYSON:**  Did you do
23 burglaries that you didn't get convicted of?
24  **INMATE BASILE:**  Yes, ma'am.
25  **PRESIDING COMMISSIONER BRYSON:**  To support your

28

1    habit?

2            INMATE BASILE:  Yes, ma'am.

3            PRESIDING COMMISSIONER BRYSON:  What kind of

4    assistance do you get from a methadone clinic?  They

5    didn't advise you what was going on with you

6    physiologically or what to expect and --

7            INMATE BASILE:  No, ma'am.  It was like when I got

8    into the program I really wasn't hooked and I did it more

9    or less so that I wouldn't be (inaudible) to (inaudible)

10   so I didn't understand why.  I didn't understand the

11   whys of gravitating to heroin at that time, and being

12   maintained on it it was really good.  I mean, I didn't do

13   nothing wrong.  I worked, I did was I was supposed to do,

14   I socialized -- really strengthened relationship with my

15   older brother Lou.  I had the respect of my mom and my

16   father and when I met Maria things kind of took a

17   different turn and I wanted to get off it because I

18   wanted to live a normal life but I had no idea and the

19   clinic didn't offer me any advice on what it would be

20   like to get off of methadone and I just kind of manned up

21   and did it and fell flat on my face -- found myself in

22   the worst mess I've ever been in my life.

23           PRESIDING COMMISSIONER BRYSON:  Okay.  So there

24   you are trying to maintain out there, and what happened?

25           INMATE BASILE:  Well, I went to -- let's see here

29

1       -- think it was April or May was when I had to go down to
2       the probation office and initially write out a statement
3       of fact of what I did on that day that I got arrested,
4       and I was told that to go in and plead guilty we wouldn't
5       do any more than 18 months in state prison.  And I agreed
6       to it.  Gary Nix, who was my codefendant -- I wanted to
7       fight it actually and he says, "Dave, let's do this --
8       you know, I've got a baby on the way" and that's fine --
9       let's do it.
10          PRESIDING COMMISSIONER BRYSON:  Excuse me, sir,
11      but did you do the burglary?
12          INMATE BASILE:  We never burglarized.  I mean, we
13      did the attempt.
14          PRESIDING COMMISSIONER BRYSON:  You did the
15      attempt.  Oh, I see.
16          INMATE BASILE:  Yeah.  We never burglarized
17      anybody that day.  We just happened to jump over -- how
18      did it go -- I think we knocked on the door, nobody
19      answered, making the assumption that nobody was home.
20      Went around the block, jumped over the fence --
21          PRESIDING COMMISSIONER BRYSON:  Jumped over the
22      fence right there as --
23          INMATE BASILE:  Reached for the door handle and
24      the screen comes slamming shut and we jumped back over
25      the wall and there was a police car sitting right there.

30

1        PRESIDING COMMISSIONER BRYSON:  Well, what do you

2    know?  Okay.  So what were you going to fight?  That was

3    a burglary by definition.

4        INMATE BASILE:  That was -- well, you know, you

5    are --

6        PRESIDING COMMISSIONER BRYSON:  Okay.

7        INMATE BASILE:  -- back in the days you're

8    stubborn and you're hardheaded and you're going to fight

9    everything and but to make a long story short we both

10   went in and pled guilty to it.

11       PRESIDING COMMISSIONER BRYSON:  Okay.

12       INMATE BASILE:  We had a day that we had to turn

13   ourselves in or a sentencing date or something and I

14   fled.  I went down to Twenty-Nine Palms and I did that

15   specifically to detox myself.  I wasn't feeling like I

16   wanted to go in prison and go through all that.  I wanted

17   to get away from everybody and I went out to the desert

18   for 90 days and then self-surrendered July 17th of 1983.

19       PRESIDING COMMISSIONER BRYSON:  So you did self-

20   detoxification in the desert?

21       INMATE BASILE:  Yes.

22       PRESIDING COMMISSIONER BRYSON:  That must have

23   been pleasant.

24       INMATE BASILE:  It was better --

25       PRESIDING COMMISSIONER BRYSON:  You must have been

31

1    very sick out there.

2         **INMATE BASILE:**  It's better than doing it in the

3    city.

4         **PRESIDING COMMISSIONER BRYSON:**  And so you didn't

5    use any of that time?

6         **INMATE BASILE:**  No.

7         **PRESIDING COMMISSIONER BRYSON:**  And would you give

8    me the date you turned yourself in again?

9         **INMATE BASILE:**  July 17th, 1983.

10        **PRESIDING COMMISSIONER BRYSON:**  Okay.  All right.

11   Commissioner Shields, do you have questions at this

12   point?

13        **DEPUTY COMMISSIONER SHIELDS:**  I don't think so.

14        **PRESIDING COMMISSIONER BRYSON:**  Okay.  We may have

15   questions further.

16        **INMATE BASILE:**  That's fine.

17        **DEPUTY COMMISSIONER SHIELDS:**  Well, maybe if I

18   could just get a summary.  So your position is that you

19   did not kill her?

20        **INMATE BASILE:**  That's correct.

21        **DEPUTY COMMISSIONER SHIELDS:**  So your position is

22   that you're innocent?

23        **INMATE BASILE:**  No, ma'am, not at all.  Not at

24   all.  I definitely am accountable and hold myself

25   accountable for my culpability in this.  There was

32

1  several things that I could have done to stop this.  For

2  one, not participate.  For two, when I left call the

3  police.  For three, you know, restrain my brother.  There

4  were several things which I did not do and regret

5  terribly.

6        DEPUTY COMMISSIONER SHIELDS:  But then also it's

7  your position that your brother did it?

8        INMATE BASILE:  Yes.

9        DEPUTY COMMISSIONER SHIELDS:  And then was he

10  tried for it?

11        INMATE BASILE:  Yes.

12        DEPUTY COMMISSIONER SHIELDS:  And he was found not

13  guilty?

14        INMATE BASILE:  Correct.

15        DEPUTY COMMISSIONER SHIELDS:  And then you were

16  tried and you were found guilty?

17        INMATE BASILE:  Correct.

18        DEPUTY COMMISSIONER SHIELDS:  And did he testify

19  against you?

20        INMATE BASILE:  No, ma'am.

21        DEPUTY COMMISSIONER SHIELDS:  What was the

22  evidence upon which you were found guilty then if there

23  wasn't a witness?

24        INMATE BASILE:  There was Gary Nix and Robert

25  Johanson and it started with Gary Nix and I believe that

33

1    Detective Stoner (phonetic) contacted him in October of

2    1983 at the county jail and the story that was told to me

3    was that he was facing some additional burglary charges

4    and he offered up, "Well, what if I could give you some

5    information that resolved the McCaffey murder?" And he

6    started out by saying that Tom Birchfield (phonetic) also

7    had been arrested for this crime. He was innocent, and

8    they were both together in the county jail at that time.

9    And so they left the area out in January. I paroled from

10   San Quentin February of '84 -- February 6th, and on

11   February 8th there was an article in the newspaper saying

12   third suspect named in murder trial. Upon the seating of

13   the jury in my brother's trial Gary Nix came forward and

14   made a statement implicating me in this murder. I went

15   to my brother's attorney and listened to the tape Nix

16   stated almost verbatim. He never came point blank told

17   me that he did it but because Gary and me hung out it was

18   little things that happened that gave him this inference

19   that I did it. And just to give you an idea of some of

20   these inferences I went to my cousin's house with Gary

21   one day to sell my brother's boat and I just got through

22   speaking with Bob on the phone. I tell my cousin that,

23   "Man, I wish I could switch places with my brother in the

24   county jail." I feel bad because I was up there -- I

25   wouldn't be going through the problems my brother's going

34

1    through.  Gary testified that at trial that that was an

2    admission of guilt on my part -- that I was feeling so

3    guilty about killing Toni that I needed to switch places

4    with my brother in the jail.  So it was innuendo,

5    speculation --

6         DEPUTY COMMISSIONER SHIELDS:  Now, I guess I was

7    trying to get -- so your brother was tried, found not

8    guilty and then in your trial the evidence against you --

9         INMATE BASILE:  Same two people came and testified

10   against me --

11        DEPUTY COMMISSIONER SHIELDS:  That -- and gave

12   some circumstantial evidence saying that you had done

13   that.  Now, did your brother step up and say anything?

14        INMATE BASILE:  My brother on advice of counsel

15   was told not to step up for fear of losing his daughter

16   and so Bob --

17        DEPUTY COMMISSIONER SHIELDS:  Did your family

18   support you?

19        INMATE BASILE:  My family told me that, "Bob just

20   got acquitted -- you have nothing to worry about."  And

21   they had spent I don't know how many thousands of dollars

22   getting a attorney to represent him.  I went to trial

23   with a public defender.

24        DEPUTY COMMISSIONER SHIELDS:  Okay.  That's all I

25   have.  I just wanted to get a little --

35

1      PRESIDING COMMISSIONER BRYSON:  When you wrapped

2   your -- you said you wrapped your arm around Toni in like

3   a headlock type position.  Is that what it was or --

4      INMATE BASILE:  Yeah, just --

5      PRESIDING COMMISSIONER BRYSON:  A headlock is

6   (inaudible).  Now, that's a -- used correctly it just

7   renders the person unconscious but it's not very hard to

8   use it incorrectly -- in fact, it's happened a lot and

9   you can pretty easily kill someone that way.  So my

10  question to you is did you not intend to kill her?

11     INMATE BASILE:  I didn't want to.  I had no --

12     PRESIDING COMMISSIONER BRYSON:  No, I'm not

13  talking about want now.  I'm talking about did you make

14  that move intending to kill her?

15     INMATE BASILE:  I would say that I made the move

16  with the intent but as I was doing it all the not wanting

17  to do it overrid the intent and I let her go.

18     PRESIDING COMMISSIONER BRYSON:  And to this day I

19  still don't have -- you said that you heard expiration of

20  air from her which, sir, is common even after -- you're

21  shaking your head.

22     INMATE BASILE:  That's not -- that's not what I

23  said.  I said I heard gasp, not --

24     PRESIDING COMMISSIONER BRYSON:  How many gasps did

25  you hear?

36

1    **INMATE BASILE:**  I heard one and that was initially

2    and I didn't stick around to hear anymore.

3    **PRESIDING COMMISSIONER BRYSON:**  So you -- what do

4    you know? You don't know that she could have survived

5    that attack anyway, right?

6    **INMATE BASILE:**  Well, I don't know for sure.

7    **PRESIDING COMMISSIONER BRYSON:**  All right.

8    **INMATE BASILE:**  But I just know that she wasn't in

9    the same place that I left her.

10    **PRESIDING COMMISSIONER BRYSON:**  Okay.

11    **DEPUTY COMMISSIONER SHIELDS:**  Well, let me ask one

12    more thing.  I don't want to belabor it but suppose

13    you're right -- that she had a couple gasps left and I

14    haven't looked at the pictures.  Is it possible she could

15    have sort of flopped around and ended up where she was?

16    **INMATE BASILE:**  No, because if -- where I left her

17    her head was -- her head was facing into the entrance of

18    the kitchen.  Pictures that I saw she was at least a good

19    ten feet away from that in the living room.

20    **DEPUTY COMMISSIONER SHIELDS:**  Do you think maybe

21    she was headed towards her daughter or something if she

22    still had a little bit of life left in her?

23    **INMATE BASILE:**  That could be.  That very well

24    could be but you could hypothesize as to what her

25    motivation was from being from one point to another if

37

1    she was alive or if my brother played an active role.

2        **DEPUTY COMMISSIONER SHIELDS:**  Okay.  Well, let me

3    give you a hypothetical.  Suppose we were watching one of

4    those crime shows and Dr. Expert comes in and says, "You

5    know, I can say with absolute certainty that that blow

6    ultimately was fatal -- that choke was ultimately fatal.

7    The course of this is the person has 60 to 140 seconds to

8    live.  They could be mobile at this time.  There is, you

9    know, there's no other explanation for this."  What would

10   your reaction be?

11       **INMATE BASILE:**  That I dealt the deathblow.  If I

12   beat up somebody that bad that he was conscious enough to

13   walk and then dropped based upon these blows to his body,

14   his head, whatever, that would be all my responsibility.

15   Absolutely.  But from what the autopsy stated it said

16   Toni Rae McCaffey died through strangulation due to

17   ligature, and I certainly didn't stick around to put

18   anything around her neck.

19       **DEPUTY COMMISSIONER SHIELDS:**  Does it make any

20   difference -- suppose you did something to her and then

21   somebody else did -- that they went, "Wow, this is almost

22   done.  I think I'll pile on here."  But what you had done

23   would have been fatal anyway.  I mean, does it make any

24   difference to you?

25       **INMATE BASILE:**  No, absolutely not.

38

1      DEPUTY COMMISSIONER SHIELDS:  I mean, why at this

2   point after so many years are we making this distinction?

3   Why is it important to you?

4      INMATE BASILE:  Because I participated in Toni Rae

5   McCaffey's death.

6      DEPUTY COMMISSIONER SHIELDS:  Uh-huh.

7      INMATE BASILE:  You know, I mean, I have to live

8   with that guilt and shame.

9      DEPUTY COMMISSIONER SHIELDS:  Right.

10     INMATE BASILE:  I have to sit there and explain to

11  my family -- the surviving members of my family that I

12  accepted all the responsibility for being there -- that I

13  may have contributed severely to Toni's death and I'm

14  held accountable.  I hold myself accountable for that,

15  okay?  But to hold me accountable for the ligature around

16  her neck, no, I didn't do that, even though in this trial

17  that I had that was part of their findings.  I may

18  disagree because it's the truth.

19     DEPUTY COMMISSIONER SHIELDS:  Did -- as part of

20  your defense at the trial did you say that it couldn't

21  have been you and it might have been your brother?  Did

22  you tell them your brother was there?

23     INMATE BASILE:  My defense was from the very day

24  that I was arrested I met with Dennis Barrett (phonetic)

25  I'm taking the stand, and when I sat in that courtroom

39

1    and he came up to me and put his hand on my shoulder and

2    says, "You're not taking the stand" I looked at him and I

3    said, "What?"  I wish I could have jumped out of my seat

4    and said, "Judge Taylor, please put me on the stand.  Let

5    me tell you what happened."

6              DEPUTY COMMISSIONER SHIELDS:  Uh-huh.

7         INMATE BASILE:  Was never afforded that

8    opportunity, and my ignorance to the judicial system is

9    what kept me planted in that seat and I have lived to

10   regret that.

11             DEPUTY COMMISSIONER SHIELDS:  So was it ever

12   raised as part of your defense that your brother probably

13   did it indirectly?

14        INMATE BASILE:  My defense --

15             DEPUTY COMMISSIONER SHIELDS:  Well, I mean, that's

16   kind of --

17        INMATE BASILE:  Yeah.  I --

18             DEPUTY COMMISSIONER SHIELDS:  Did -- was your

19   brother's name ever mentioned as a -- at the trial as the

20   possible murderer?

21        INMATE BASILE:  No, because of a conflict of

22   interest with Dennis Barrett and my family.  He was

23   trying to protect both of us and what he did was draw in

24   Tom Birchfield, Paul Hussey, another Hussey brother -- he

25   went on this wild goose chase and I would sit there and

40

1  just shake my head.  He brought in so many different

2  people that it was like just throw a dart on a board and

3  pick one, and he thought because I was a third suspect

4  named in this murder trial that it was a slam dunk --

5  we're walking, don't worry about nothing.  And I felt

6  really (inaudible)

7      DEPUTY COMMISSIONER SHIELDS:  I'm not going to

8  belabor this but I mean suddenly I'm all confused about

9  this, and I started out -- I mean, I listened to

10  everything you said and everything you told the

11  Commissioner.  I mean, this is pretty simple.  You were

12  there, took a good shot at hurting her and doing

13  something and she ended up dead, and then there's all

14  this kind of peripheral stuff.  I mean, you know, she may

15  have flopped around.  There is no bad way to be a murder

16  victim.  I mean, it would have been convenient if she

17  just fell down and did it the right way and it was

18  totally clear and her hand pointed at your brother.

19      INMATE BASILE:  Commissioner Shields, you would

20  have had to have been there because you go through this

21  first trial, okay?

22      DEPUTY COMMISSIONER SHIELDS:  Uh-huh.

23      INMATE BASILE:  You got five big volumes of

24  testimony, 88 tapes that was handed to my defense counsel

25  and he took that and tried to incorporate it into my

41

1    trial and that's why it's -- takes this bizarre turn.  If

2    it was just me being tried and not my brother it would

3    have been a whole different ball of wax.  And I'm just

4    following along with my defense attorney.  What can I

5    say?  I certainly wasn't that intelligent at that time to

6    speak for myself or represent myself.

7        DEPUTY COMMISSIONER SHIELDS:  Okay.

8        PRESIDING COMMISSIONER BRYSON:  Okay.  Well, you

9    were 30 years old, sir, not a kid at that time.

10       INMATE BASILE:  True.

11       PRESIDING COMMISSIONER BRYSON:  I would have to

12   say that, and you had been a friend of Toni's before.

13   You said she was your friend, right?

14       INMATE BASILE:  Yes.  I'd known her for I think

15   two years.

16       PRESIDING COMMISSIONER BRYSON:  I know you were

17   shooting heroin together or anyway (inaudible) in some

18   way.  What were you doing, shooting it at the time?

19       INMATE BASILE:  Yes.

20       PRESIDING COMMISSIONER BRYSON:  And so do you feel

21   that the heroin played a role in this crime (inaudible)

22       INMATE BASILE:  Oh, absolutely.  There's no doubt

23   about it.

24       PRESIDING COMMISSIONER BRYSON:  Do you have memory

25   of what you did during the crime?  Let me ask you that.

42

1      INMATE BASILE:  Yes.

2      PRESIDING COMMISSIONER BRYSON:  Okay.  In going

3  over your pre-conviction factors I will note that you do

4  have a history as a -- well, first of all you have a

5  juvenile history.  You were arrested for suspected

6  burglary.  We have a -- a juvenile petition was filed.

7  What happened on that arrest?  Was that just dropped?

8      INMATE BASILE:  Well, you talking about '69 in

9  Beverly Hills?

10      PRESIDING COMMISSIONER BRYSON:  '69, yeah.

11      INMATE BASILE:  I think I went through a family

12  treatment program -- a six-month family treatment program

13  is what it was in Selmar (phonetic).

14      PRESIDING COMMISSIONER BRYSON:  Okay.  And then

15  you had petty theft, assault and battery.  In fact, I

16  don't know what happened to that charge either -- the

17  disposition on that charge was --

18      INMATE BASILE:  The assault and battery was

19  dismissed and the petty theft I was given ten days credit

20  for time served in the county jail.

21      PRESIDING COMMISSIONER BRYSON:  Okay. Then you

22  were found guilty of -- in 1971 -- that would be when you

23  were I believe 19 -- you were found guilty of

24  transporting or selling dangerous drugs.  That was --

25  you were given three years formal probation. Probation

43

1   was terminated in '77.

2        INMATE BASILE:  No.

3        PRESIDING COMMISSIONER BRYSON:  Is that

4   (inaudible) says '77 (inaudible)

5        INMATE BASILE:  What happened was is that I was

6   arrested for sales of LSD.  That's what that was.

7        PRESIDING COMMISSIONER BRYSON:  Okay.

8        INMATE BASILE:  And I was given three years

9   probation.  While I was on probation I got arrested for

10  conspiracy to sell marijuana and the end disposition in

11  '77 was because I got out of prison in '77 I went back to

12  Santa Monica and Judge Selber (phonetic) in that case

13  dismissed my probation at that time.

14       PRESIDING COMMISSIONER BRYSON:  I see.  Thank you.

15  Because one of these -- let's see -- there was a bench

16  warrant for -- for the -- well, we're back to the 484

17  charges -- the petty theft and battery which was

18  dismissed it says and there's your ten days county jail.

19  I understand -- the subject was released in 1971.  Okay.

20  Then in 19 -- there's the criminal conspiracy H & S

21  11360, possession of marijuana for sale in '73, and the

22  outcome was the three years probation.  This is --

23       INMATE BASILE:  There was a violation of

24  probation.

25       PRESIDING COMMISSIONER BRYSON:  Right.

44

1      **INMATE BASILE:**  And I was on the county probation

2   at the same time and so the feds took over (inaudible)

3   six months -- six year Youth Act which started in '73 and

4   I discharged in '79.  When I got out of prison in '77 is

5   when I went back to Santa Monica and then my county

6   probation was over too at that time.

7      **PRESIDING COMMISSIONER BRYSON:**  Okay.  Here we've

8   got something over here -- you received four to six years

9   5010b, conspiracy to contribute non-narcotic.

10     **INMATE BASILE:**  That's the same charge.

11     **PRESIDING COMMISSIONER BRYSON:**  That's the same

12  charge?  Okay.  (Inaudible) okay.  And there's the

13  violation -- okay.  So that brings us up to -- there was

14  a 1977 245 -- was assault with a deadly weapon.  You were

15  detained only.  Do you know what that was?

16     **INMATE BASILE:**  I remember that I had an argument

17  with Randy Roberts and when -- and I was doing something

18  with a brother which brought me to call her father and

19  said, "Hey, you know, look, this is what happened. I'll

20  come over and explain myself."  I went over there and the

21  police arrested me and because I was talking crazy to

22  them they turned a simple little dispute into assault

23  with a deadly -- I had an ace bandage because my knuckle

24  was broken and I called my probation officer Mr. Cobb

25  (phonetic) and I says, "Look, this has all a big

45

1   misunderstanding. I'll be out in no time." So it was

2   just dismissed.

3        **PRESIDING COMMISSIONER BRYSON:** I see.

4        **INMATE BASILE:** It was just a big

5   misunderstanding. It was nothing.

6        **PRESIDING COMMISSIONER BRYSON:** Okay. Then you

7   have a receiving stolen property of which you were found

8   guilty -- 24 months probation, five months jail time and

9   a fine.

10        **INMATE BASILE:** Correct. That did occur.

11        **PRESIDING COMMISSIONER BRYSON:** And what was that?

12        **INMATE BASILE:** That was receiving stolen

13   property. I got caught and --

14        **PRESIDING COMMISSIONER BRYSON:** What stolen

15   property was it you received?

16        **INMATE BASILE:** Well, what I did was is I was at a

17   heroin connection's house. He had some weapons there

18   that I purchased. Well, I didn't purchase -- I took them

19   and I brought them to somebody else who bought a rifle --

20   .270 rifle. He got arrested for it. He told the police

21   that I gave it to him. I admitted to doing it and got

22   the other rifles back and brought I think four or five of

23   them right into a Santa Clara County Sheriff's office and

24   turned them in.

25        **PRESIDING COMMISSIONER BRYSON:** I see -- okay.

46

1   Now, there was the -- another -- there was a possession

2   of drugs in prison but that was dismissed, and then you

3   were referencing -- I believe this is the attempted

4   burglary that you referenced?

5          INMATE BASILE:  Correct.

6          PRESIDING COMMISSIONER BRYSON:  And there was

7   possession of burglary tools.  Was that associated with

8   that crime also?

9          INMATE BASILE:  Well, yes and no.  I mean, I was a

10  mechanic so I had tools and they didn't confiscate any of

11  my tools but they added it in to the charge and all I was

12  really found guilty for was attempted burglary.

13         PRESIDING COMMISSIONER BRYSON:  (Inaudible) okay.

14  So let's talk about your personal factors.  You were born

15  to Joseph and Gloria Basile -- one of three children in

16  San Jose.  It says you obtained a GED and Associate

17  degree through Excelsior College and that was here at

18  Mule Creek (inaudible) and you joined the U.S. Army in

19  '69. How old were you when (inaudible) 17 or --

20         INMATE BASILE:  Seventeen years old.

21         PRESIDING COMMISSIONER BRYSON:  Had -- so you

22  graduated from high school or no, you didn't?

23         INMATE BASILE:  I was attending Beverly Hills High

24  and I was living in Beverly Hills and my mom moved up to

25  Sunset right above the Whiskey-a-Go-Go which took us out

47

1    of the district.  When Mr. Miltich (phonetic) found out

2    he said I couldn't go out at -- go to Beverly Hills High.

3    So I was -- opted to go to Hollywood High and a

4    continuation school and I didn't have much interest in

5    doing that so I just didn't go.

6        PRESIDING COMMISSIONER BRYSON:  I see.

7        INMATE BASILE:  Then I got into the service -- I

8    took my initial GED there.

9        PRESIDING COMMISSIONER BRYSON:  I see.  And you

10   were -- so you served two years then and you were

11   honorably discharged.  Did you have any problems in the

12   military?

13       INMATE BASILE:  Well, it's not that I had

14   problems.  I was using -- I started using heroin when I

15   was 17.

16       PRESIDING COMMISSIONER BRYSON:  Was that because

17   of the military or was that prior to the military?

18       INMATE BASILE:  It was probably November 17th,

19   1969 was the day that I started.  Then going to the

20   service until it was January 1st of 1970.  Actually I

21   think I was down at the recruiting station in late

22   December.  That's what I requested --

23       PRESIDING COMMISSIONER BRYSON:  How did you get

24   started on heroin?

25       INMATE BASILE:  Well, I took my first leave and I

48

1    came from Fort Ord up to San Jose and I ran into Gary Nix

2    and that's pretty much where it all started right there.

3          PRESIDING COMMISSIONER BRYSON:  So you started

4    right for the hard stuff right from the get-go?  Is that

5    correct?

6          INMATE BASILE:  I had dabbled around, you know,

7    but I never ever thought that heroin was going to lead to

8    such a drastic outcome.  I mean, I had smoked marijuana.

9    I'd taken LSD.  I was a kid in the 60s.  I mean,

10   (inaudible) Whiskey-a-Go-Go on Sunset Blvd. and it was

11   hard not to.  Couldn't walk down to the supermarket

12   without being offered it.  But when I got to San Jose

13   that's when things really kind of broke loose and Gary

14   Nix and the rest of the people that I had gone to school

15   with -- because I was born and raised in Santa Clara.

16   Mom took me out when I was 13 to Beverly Hills so the

17   guys that I re-associated with that weren't doing

18   anything like that were just full blown into getting

19   (inaudible) and I flew right into it and that's where I

20   got my first big taste and it just really grew and grew

21   from that point.

22         PRESIDING COMMISSIONER BRYSON:  I see.  This talks

23   about your background with arcade games, and then how old

24   were you when you got married?

25         INMATE BASILE:  I was 31 years old -- 30 or 31

49

1   years old.

2        **PRESIDING COMMISSIONER BRYSON:**  Because you were

3   30 years old at the time of this crime.

4        **INMATE BASILE:**  Then it must have been 30 because

5   I think that I got married in April -- about April of '82

6   and the crime occurred in September of '82.

7        **PRESIDING COMMISSIONER BRYSON:**  And tell us about

8   your wife.  Was -- you said that seemed to be a changing

9   point for you.

10       **INMATE BASILE:**  Maria Arabia (phonetic) -- what a

11  beautiful lady she was.  You know, full-blooded Italian.

12  You know, I mean, it was like I thought this was the one

13  and being from an Italian background myself, you know, we

14  kind of both fell head over heels for each other, and I

15  went down there and met her parents and I mean, they all

16  embraced me with kisses right on the lips and it

17  surprised me because that's how they are and I was

18  welcomed right into the family, and this was in November

19  of '81 is when I first met her and between -- this would

20  of had to have been January or February Maria got

21  pregnant and I just felt it was the honorable thing to do

22  was to get married.  We hadn't really had a chance to

23  establish ourselves -- build a foundation -- really

24  knowing each other, and maybe we went into it too quickly

25  but what occurred was -- is I alluded to wanting to get

50

1   off of heroin -- to free me from that ball and chain

2   around my legs so I could move around and do things that

3   normal people did.  And when I started shooting heroin

4   again it became strained and I told her, "Maria, don't

5   worry, I (inaudible) and put me back in the program."  I

6   was working at the time for Rainbow Novelty in San

7   Francisco so I commuted every day back and forth and the

8   day that I got reinstated in heroin I think I --

9   reinstated in the methadone program I came back to my

10  apartment and everything was gone.  She moved out on me

11  and I was just -- I was crushed.  I (inaudible) we made

12  it so far and now that things had a way of working

13  themselves out -- we're stable again, and she left.

14       PRESIDING COMMISSIONER BRYSON:  Was it because of

15  your drugs do you think?

16       INMATE BASILE:  That contributed to the way that I

17  behaved and the way that I behaved was inappropriate.  It

18  was a relationship breaker with anybody -- with anybody

19  who didn't do heroin.

20       PRESIDING COMMISSIONER BRYSON:  But she did not --

21  is that right?

22       INMATE BASILE:  Absolutely not -- absolutely not.

23       PRESIDING COMMISSIONER BRYSON:  What a tragedy.

24       INMATE BASILE:  It was horrible, and then to hear

25  her father, "Dave, you got to do the right thing -- you

51

1    got to do the right thing.  Stop this -- get off this

2    stuff." And I remember when Marcello was born.  You know,

3    he was born in November 4th of 1982, a month after Toni

4    was murdered.

5            **PRESIDING COMMISSIONER BRYSON:**  Now, do you know -

6    - do you keep in touch with her at all today or with your

7    son?  Are you in touch with your son?

8            **INMATE BASILE:**  Maria stayed with me for the first

9    three years of my incarceration and I didn't change -- I

10   still used dope.  She came up on a family visit and

11   (inaudible) but that was the last time I saw her and she

12   had Marcello there and the next thing I knew all the

13   letters I was sending was being sent back.  I tried to

14   call -- calls weren't accepted and we ended up getting

15   divorced and in 1989 -- 1990 they took me out of New

16   Folsom and brought me down to Salinas for a ~~Hussey~~ CUSTODY

17   hearing.  Then they took all my rights to Marcello at

18   that time.  I have tried to write and a lot of my letters

19   were returned.  But when he became 13 years old he was

20   experiencing a lot of problems himself.  He didn't know

21   who his dad was, you know, and what he did know of me was

22   not good.  Your dad's in prison -- he murdered -- you

23   know, all these shameful things.  And it's been a

24   struggle to get to where we are today and we do stay in

25   touch.  He is married.  I do have a grandson and he sends

52

1   me pictures.

2          **PRESIDING COMMISSIONER BRYSON:**  Where is he

3   living?

4          **INMATE BASILE:**  He's living in Fresno -- living in

5   Fresno.

6          **PRESIDING COMMISSIONER BRYSON:**  What does he do?

7          **INMATE BASILE:**  I'm not certain.

8          **PRESIDING COMMISSIONER BRYSON:**  Okay.  Has he any

9   (inaudible) drugs as far as you know?

10         **INMATE BASILE:**  No.  He is bipolar and he takes a

11  lot of prescribed medication.  When he's not on

12  medication (inaudible) irrational behavior and he had

13  gotten himself in trouble -- did a burglary as a matter

14  of fact and did a purse snatch from a lady who worked for

15  the FBI and -- but Maria had begged the court to

16  recognize his problem and although he has a conviction he

17  didn't do any jail time, and he had run away and that's

18  what initially got Maria and me back into contact.  At

19  that point in my life I had realized things that I did to

20  her, and part of my Eighth and Ninth Step in NA about

21  making amends to people -- it made about (inaudible)

22  because there's still things that I remember that just

23  were not right that I did, and I apologized and she

24  forgave me.

25         **PRESIDING COMMISSIONER BRYSON:**  (Inaudible) you've

53

1    experienced that.  I want to turn your attention now to
2    Commissioner Shields and she'll talk about your post-
3    conviction factors (inaudible)

4        **DEPUTY COMMISSIONER SHIELDS:**  Okay.  Do you need a
5    drink of water or anything?

6        **INMATE BASILE:**  Water would be fine.

7        **DEPUTY COMMISSIONER SHIELDS:**  Yeah, if we can get
8    him a new water.  These meetings are long.  You talked I
9    think more than anyone because there are two
10   Commissioners and there's one of you and you're doing the
11   talking so -- and actually I'm going to start out in your
12   case -- well, I'll do a little bit of talking so that
13   will give you a little time to take you off the hot seat
14   for a moment.  I'm going to start with your psychological
15   evaluation which was done by Dr. Starrett this year,
16   April 19th, '07, and I want to go to the second page and
17   under Interview Information -- you don't have to follow
18   this but you can -- under Interview Information, second
19   paragraph, he describes you.  This is where they kind of
20   give you a little Polaroid picture of who they're talking
21   about.  So this is your Polaroid picture and I thought it
22   might be important to our discussion.  You're a 55-year-
23   old divorced Caucasian male of the Christian faith.

24        "The inmate was oriented to person, place
25             and time.  He was alert and cooperative.

54

1          His simple registration was intact along

2          with his short-term memory.  His abstract

3          thinking was weak.  His mathematical

4          ability on complex attention and

5          concentration were intact.  His complex

6          problem solving was impaired.  He did not

7          appear to understand proverbs."

8    Now, this is a totally unfair question but what did this

9    guy mean?

10          INMATE BASILE:  He's describing somebody in my

11   mind who's retarded -- that he's --

12          DEPUTY COMMISSIONER SHIELDS:  What was the

13   proverb?

14          INMATE BASILE:  The proverb was is -- what does

15   the proverb -- what does the sentence Rome wasn't built

16   in a day mean to you?  And I responded to him by saying

17   well, it kind of indicates to have patience, you know,

18   because things just don't get done overnight.

19          DEPUTY COMMISSIONER SHIELDS:  Uh-huh.

20          INMATE BASILE:  And, of course, when I read this I

21   was kind of appalled.  I thought that he made a mistake -

22   - that he had somebody else in front of him when he was

23   doing this because he gave me three words -- says I want

24   you to remember these three words.

25          DEPUTY COMMISSIONER SHIELDS:  Uh-huh.

55

1          **INMATE BASILE:**  I said okay.  He says, "What's two

2     times four?"  "Eight."  "Spell eight backwards."  I

3     spelled it backwards.  There was a couple other little

4     things that he asked me -- what were the words and I gave

5     him --

6          **DEPUTY COMMISSIONER SHIELDS:**  Be careful. You're

7     scaring your lawyer.

8          **ATTORNEY FOX:**  Yeah.  What are those words?

9          **DEPUTY COMMISSIONER SHIELDS:**  (Inaudible)

10         **INMATE BASILE:**  You know, to me, you know, I read

11    that and I felt that he must have made a mistake.  I

12    mean, I do electronic work.  I've done, you know,

13    Associate in Science of Technology.  I have to have

14    abstract thinking to do the things that I do.

15         **DEPUTY COMMISSIONER SHIELDS:**  Do you know what a

16    proverb is or do you know another proverb?  Can you tell

17    us?

18         **INMATE BASILE:**  Well, I don't --

19         **DEPUTY COMMISSIONER SHIELDS:**  I'm not going to

20    play psychologist here but -- well, and let me just jump

21    forward a little bit.  When you were -- when we were

22    talking about the crime and I was getting more and more

23    confused actually my mind went to this paragraph, and I

24    thought maybe there is something that's keeping you from

25    processing this.  So that's why I wanted to, you know,

56

1    start off with this and say -- well, I don't know.   If

2    your complex problem solving's -- and let me just say I -

3    - you should not have to defend what somebody else writes

4    about you on paper and so I don't want you to feel

5    defensive.   What I'm using this is for us to have our own

6    personal discussion where we're going to decide this

7    between you and the Commissioners based on what we know.

8    This isn't some fancy psychological thing.   And I don't

9    want you to feel, you know, defensive although how can

10    you not feel defensive?  But, you know, I did wonder --

11    do you think maybe your complex problem solving is

12    impaired and that might explain some of why that whole

13    deal that went down was -- no?

14         **INMATE BASILE:**  No.  I mean, I could refer you to

15    a letter from Steve Bean (phonetic) that would probably

16    clear all the smoke away.  If I had complex problem

17    solving I wouldn't be able to do half the things that he

18    alluded to in this letter.  But (inaudible) it's just

19    impossible.  It's just -- just right here he's done it to

20    several people.  I've talked to several people who've

21    come out of his particular meeting and they have the same

22    thing written down about them and I've read transcripts

23    from Board hearings where other attorneys come in here

24    and argue specifically about that, saying this is a

25    boilerplate paragraph that he puts on people or maybe

57

1    it's on his computer and he doesn't change the wording

2    around.  So no, this doesn't bother me and I don't take

3    offense by it.  I stand by what I've done and my ability.

4    I know that I can solve complex problems.  In regards to

5    this case --

6        **DEPUTY COMMISSIONER SHIELDS:**  Let me give you one

7    more chance here.  You're not manning up are -- on me,

8    are you?

9        **INMATE BASILE:**  No, ma'am.  I'm just stating that

10   you would have had to have been there at that time and

11   lived that moment --

12       **DEPUTY COMMISSIONER SHIELDS:**  Okay.

13       **INMATE BASILE:**  -- to understand the complexity

14   that -- other people's voices, not mine.  I mean, if they

15   would have asked me, "Mr. Basile, what happened that

16   night?" I would have told them -- real simple.  Just like

17   I explained to you in my final statement.

18       **DEPUTY COMMISSIONER SHIELDS:**  Okay.  I did want to

19   start with that because I thought it might shed some

20   light on things but it shed light I guess on things I --

21   something else.  Let me go -- he does go very lengthily

22   into your version and actually those kind of things I

23   don't expect you to -- we're using another version of the

24   facts so to me that's neither here nor there.  He says

25   you do not have a mental disorder but you meet the

58

1    diagnostic criteria for opiate dependence in

2    institutional remission.  Now, would you agree with that?

3            INMATE BASILE:  Yes.

4            DEPUTY COMMISSIONER SHIELDS:  Means you're a

5    heroin addict.  And says that you don't have an Axis II

6    diagnosis which means that you don't have sort of some

7    concrete thing about you that will never ever change.  He

8    does a summary and I actually, you know, find this

9    helpful where he's gone through the previous evaluations

10   and those generally say that your, you know, future risk

11   is low although -- well, that's 1987.  I'm not going to -

12   - I think that's too remote.  The recent ones have shown

13   that your risk is below average.  Your general risk of

14   recidivism is in the low range compared to similar

15   inmates.  You know, I'm doing this a little backwards but

16   this might be just as good a time as any to talk about NA

17   and your drug problem.  Basically, he's saying that, you

18   know, it's a plus that you've been clean and sober for 12

19   years.

20           INMATE BASILE:  Yes, ma'am.  Since 1995.

21           DEPUTY COMMISSIONER SHIELDS:  What date?

22           INMATE BASILE:  It was January 1995.

23           DEPUTY COMMISSIONER SHIELDS:  What date in

24   January?

25           INMATE BASILE:  I don't know.  Somewhere around

59

1    the 1st -- one of those New Year's resolutions.

2        **DEPUTY COMMISSIONER SHIELDS:**  One of -- oh, okay.

3    Shortly after the 1st of the year.  And how long have you

4    gone to NA and AA?

5        **INMATE BASILE:**  Since 1989.

6        **DEPUTY COMMISSIONER SHIELDS:**  So it took about six

7    years before it kicked in?

8        **INMATE BASILE:**  Yes, ma'am.

9        **DEPUTY COMMISSIONER SHIELDS:**  Okay.  And do you go

10   to NA up to this day?

11       **INMATE BASILE:**  I do not go to NA here in this

12   prison.  I moved two times in the last two years and I

13   went to all the NA programs that -- Mule Creek goes all

14   the way up through 2004 and what I did was I continued my

15   NA and recovery through my pastor, Tom Hooper (phonetic),

16   and what I have here is -- I don't know if you've seen --

17   is this from him.

18       **DEPUTY COMMISSIONER SHIELDS:**  Okay.  It's called

19   the Twelve Step Program -- Love Lifted Me Program and

20   that's from Venice, California.  This is 2004.  Do you

21   have more recent ones?

22       **INMATE BASILE:**  No.  What I have is after I

23   completed that program with him I continued my spiritual

24   awakening by doing Bible study programs with him, and

25   that's what I do currently to this day, and in a letter

60

1    that he sent that you should have a copy of from Pastor

2    Tom (inaudible) Hooper it alludes to the ones that I've

3    completed and the ones that I have -- I'm actively

4    enrolled in.

5             ATTORNEY FOX:  And that's the Bible (inaudible)

6             INMATE BASILE:  (Inaudible)

7             DEPUTY COMMISSIONER SHIELDS:  Okay.  Let me just

8    look at that.  It's on a letterhead and it's dated

9    October 16th, 2006 and it says basically they've talked to

10   you on the telephone and you've written letters.  They

11   believe you're sincerely -- changed your life.  Now, he's

12   on the advisory board of the Bible Tabernacle, and is

13   that where you were going to parole to?

14            INMATE BASILE:  Yes, ma'am.

15            DEPUTY COMMISSIONER SHIELDS:  Okay.  So you have

16   an ongoing connection with them?

17            INMATE BASILE:  I have a very good relationship

18   with both of them.

19            DEPUTY COMMISSIONER SHIELDS:  Okay.  Now, I --

20   okay.  Let me go back to the psychological.  It'll just

21   be a little challenging and I want to go through that.

22   Do you see yourself at a -- as a risk of relapsing?

23            INMATE BASILE:  As long as I avoid high-risk

24   situations, no, I don't.  I feel that what caused this

25   change in 1995 was not going to the yard and asking who's

61

1    got it -- where is it at.  It was more directing my

2    attention as who's trying to get out of prison -- who's

3    doing what self-help groups -- who's doing what as far as

4    college preparation.  So while in prison I surrounded my

5    people -- myself by positive people instead of the

6    negative influence.  And my parole plans -- I've kind of

7    taken the bull by the horns and surrounded myself by

8    people from this ministry.  I want to go to the ministry

9    because there they do the same thing with Twelve Steps

10   spiritual principles of the NA and as long as I keep

11   myself in the company of people that are a positive

12   influence instead of a negative influence I avoid high-

13   risk situations.  As long as I realize that I have people

14   I can call upon -- my cousin Ginger, my cousin Carol, now

15   my brother Lou, and my niece Michaela -- putting some

16   energy into strengthening the relationship with my son --

17   those are the positive things going (inaudible)

18            **DEPUTY COMMISSIONER SHIELDS:**  Okay.  Your reports

19   -- this is kind of a double negative but your clinical

20   insight -- he says the low range but then goes on to say

21   that basically it's positive in the sense that you have

22   insight on acceptance of your responsibility and have had

23   a good response to treatment.  Your risk management is in

24   the low range.  Overall propensity for future violence is

25   in the low range when compared to similar inmates.  Your

62

1    risk of recidivism in the low range, and he says it's

2    unlikely that a requirement for further exploration of

3    the incident offense would produce more significant

4    behavioral changes that are positive or pro-social

5    nature.  The overall rating for general recidivism is low

6    even after considering your drug use.  Your risk factors

7    and your recidivism rate would increase if you returned

8    to drugs or life -- or the old lifestyle.  Anything you

9    want to add to the psychological?

10        **INMATE BASILE:**  I think that Dr. Starrett did a

11   pretty valid assessment and I think that where he was

12   coming from is that the course of twelve years now I've

13   gone through pretty much every type of self-help group

14   that any institution's had to offer except for CTF

15   because it was locked down for every day that I was over

16   there.  But when I got here I enrolled into Victim's

17   Offender Educational Group --

18        **DEPUTY COMMISSIONER SHIELDS:**  Uh-huh.

19        **INMATE BASILE:**  -- called VOEG, and this right

20   here was like -- it just was the accumulation of

21   everything because I had worked from the time I was 13 to

22   present -- this brought me back to when I was born up

23   until 13 and I made significant progress in realizing

24   what led me to heroin in the first place.

25        **DEPUTY COMMISSIONER SHIELDS:**  What was that?

63

1       **INMATE BASILE:**  Well, my mom opted to go to

2   Hollywood and become an actress.  She left me and my

3   brother Bob in Santa Clara with a Negro housekeeper that

4   -- who raised us for our adolescence and there was a lot

5   of trauma that evolved around --

6       **DEPUTY COMMISSIONER SHIELDS:**  Excuse me here --

7   thank you.

8       **INMATE BASILE:**  -- that situation.  My brother

9   Bob, to the day that I left the streets when I was 31, 32

10  years old still locked (inaudible).  I bit my nails to no

11  end and I often wondered why and it was a fear of this

12  abandonment.  In any relationship I had was a fear of

13  abandonment.  I thought my mom didn't love me.  My mom

14  and my dad were divorced.  My relationship was -- it was

15  nothing.  It was -- I saw kids doing things with their

16  parents that I couldn't do.  There was a lot of

17  resentment so when she came back into my life I remember

18  over and over her words, "What you think, Dave, is that

19  nobody loves you."  She already showed me that she

20  didn't.  She made her choice and that's the way that I

21  believed.  That was my (inaudible) that was where my mind

22  was at, and the pain that revolved around that was

23  satisfied through the dope.  When the holidays came I

24  could sit back, do some heroin, it didn't bother me.

25  Now, that took care of the immediate problem but then it

64

1   graduated to a bigger problem -- a problem that I had no

2   conception of and that was the actual addiction -- the

3   physical withdrawal that you go through.  That was

4   something that I wasn't counting on and it became a

5   downward spiral for me when I (inaudible) pick up the

6   needle and six-month runs -- spend all my money

7   (inaudible) have to end up cleaning up and going through

8   that eventually.  But I realized the root of my problem

9   existed from that -- way back then.  It also allowed me

10  to forgive my brother Bob because I realized that if I

11  was going through this that Bob himself must have been

12  going through it too.  Bob was an A student in school.

13  This character that we've been talking about for the last

14  hour or so he's not my brother Bob.  He got caught up in

15  drugs too.  His choice was cocaine and very paranoid.

16  You asked me before what was the reason.  Well, my father

17  had to pay child support on myself and my brother until

18  we were 18 years old.  My brother Bob did not want to pay

19  child support and he did not want to give up his daughter

20  but he didn't want Toni in his life.  And I only found

21  this out 17 years after the fact -- that that was the

22  real motivation for him wanting Toni out of his life.

23  Toni would have left LA with Michaela -- Bob would have

24  been stuck with the bill and he was really, really,

25  really tight with money, and I believe this trait came

65

1    from my mother and it was evident when my father died.

2    Before she could even say, "Hey, you know, how do you

3    feel about that?", "You know, he left you some money.

4    Can I borrow some?" and that's kind of been her makeup.

5         **DEPUTY COMMISSIONER SHIELDS:** Now, your brother

6    Bob passed away?

7         **INMATE BASILE:** Yes, ma'am.

8         **DEPUTY COMMISSIONER SHIELDS:** From what?

9         **INMATE BASILE:** A heart attack related to drugs.

10        **DEPUTY COMMISSIONER SHIELDS:** And what happened to

11   his daughter?  You in touch with her?

12        **INMATE BASILE:** His daughter I spoke with in 2000,

13   2001 after my father died.  I had given her $50,000 of my

14   inheritance and we wrote letters back and forth for a few

15   months and then she just moved -- I was out of touch and

16   when I was going through this VOEG group -- well, matter

17   of fact Mr. Rico -- in my last postponement had indicated

18   wanting to know what my relation -- matter of fact, he

19   posed this question to me.  If I was to run into my

20   brother what would you do, and of course I hadn't really

21   given a whole lot of thought because I never thought it

22   possible but there's always that possibility.  And so I

23   brought this up to my VOEG coordinator, Rochelle, and so

24   after a lot of -- lot of talk she asked me, "How do you

25   feel about opening up a dialogue with him."  Of course,

66

1    there would have to be boundaries.  I mean, you have to

2    be, you know, not adverse to a change of lifestyle. You

3    couldn't be on drugs.  There was a lot of factors that

4    went into this and I said, "Rochelle, wow -- I guess we

5    could give it a try" and so in the attempts pursuing my

6    brother we discovered that he died.  One door closed --

7    two doors opened, because it established a relationship

8    with Michaela that's going on today, and my older brother

9    Lou, who I hadn't spoken to for (inaudible) and matter of

10    fact I'm scheduled to meet with Lou -- I hadn't seen him

11    for 25 years -- on Monday, and Michaela on Wednesday for

12    a dialogue to try to promote (inaudible)

13    **DEPUTY COMMISSIONER SHIELDS:**  Okay.  Well, I

14    opened a door when I brought that up.  Let me go through

15    -- because this is a little kind of technical -- I want

16    to go through -- you have 19 points, mandatory minimum.

17    You currently work as a clerk.  Is that --

18    **INMATE BASILE:**  I work down in R & R -- yes,

19    ma'am.

20    **DEPUTY COMMISSIONER SHIELDS:**  In R & R. You have

21    is it four vocations -- Electronics, Furniture

22    Upholstery, PC Repair, and Air Conditioning?

23    **INMATE BASILE:**  Correct.

24    **DEPUTY COMMISSIONER SHIELDS:**  Okay.  I didn't miss

25    any?

67

1          **INMATE BASILE:**  No, ma'am.

2          **DEPUTY COMMISSIONER SHIELDS:**  Okay.  And actually

3     the fact that you've had two moves in two years explains

4     I think maybe a little decease in your rate of getting

5     chronos because you have over 50 since you've been down -

6     - probably close to the 60s, and you're currently using

7     that Bible program and it looks to me since the last --

8     your last hearing that you've mainly gone to the Impact

9     Program.  Now, do you have a certificate from that?

10         **INMATE BASILE:**  Oh, yes.  I --

11         **DEPUTY COMMISSIONER SHIELDS:**  Did you graduate or

12    did you go to individual classes?

13         **INMATE BASILE:**  I went to this Impact class that

14    they held -- it was a module actually and they gave me

15    chronos for -- I think it was like four or five chronos.

16         **ATTORNEY FOX:**  There's one recent -- well, that's

17    in -- '06, okay.

18         **INMATE BASILE:**  Those are all --

19         **ATTORNEY FOX:**  Okay.  These are all Impact.

20         **DEPUTY COMMISSIONER SHIELDS:**  Okay.  So you went

21    to -- so you went to four -- Impact is a 16-session

22    program and you went to four so you're sort of a quarter

23    of the way through that and we probably have that in your

24    C-File.  And then also I have that you went to Anger

25    Management --

68

1      **INMATE BASILE:**  Yes.

2      **DEPUTY COMMISSIONER SHIELDS:**  -- in October of '06

3  and the last NA chrono was for the third quarter in '04.

4      **INMATE BASILE:**  Yeah, that was it.

5      **DEPUTY COMMISSIONER SHIELDS:**  Okay.  Now, do you

6  have more self-help chronos for the current period?

7      **INMATE BASILE:**  Oh, well from May of 2007 --

8  that's -- this right here was -- because I went through

9  VOEG and it started in November so I've been currently in

10  VOEG since November of '06.

11      **DEPUTY COMMISSIONER SHIELDS:**  Okay.  And we

12  actually have a letter from Rochelle Edwards who is --

13      **INMATE BASILE:**  Commissioner Shields, may I please

14  --

15      **DEPUTY COMMISSIONER SHIELDS:**  Sure.

16      **INMATE BASILE:**  The Impact program is a rehashing

17  of all the self-help programs I took at Mule Creek.  I go

18  there and I feel like wow, I'm way ahead of these guys.

19  I says, "Contact me when you get to the drug one because

20  maybe then I'd have something that I can offer these

21  people here."  In the meantime continue doing what you're

22  doing with them, of course, because they're kind of

23  getting up to speed and running -- feel like I'm already

24  at.  The VOEG program I got into because that was

25  something that was way over the top that I felt very

69

1   compelled to get into and have currently been a member of

2   since November.

3        **DEPUTY COMMISSIONER SHIELDS:**  Do you do that

4   weekly?

5        **INMATE BASILE:**  I did it weekly from November to

6   May.  Now it's every other week in the next step and

7   that's for a year, and then after that it would be a

8   (inaudible) program by May.

9        **DEPUTY COMMISSIONER SHIELDS:**  Okay.  Just for the

10  record the VOEG program is Victim Offender Education

11  Group.

12       **DEPUTY DISTRICT ATTORNEY RICO:**  Commissioner, I'm

13  sorry.  I don't seem to have a copy of that letter.

14  Where would that --

15       **DEPUTY COMMISSIONER SHIELDS:**  I was just handed

16  that.  You may not have it.  It just came across the

17  table.  Sorry.  Would you like us to --

18       **PRESIDING COMMISSIONER BRYSON:**  Would you like

19  that faxed to you?

20       **DEPUTY DISTRICT ATTORNEY RICO:**  Yes, if that would

21  be agreeable.  If I might have just like 60 seconds to

22  make sure someone's at the fax machine.

23       **PRESIDING COMMISSIONER BRYSON:**  Certainly.

24       **DEPUTY COMMISSIONER SHIELDS:**  Sir, can you give us

25  the fax number?

70

1       **DEPUTY DISTRICT ATTORNEY RICO:**  Right.  There's

2  two different fax numbers so I want to just make a call

3  down to the building and see which one's the best.

4       **DEPUTY COMMISSIONER SHIELDS:**  Okay.

5       **PRESIDING COMMISSIONER BRYSON:**  All right.  Okay.

6       **DEPUTY COMMISSIONER SHIELDS:**  Oh, okay.  This -- I

7  guess I should pause -- check pauses here?

8       **PRESIDING COMMISSIONER BRYSON:**  Yes, please.

9                **(Off The Record)**

10      **ATTORNEY FOX:**  Mr. Rico?

11      **DEPUTY COMMISSIONER SHIELDS:**  Okay.

12      **DEPUTY DISTRICT ATTORNEY RICO:**  I'm here -- I'm

13  ready.

14      **PRESIDING COMMISSIONER BRYSON:**  And we're back on

15  record.  Is that (inaudible) now the light is not

16  blinking.

17      **DEPUTY COMMISSIONER SHIELDS:**  That's correct.

18      **PRESIDING COMMISSIONER BRYSON:**  All right.  The

19  time is now 1837.  And we'll test the system for a

20  moment.

21      **DEPUTY COMMISSIONER SHIELDS:**  We're fine.

22      **PRESIDING COMMISSIONER BRYSON:**  All right.  And I

23  believe at this point we have the -- Deputy Commissioner

24  is going to go over the incarcerating factors -- the

25  programming.

71

1          **DEPUTY COMMISSIONER SHIELDS:**  Okay, sir.  What we

2   have -- did your attorney tell you that there -- our

3   recording stopped and we kept talking?

4          **INMATE BASILE:**  (Inaudible)

5          **DEPUTY COMMISSIONER SHIELDS:**  Right.  So what I

6   want to do and since we've been through it I think it is

7   helpful -- what I want to do is get on the record what

8   you've done -- your programming.

9          **INMATE BASILE:**  Okay.

10         **DEPUTY COMMISSIONER SHIELDS:**  And what I covered

11  and maybe a little redundant but I want to make sure we

12  get it all that you have four vocations -- Electronics,

13  Furniture Upholstery, PC Repair and Air Conditioning.

14  You currently work as a clerk where?

15         **INMATE BASILE:**  At R & R.

16         **DEPUTY COMMISSIONER SHIELDS:**  At R & R.  And, you

17  know, I think you had -- your current rating is all 1's -

18  - is that true (inaudible)

19         **INMATE BASILE:**  My work performance -- I have one

20  here -- a chrono from one of my bosses.

21         **DEPUTY COMMISSIONER SHIELDS:**  Okay.  Your

22  performance has been above average.  You've been a good

23  worker.

24         **DEPUTY DISTRICT ATTORNEY RICO:**  Commissioner, I'm

25  sorry to interrupt but I'm just wondering because there

72

1    is the time gap there and there's a reference to the fact

2    that the equipment stopped recording.  So that no one

3    considers there any impropriety would be appropriate for

4    Counsel for the inmate and the inmate personally to waive

5    any irregularities for the record because the inmate, as

6    I understand it, wishes to proceed with the hearing to

7    conclusion tonight.

8    　　　　　**ATTORNEY FOX:**  Sure.  You would waive any --

9    　　　　　**INMATE BASILE:**  Whatever -- waived.

10    　　　　　**ATTORNEY FOX:**   -- any requirements?  Mr. Basile

11    would like to complete the hearing this evening.

12    　　　　　**DEPUTY COMMISSIONER SHIELDS:**  Okay.  And I

13    apologize to the group because I'm the one that needs to

14    confess that I didn't hit the button when we did a fax.

15    So you have four vocations.  Your work performance has

16    been good.  You have many self-help chronos and I

17    actually counted them up again.  You have more than 55

18    since you've been down.  You pointed out that you've had

19    two moves.  You've been to two different institutions in

20    the last two years so numerically you have fewer chronos.

21    You've done four of the courses in the Impact program.  I

22    believe you had an Anger Management class and you had --

23    what was --

24    　　　　　**INMATE BASILE:**  The VOEG group from November to

25    May.

73

1    **DEPUTY COMMISSIONER SHIELDS:**  Right.  And why

2    don't you give me -- let me put that in -- that it's the

3    Victim --

4         **INMATE BASILE:**  Victims Offender Education Group.

5         **DEPUTY COMMISSIONER SHIELDS:**  Right, and you have

6    been -- and as I recall what you said was that you had

7    been applying a Twelve Step approach and as is not

8    uncommon you had sort of mastered that and then you found

9    this new program, Victim Offender Education Group, VOEG,

10   at San Quentin and you have been working on that.  That's

11   been your primary activity for almost the last year --

12   for most of the last year and I believe it's a multi part

13   program and you had done 20 --

14        **INMATE BASILE:**  Twenty-two weeks.

15        **DEPUTY COMMISSIONER SHIELDS:**  -- 22 weeks of the

16   original program and now you're in --

17        **INMATE BASILE:**  The next step.

18        **DEPUTY COMMISSIONER SHIELDS:**  -- the next step and

19   you -- the coordinator for this is Raquel Edwards, E-D-W-

20   A-R-D-S, an MFT, Marriage Family Therapist, who's the

21   facilitator.  You're -- presented a letter of support

22   from her saying that you're -- that she's supporting your

23   being found suitable for parole at this hearing.  She's

24   known you for the last seven months and she believes that

25   you will be a safe contributing member of society once

74

1    released and will be an asset to your community,

2    "especially those headed down the path he once was on.  I

3    hope you find him suitable for parole."  And you have

4    several certificates related to that.  We did Dr.

5    Starrett's psych before we -- before the recording

6    problem.  I did want to go over your disciplinaries.  As

7    I recall you had five 115s -- the last was in 1993.  You

8    also have had since you've been here five 128As, the last

9    being in 2002.  Have I missed anything as a general

10    synopsis there?

11         INMATE BASILE:  No, just the fact that I was in

12    Narcotics Anonymous from 1989 to approximately 2004, the

13    last four years being done at the Love Lifted Me Up

14    Ministry --

15         DEPUTY COMMISSIONER SHIELDS:  Right.

16         INMATE BASILE:  -- conducted by pastor Tom Hooper

17    and presently or since 2004 to present time I've been

18    involved in the Bible study classes that's offered by his

19    wife, Miss Dottie Hooper.

20         DEPUTY COMMISSIONER SHIELDS:  Okay.  And also

21    actually your parole plan includes paroling to a facility

22    -- I'm just putting that in now -- to a facility run by

23    that group so you have an ongoing contact with them.  Ms.

24    Fox, does anything else come to mind?  Because this is

25    part of the record.  It's in the Board report so anyone

75

1    can also refer to that.

2            ATTORNEY FOX:  I just emphasize that there were

3    two serious 115s and three of them were administrative --

4            DEPUTY COMMISSIONER SHIELDS:  Okay.

5            ATTORNEY FOX:  -- in the last --

6            PRESIDING COMMISSIONER BRYSON:  And I count four

7    128As.  It's a small point but --

8            ATTORNEY FOX:  Well, I have four 128As, last in

9    '02.

10            DEPUTY COMMISSIONER SHIELDS:  One, two -- you're

11    right.  Okay.  I'm turning it back to the Commissioner.

12            PRESIDING COMMISSIONER BRYSON:  All right.  Then

13    as to parole plans, first of all your parole plans were

14    to parole to the Bible Tabernacle placement, correct?

15            INMATE BASILE:  That's correct.

16            PRESIDING COMMISSIONER BRYSON:  And this was --

17    this would be available -- this is in the New Life

18    Institute, Canyon Country, Los Angeles.

19            INMATE BASILE:  That's correct.

20            PRESIDING COMMISSIONER BRYSON:  You provide

21    program information into recovery programs, adjusting to

22    reentry back into society and future employment.  Then we

23    have a letter from a gentleman named Ernie Hickson, H-I-

24    C-K-S-O-N.  This is December 15, 2006 who has a son who's

25    also incarcerated and he -- this gentleman has met you

76

1    and known you for approximately ten years and he's a

2    retired school administrator with lots of experience

3    working and helping others to build personal skills and

4    he feels he knows (inaudible) of your mistake.  He says

5    he's willing to assist you in any way possible upon your

6    release and will do what he can to support you in finding

7    housing, employment, moral support and to otherwise

8    transition back into community life.  Very good

9    recommendation.  And then we have an October 22nd, 2006

10   letter from Shirley --

11           INMATE BASILE:  McCurcher (phonetic).

12           PRESIDING COMMISSIONER BRYSON:  McCurcher --

13   thanks again -- and she's writing as your cousin and says

14   that she's gotten to know you better and she feels you'll

15   be able then to transition back into society and she says

16   has no intention of seeing anyone who's associated with

17   during the time you got into trouble.  "Everyone

18   concerned knows he has my welcome and welcome to our

19   family -- we'll support him in any way we can.  He's

20   intelligent, he's worked hard, he knows what's at stake

21   and he will succeed."  Then we do have from Dottie Hooper

22   and Pastor Tom Hooper the information on Christian Twelve

23   Step Recovery Ministries in the program -- the Love

24   lifted Me Recovery program and the Bible Tabernacle.

25   material. (Inaudible) My apologies.  Mr. Rico, are you

77

1    still in the vicinity?

2        **DEPUTY DISTRICT ATTORNEY RICO:**  Yes, I am,

3    Commissioner.

4        **PRESIDING COMMISSIONER BRYSON:**  Thank you.  We're

5    concerned because the last DA that left the room left the

6    building as well and so we didn't know.  All right.  So

7    we're -- we have the Bible Tabernacle material.  Then we

8    also have a letter from your cousin as of October 12th,

9    2006, Carol Ann Walter, and she writes that you began to

10   reach out to family members and they started to write

11   back and forth.  "He knows he's made mistakes and is very

12   remorseful of things in his past.  I understand

13   (inaudible) was very helpful to you, the inmate, and

14   hopes to be -- will thereafter be paroled with all my

15   heart.  He intends to make a new start with his life,"

16   she believes and that you have a network of family

17   wanting to help you in any way she can and she says,

18   "Personally I will be there for him.  I know David and I

19   know he is sincere."  So those are all very good support

20   letters.  Is there anything we missed?

21       **ATTORNEY FOX:**  Well, I'd like to submit a

22   preferred placement partner in Manpower, which is a

23   source of employment opportunity.  It's not a job offer

24   but it's an employment agency.

25       **PRESIDING COMMISSIONER BRYSON:**  I see.

78

1    ATTORNEY FOX:  And he's already got an ID card

2    from them so once he does get out he'll be able to

3    (inaudible) employer.

4    PRESIDING COMMISSIONER BRYSON:  And this is a --

5    they match the -- this is a computerized system it

6    appears and they match your skills with future employers?

7    INMATE BASILE:  When I took the PC Repair course

8    at Hartford once I graduated that Manpower put me on a

9    preferred service list.

10    PRESIDING COMMISSIONER BRYSON:  I see.  Very good.

11    And this is a letter confirming this from a Robert V.

12    Antonucci -- that's A-N-T-O-N-U-C-C-I, Doctor of

13    Education, the president of Manpower.  This is in Ione,

14    California.  Is that correct?

15    INMATE BASILE:  That's where I was at at the time

16    of --

17    PRESIDING COMMISSIONER BRYSON:  Oh, that's right.

18    I'm sorry.  This is out of Scranton, Pennsylvania.  So

19    how would that work?

20    INMATE BASILE:  Manpower is a temporary agency

21    associated throughout the nation --

22    PRESIDING COMMISSIONER BRYSON:  Okay.

23    INMATE BASILE:  -- and there is one in San Jose

24    that I went through way back when.  I'm sure there's one

25    down in southern California.

79

1    **PRESIDING COMMISSIONER BRYSON:**  Okay.  Thank you.

2    All right.  Now, we sent out 3042 notices.  Those notices

3    go to agencies having a direct interest in your case.  We

4    have a representative from Santa Clara County District

5    Attorney's office present who will have the opportunity

6    to make a statement regarding parole suitability prior to

7    completing this hearing.  We do have a letter in

8    opposition from the Sunnyvale Department of Public

9    Safety.  This is authored by Lieutenant David Tibbs

10   (phonetic) investigation division, Sunnyvale Department

11   of Safety, and basically the department opposes your

12   parole.  The department basically reiterates the crime,

13   facts, and as they are presented in the probation officer

14   report, and then the last paragraph says,

15           "Based on all the aforementioned

16           information I feel Mr. Basile murdered Miss

17           McCaffey, a 19-year-old mother of an infant

18           strictly for financial gain.  According to

19           Mr. Basile's own words was a very violent

20           murder with Miss McCaffey struggling for

21           life for 12 minutes prior to succumbing.

22           Mr. Basile also discounted the fact that

23           McCaffey's 5-year-old daughter was asleep

24           down the hall whenever he murdered her.

25           Based on these facts -- "

80

1  We found an error in this letter -- we don't know what

2  the (inaudible) of this error is but the lieutenant's

3  letter says, "Based on these facts I feel Mr. Smith

4  should not be released back into the community."

5  Obviously an error in this letter.

6      **ATTORNEY FOX:**  Commissioner, I believe he said --

7  it was a five-month-old daughter -- a five-year-old but

8  it's --

9      **PRESIDING COMMISSIONER BRYSON:**  Did I say that?

10     **ATTORNEY FOX:**  You did.

11     **PRESIDING COMMISSIONER BRYSON:**  Yeah, thank you.

12  It is a five-month-old daughter so I stand corrected on

13  there.  Thank you.

14     **ATTORNEY FOX:**  You bet.

15     **PRESIDING COMMISSIONER BRYSON:**  All right, and

16  Commissioner, do you have any questions that you --

17     **DEPUTY COMMISSIONER SHIELDS:**  No, I don't.

18     **PRESIDING COMMISSIONER BRYSON:**  Then I'd like to

19  ask the district attorney if you have questions of this

20  inmate.

21     **DEPUTY DISTRICT ATTORNEY RICO:**  Just briefly.  Had

22  Mr. Basile ever shot up with heroin with the victim, Toni

23  Rae McCaffey before the date of the crime, September 22nd,

24  1982?

25     **INMATE BASILE:**  That was my first time doing drugs

81

1    with her but I would like to state for the record that

2    Toni and my brother had used on prior occasions

3    previously I should say -- previous occasions.

4         **DEPUTY DISTRICT ATTORNEY RICO:**  In Mr. Basile's

5    presence?

6         **INMATE BASILE:**  Yes, in my presence, in their

7    apartment probably for a span of four or five months.

8         **DEPUTY DISTRICT ATTORNEY RICO:**  And was that

9    cocaine that Toni was using or heroin?

10        **INMATE BASILE:**  Both.

11        **DEPUTY DISTRICT ATTORNEY RICO:**  Now, it's my

12   understanding that there was testimony in the trial from

13   a number of individuals including a Gary Nix, N-I-X, and

14   a Mr. Johanson -- Robert Johanson, J-O-H-A-N-S-O-N.   Is

15   that correct?

16        **INMATE BASILE:**  That's correct.

17        **DEPUTY DISTRICT ATTORNEY RICO:**  And Mr. Basile is

18   aware that Mr. Nix testified that Mr. Basile, David,

19   admitted to him that he was responsible for the

20   strangling death of Toni.  Is that correct?

21        **INMATE BASILE:**  Not the truth but it's what he

22   said.

23        **DEPUTY DISTRICT ATTORNEY RICO:**  All right.  And

24   there was also testimony at the trial from Mr. Johanson

25   that Mr. David Basile stated to him he had held Toni

82

1    down, choked her for between 12 and 18 minutes indicating

2    he had a pillow over her face, and that he had then used

3    a bandana around her neck to make sure she was dead.   Is

4    that his recollection of what Mr. Johanson testified to

5    at the trial basically?

6              INMATE BASILE:   Again, not the truth but that's

7    what he said.

8              DEPUTY DISTRICT ATTORNEY RICO:   All right.   Now,

9    did Mr. Basile inject Toni with heroin that night before

10   she died?

11             INMATE BASILE:   Yes.

12             DEPUTY DISTRICT ATTORNEY RICO:   And I think

13   earlier Mr. Basile described this incident by saying he

14   had put his arm around Toni's throat with the intent to

15   kill her, and choked her and then released her.   Is that

16   accurate?

17             INMATE BASILE:   Yes.

18             DEPUTY DISTRICT ATTORNEY RICO:   Looking at the

19   transcript -- Subsequent Hearing No. 3 transcript from

20   November 8th of 2005 at Page 7 then Presiding Commissioner

21   Fisher asked, "Okay.   And your participation in this was

22   that you went there with him.   Is that correct?   And you

23   said that you put your hands around her neck?"   And

24   inmate Basile answered, "Yes," and Commissioner Fisher

25   continued, "In a strangulation hold, but you said you

83

1   left before she died." Does Mr. Basile remember that?

2        **INMATE BASILE:** I'm looking right at it.

3        **DEPUTY DISTRICT ATTORNEY RICO:** And I guess maybe

4   it's just a small discrepancy but at that time when asked

5   by the Commissioner did you put your hands around her

6   neck he replied, "Yes." And today he's indicated that he

7   put his arm around her throat. Would he care to explain

8   if there is any discrepancy there?

9        **INMATE BASILE:** Yes, you're right. There is a

10  discrepancy there.

11       **DEPUTY DISTRICT ATTORNEY RICO:** So what did he

12  actually do?

13       **INMATE BASILE:** Like I stated -- I put my arm

14  around her neck.

15       **DEPUTY DISTRICT ATTORNEY RICO:** What makes Mr.

16  Basile a different person as he sits there today than the

17  person that he was on September 22nd, 1982?

18       **INMATE BASILE:** In 1982, I didn't care about

19  myself much less anybody else. I had no empathy for

20  anybody. I had no self-esteem, no self-worth as evident

21  by my behavior. When I came to prison just -- somebody

22  didn't just take a wand and tap me on the shoulder and

23  transform me. I took part in programs to help me help

24  myself. Nobody forced me to. This came out of my own

25  heart because I wanted to. I know that having learned the

84

1  things about myself, my own personal past, what I've

2  lived through, what I've gone through has been shameful.

3  I've carried that guilt around me for a lot of years and

4  having discovered basically Pastor Tom was probably the

5  biggest motivation in my life because it helped me free

6  myself from that burden of guilt.  I know that if I was

7  to walk out of prison today I wouldn't be a threat to

8  anybody.  I have respect for people.  I listen to people.

9  I can hear what they have to say.  I have empathy for

10  people, and besides I have developed a self-esteem and

11  self-worth about myself that didn't exist in my life

12  before, and I think having that opportunity to care about

13  something versus not is a significant jump from where I

14  was before to where I'm at now.

15        **DEPUTY DISTRICT ATTORNEY RICO:**  And can Mr. Basile

16  add anything further as to why that night he went to

17  Toni's place and then put his arm around her throat with

18  the intent to kill?  What caused him to do that?

19        **INMATE BASILE:**  My state of affairs at the time --

20  to say was chaotic would be an understatement.  My whole

21  life was upside down.  I had just been bailed out of

22  jail.  My wife was expecting delivery in roughly two, two

23  and a half weeks.  I wasn't there.  My situation with

24  compound burglaries again, you know, would reflect a

25  person who didn't care, and my situation with my brother

85

1    has always been an influence in my life regardless of

2    what we did, whether it was good or bad or whatever the

3    upbringing was it was -- the circumstances.  In this

4    state right here -- in the state of mind that I was in it

5    didn't take much to just, you know, push me into a

6    position to go along and be an accomplice to this act.

7    When I got into the apartment -- I remember Commissioner

8    Bryson asked me was it, you know, was -- did I intend to

9    kill.  Upon thinking about that statement that I made,

10   you know, I don't know if it was really intent because I

11   didn't want to.  I didn't want to be there and I don't

12   know how I can convince you of the fact that I didn't

13   want to be in that room with my brother and Toni and at

14   that time.  But there was something that was compelling

15   me to do it and I put my arm around her neck and during

16   the course of doing this I stopped.  That's the truth.

17   That's what happened that night.  I was there.  Gary Nix

18   wasn't there, Robert Johanson wasn't there, but I was.

19   And the only other person that was that was living was my

20   brother and he's dead.  And, you know, after I left if it

21   was him by his hand who tied the bandana around her neck

22   I can only make an assumption.  I can't say for certain

23   that my brother did it although I have today, but it's an

24   assumption on my part because I was not there.

25        **DEPUTY DISTRICT ATTORNEY RICO:**  Does Mr. Basile

86

1    still feel a certain amount of anger because of what

2    happened that night?

3           **INMATE BASILE:** I don't feel anger at what

4    happened that night. I feel an anger because it's hard

5    to defend myself against people that were compelled to

6    get on the stand and testify against me and make up lies.

7    You look at the preliminary hearing transcripts -- those

8    statements are not there because when they came to my

9    trial the district attorney had to fine tune them a

10   little bit because they already lost the case on my

11   brother with both those guys testifying.  You got to ask

12   yourself why was that -- why did testimony change.

13   Because you already blew it on two cases and now I'm the

14   third guy.  I'm the third guy so come at me with

15   everything you got because you already let my brother

16   walk.  And so they were compelled -- Nix got $6,500 in

17   the Witness Protection Program.  Robert Johanson had a

18   charge hanging over his head that he was running from and

19   they made a deal where he didn't do a day in jail.  So

20   that's where my anger comes from.  It's hard to defend

21   myself against words on a piece of paper that people take

22   verbatim.  I was there.  I've told you in 1998 you want

23   to know the truth?  I'll tell you the truth.  And I came

24   foreword with the truth and you've been cutting me apart

25   ever since -- ever since.  That's where my anger comes

87

1    from.

2        **DEPUTY DISTRICT ATTORNEY RICO:**  Just for the

3    record when Mr. Basile was talking about, you know, you

4    have done this he's not talking about me personally.  I

5    wasn't the trial prosecutor in this case.

6        **INMATE BASILE:**  No, sir -- no, sir and I'm sorry

7    for inferring it.

8        **DEPUTY DISTRICT ATTORNEY RICO:**  And if -- I think

9    I've asked Mr. Basile in the past before we realized that

10   his brother was dead how he would feel if they crossed

11   paths if you were released.  So my last question is how

12   would he feel if he were to be released and he crossed

13   paths with Mr. Nix or Mr. Johanson or any of the others

14   that he believes testified in a way that he does not

15   believe to be truthful.

16       **INMATE BASILE:**  Well, number one, you did ask me

17   that question, which initiated my postponement from my

18   January hearing because I wanted to have those questions

19   addressed by a psychiatrist, and you saw the response

20   that he had.  I'm telling you that I am light years away

21   from where I was at 24 years ago -- light years.  If you

22   think for one minute that I would step out of prison and

23   go look those people up or put me in a high-risk

24   situation where those people are probably dwelling today

25   you got to be -- there's got to be something wrong with

88

1    your thinking.  I just spent 24 years in prison.  I've
2    watched guys come back -- oh, I'm sorry -- I've watched
3    guys come back because they come here, they don't learn
4    nothing about themselves, and they go back out into the
5    same environment.  I haven't.  I've come here and I've
6    learned something about myself.  I've grown as a man.
7    I've matured as a man.  I've done things to build up my
8    self-esteem, my self-worth.  I've been a hard worker as
9    reflected by all my jobs that I've ever had and I want to
10   get back out in society, do some more work so that I can
11   at least have some kind of retirement when I get out, you
12   know, when I get of the age.  I don't have time to be
13   thinking about things like that, and I know when I gave
14   that response the last time you stated, "I just can't
15   believe that you would spend 24 years in prison and not
16   hold any resentment."  Well, I'm telling you, Mr. Rico, I
17   don't hold resentment for those men.  They did what they
18   had to do in their lives at that time.  I don't harbor
19   animosity towards them.
20        **DEPUTY DISTRICT ATTORNEY RICO:**  And I'm sorry,
21   Commissioner.  The real last question -- I was looking at
22   Page 10 of the report prepared by Richard Starrett, and
23   there's one line in there that says, "It appears that all
24   family members are coming up for a visit that should be a
25   healing experience", and that report's dated 4/19/07.

89

1    I'm wondering how it was that the author was informed

2    that there would be family members coming up for a visit

3    for a healing experience.  Does Mr. Basile recall how

4    that occurred?

5        **INMATE BASILE:**  Yes, sir.  Let me clarify this

6    whole situation for you.  Based upon your question to me

7    about how I would respond to my brother -- and I've

8    already stated for the record earlier today that I was

9    kind of concerned about that because he's family -- he's

10    family.  And there was a possibility -- a high

11    probability that maybe somewhere down the line our paths

12    would cross.  I wanted to know.  I wanted to know.  This

13    is what generated this dialogue between my brother and

14    me.  I found out about my brother's death prior to me

15    going in for this psychological evaluation, and when I

16    went in I already knew that Rochelle was scheduling

17    dialogue with my brother Lou, and that was supposed to

18    have occurred in June but because he threw his back out

19    he had postponed and rescheduled for the first Monday in

20    August and I said to Rochelle that I did not want to

21    speak with Michaela until after I spoke with Lou because

22    there was some disharmony between her and him and I

23    wanted to make sure that it could be worked out because

24    my biggest goal in life right now is to restore Michaela

25    to her birthright of her name that her father has denied

90

1   her for 25 years.  That's where I'm at with Michaela.  I

2   want to give her back her family -- that's where I'm at.

3   That's what promoted this letter right here.  That's why

4   Dr. Starrett knew it because it wasn't a plan -- it's

5   just something that just took on a life by itself and

6   when it all started to develop I started thinking about

7   it and I felt that, you know, what better way can I make

8   amends to Michaela but to give back her family.  I

9   contacted all my cousins -- I informed her that hey,

10  look, I'm in touch with Michaela -- there's a possibility

11  that I'm going to have a dialogue with her -- how do you

12  feel about opening up your arms and taking her into your

13  life?  And this is on my dad's side of the family, and

14  they were all for it, and that's why Dr. Starrett said

15  what he said because this is the way that I explained it

16  to him.

17          DEPUTY DISTRICT ATTORNEY RICO:  I have nothing

18  further.

19          PRESIDING COMMISSIONER BRYSON:  All right -- thank

20  you.

21          DEPUTY COMMISSIONER SHIELDS:  Actually I want to

22  follow up --

23          PRESIDING COMMISSIONER BRYSON:  Go ahead.

24          DEPUTY COMMISSIONER SHIELDS:  -- last couple

25  questions and I want to make sure I understand.  Your

91

1    mother has passed away?

2          **INMATE BASILE:**  My mother died September 29, 2004.

3          **DEPUTY COMMISSIONER SHIELDS:**  Okay.  Did you

4    inherit any money from her?

5          **INMATE BASILE:**  No, ma'am.

6          **DEPUTY COMMISSIONER SHIELDS:**  She was the one that

7    was worried about money and she ended up dying without

8    money?

9          **INMATE BASILE:**  I think she gave it all to my

10   brother Lou -- everything -- because Lou was taking care

11   of her.

12         **DEPUTY COMMISSIONER SHIELDS:**  Okay.

13         **INMATE BASILE:**  Moved her up and, you know,

14   (inaudible) in one her houses --

15         **DEPUTY COMMISSIONER SHIELDS:**  And then when did

16   your father pass away?

17         **INMATE BASILE:**  April 8th, 1999.

18         **DEPUTY COMMISSIONER SHIELDS:**  And you did inherit

19   some money from him?

20         **INMATE BASILE:**  Yes.

21         **DEPUTY COMMISSIONER SHIELDS:**  Did everyone inherit

22   money or did he just --

23         **INMATE BASILE:**  No.

24         **DEPUTY COMMISSIONER SHIELDS:** -- just you?

25         **INMATE BASILE:**  No. (Inaudible) I will submit it

92

1   if --

2       **ATTORNEY FOX:**  Did he have a will if you'd like to

3   --

4       **DEPUTY COMMISSIONER SHIELDS:**  Oh, I don't think I

5   -- no, this is more superficial -- my question.  You

6   inherited some money and --

7       **INMATE BASILE:**  My brother Lou was the executor

8   and inherited $350,000, give or take.  I inherited

9   $100,000 and my brother Bob got a dollar.

10      **DEPUTY COMMISSIONER SHIELDS:**  Okay.  We won't go

11  into that.  And then of your $100,000 you gave $50,000 to

12  Michaela?

13      **INMATE BASILE:**  Correct.

14      **DEPUTY COMMISSIONER SHIELDS:**  And then you kept

15  the rest?

16      **INMATE BASILE:**  There was -- yeah, there was a,

17  you know, about $20,000 in attorney fees.  Then I

18  invested it and I had it in the stock market and I bought

19  (inaudible) in Enron stock and I lost a lot and --

20      **DEPUTY COMMISSIONER SHIELDS:**  Okay, and what -- I

21  mean, part of that is relevant.  How much money do you

22  have when you parole?  You have a little nest egg?

23      **INMATE BASILE:**  No, I don't.  I have -- I have

24  enough to where I could, you know --

25      **DEPUTY COMMISSIONER SHIELDS:**  Okay.

93

1    **INMATE BASILE:** -- put clothes on my back and food

2    in my mouth, maybe provide for transportation.

3    **DEPUTY COMMISSIONER SHIELDS:** Okay. And then I

4    noticed in the letter from Ms. Edwards that Michaela is

5    referred to as Basile. Now, who raised her?

6    **INMATE BASILE:** Her father, Robert Basile.

7    **DEPUTY COMMISSIONER SHIELDS:** Okay. Then why did

8    you say he was denying her her name?

9    **INMATE BASILE:** When this took place Bob took

10    Michaela, went to out of state -- New Mexico -- and then

11    he came back to LA. Nobody in the family had much

12    (inaudible). When my Aunt Millie died in '93 Michaela

13    and Bob went up there to pay their respects in San Jose

14    and they were pretty much ostracized. She never got a

15    chance to meet anybody. The only person that she saw up

16    there that she recognized and -- was my wife and she had

17    questions about her and then they went back to LA. There

18    was no communication with Ginger or Carol or Shirley

19    because Bob would not prevent [sic] her to do that. So -

20    -

21    **DEPUTY COMMISSIONER SHIELDS:** But he did allow you

22    to give you -- to give her the money?

23    **INMATE BASILE:** Right, through an attorney.

24    **DEPUTY COMMISSIONER SHIELDS:** So you got his

25    permission to do that or you just did it because he --

94

1    she was 18?

2         INMATE BASILE:  I waited until she turned 18.  I

3    didn't need his permission.

4         DEPUTY COMMISSIONER SHIELDS:  That's all I have.

5         PRESIDING COMMISSIONER BRYSON:  All right.

6         INMATE BASILE:  Actually I'd like to state for the

7    record --

8         DEPUTY COMMISSIONER SHIELDS:  Okay.

9         INMATE BASILE:  -- that I had spoken to Michaela

10   when she was 17 years 11 months old, and I asked her -- I

11   said -- "Hi, Uncle Dave, how you doing, you know, I'm

12   sorry you're up there -- I wish you could get out, blah

13   blah blah."  "So, Michaela, do you know what happened to

14   your mother?"  She says, "Well, Dad told me that Tom

15   Birchfield killed her."  I said, "What?" and I says,

16   "What did Grandma tell you?"  She says, "She'd tell me

17   the truth when I turned 18."   I said, "All right."  When

18   she turned 18 my mom didn't tell her the truth.  I told

19   her the truth.  I was the one that broke the news to her.

20   And from the time she was 18 to the time when her father

21   died she didn't have much contact with him.

22        PRESIDING COMMISSIONER BRYSON:  And what did you

23   tell her?

24        INMATE BASILE:  What did I tell her?  I told her

25   what I told this Panel today -- that I left Bob in the

95

1    room with (inaudible) and I'd heard prior to it, you

2    know, allegations of molestation on Bob's part. I heard

3    of abuse, selling her for $40 crack offs (phonetic),

4    things so disgusting that it was (inaudible) in

5    Michaela's and I was heartbroken and I told her that --

6            PRESIDING COMMISSIONER BRYSON:  Did you hear this

7    from her?

8            INMATE BASILE:  I heard it from her. If it's the

9    last thing I do I'm going to give you back your family

10   and that's why I contacted (inaudible) why I'm contacting

11   Lou because there's a little rift between them that I

12   want to mend first and then from then go to my son, go to

13   my other cousins, Shirley and Carol and Ginger, and

14   through that we'll open up doors so she can meet

15   (inaudible) family but she doesn't even know them.

16   Doesn't even know about it. She's been down there on her

17   own raising a child -- seven years --

18           PRESIDING COMMISSIONER BRYSON:  And what's the

19   situation she's in now?

20           INMATE BASILE:  She's working and she's living in

21   an apartment down there. She's managing but she has

22   nobody. She has nobody.

23           PRESIDING COMMISSIONER BRYSON:  Counsel, do you

24   have questions for this inmate?

25           ATTORNEY FOX:  No -- no questions -- thank you.

96

1       PRESIDING COMMISSIONER BRYSON:  All right.  Then I
2   would invite the district -- one question?

3       DEPUTY DISTRICT ATTORNEY RICO:  Yeah, just a
4   follow-up just to -- I thought that Mr. Basile had
5   indicated earlier that he hadn't seen her since she was
6   six months old.  How is he aware of her circumstances?
7   Did I misinterpret that?  Is somebody --

8       PRESIDING COMMISSIONER BRYSON:  I believe that is
9   what you did say earlier, sir.

10      INMATE BASILE:  Yes.  Had I seen her -- no, I had
11  not.  But that doesn't prevent one from writing.

12      PRESIDING COMMISSIONER BRYSON:  Oh, sorry -- okay.
13  So it was our misinterpretation that --

14      INMATE BASILE:  I didn't mean to --

15      PRESIDING COMMISSIONER BRYSON:  Okay.  So you've
16  been -- you've corresponded with her.

17      INMATE BASILE:  Yes, I have.

18      ATTORNEY FOX:  And that was my understanding.
19  He'd asked if he'd seen her and he hadn't seen her.

20      DEPUTY COMMISSIONER SHIELDS:  But didn't that come
21  up within context of how -- I thought Ms. Edwards was the
22  one that contacted her -- that you didn't -- hadn't --

23      INMATE BASILE:  It's not true.

24      DEPUTY COMMISSIONER SHIELDS:  Okay.  Well, that's
25  probably not that relevant -- that's fine.

97

1          **DEPUTY DISTRICT ATTORNEY RICO:**  All right.  So

2    back to closing?

3          **PRESIDING COMMISSIONER BRYSON:**  If you're ready

4    for closing.  If you have any more questions --

5          **DEPUTY DISTRICT ATTORNEY RICO:**  I am.

6          **PRESIDING COMMISSIONER BRYSON:**  All right.

7          **DEPUTY DISTRICT ATTORNEY RICO:**  I am.  No, I'm --

8    this has been rather a protracted and drawn out hearing,

9    to say the least.  It all gets back to the crime that

10   took place on September 22nd, 1982 when shortly after

11   midnight Toni Rae McCaffey, 19 years old, was found

12   strangled in her apartment.  She had injection marks on

13   her, her blood was positive for cocaine and morphine --

14   I'm sorry, her bile was positive for cocaine and

15   morphine.  The facts are somewhat convoluted, to say the

16   least.  I think this hearing has been indicative of that.

17   There were a number of other individuals involved to some

18   extent in the circumstances that led up to Toni's murder.

19   There were indications that her husband Robert wanted her

20   dead and was soliciting her murder through others, and

21   that he had solicited that murder through his own brother

22   David.  Apparently he had been making comments to David,

23   indicating things that Toni was going to do like inform

24   the authorities about David's burglary activities.

25   Whether that be true or not that information was imparted

98

1    and the bottom line is that this young lady wound up dead

2    with her five or six-month-old infant Michaela asleep in

3    another room that night.  There are conflicts in the

4    evidence -- discrepancies between what witnesses

5    testified to under oath in connection with this case and

6    with what Mr. Basile is indicating today were the

7    circumstances.  And I guess the real question here is

8    whether or not Mr. Basile has come to terms with what it

9    is he did that night -- what caused this murder to occur

10   -- what his involvement was and why -- why he did this.

11   There was a reference I think in the -- perhaps the psych

12   eval and I don't have that right in front of me but a

13   statement that he had made saying that thinking about

14   what happened that night even up until today causes him

15   to wonder what kind of a weak-minded person he was at the

16   time.  Was he under the influence of his brother Robert

17   doing his bidding?  Was he under the influence of

18   narcotics and/or alcohol?  I think that in the 2003

19   hearing Mr. Basile referred to himself as a "dope fiend"

20   at the time.  He's indicated that he's different today.

21   The psychological evaluation indicates interestingly

22   enough in its -- and I'm looking for the page -- Axis I

23   diagnosis, opiate-dependence in institutional remission,

24   and then adult antisocial behavior.  But the

25   institutional remission is a bit concerning.  I recognize

99

1     that 1993 was some 13 years ago but it would appear that

2     13 years ago in a state prison setting, after being in

3     custody in state prison for almost ten years, it would

4     appear that there was still a usage that found its way

5     into the blood that was thereafter verified.  I would

6     hope that Mr. Basile's avoidance of drugs and alcohol is

7     something permanent that will last.  No one can ever

8     predict the future.  I see that he's nodding his head and

9     I think that he probably hopes that that's the case too

10    and he probably believes that it is the case.  But I

11    think in terms of determining whether or not he's

12    suitable one needs to assess just how believable things

13    are, and I asked him how he's a different person today

14    than he was at the time of the offense and he went on in

15    quite admirable fashion discussing the facts that he has

16    learned he's no longer got the lack of self-esteem, he's

17    confident in himself, he has changed, he has matured, et

18    cetera.  And on a number of levels that's probably true.

19    He was 30 at the time of the crime -- 55 or so now.  But

20    I guess it all gets back to what happened that night and

21    why, and if he's truly faced the demons that brought him

22    to that point.  And when asked towards the end of my

23    questioning about how he felt about these two other

24    individuals, maybe it's just the hour of the day but I

25    noted that his entire demeanor changed -- the level of

100

1    his voice changed.  There were indications of anger and

2    maybe justifiably so if it be true that he's not saying

3    that Robert actually finished Toni off but he's inferring

4    that.  He is admitting that he participated in that crime

5    to the extent of going over there, shooting her up with

6    heroin, and putting his arm around her throat with the

7    intention of killing her and then he indicates that he

8    thought better of it and backed off.  I don't think

9    anybody will be able to say exactly what happened that

10    night.  But I do know that when Mr. Basile was talking

11    he's indicated that he accepts responsibilities for his

12    actions but I think that he still sees himself in perhaps

13    a lesser role than he actually was and when I heard him

14    argue and when I heard him say just a little while ago

15    that he was an accessory in this crime he used the word

16    accessory.  He didn't say he was a killer.  He didn't say

17    he was participating in a conspiracy to commit murder.

18    He referred to himself as an accessory, and I think that

19    what's going on is an evolving process.  I think that he

20    is still in that evolution where he says he accepts full

21    responsibility but -- and maybe if he were to be released

22    and he crossed paths with Mr. Nix or Mr. Johanson they

23    would all shake hands and go have a cup of coffee

24    together.  But what I saw is indicative of perhaps some

25    issues that are as yet unresolved.  So I submit on

101

1    everything before this Board consideration of what the

2    evidence shows in the case in spite of the fact that

3    there are things that Mr. Basile should be commended for.

4    There are still issues that need to be addressed here and

5    that's his coming to terms with the full extent of his

6    accountability in connection with the victim's death, and

7    I think that when one reviews the psychiatric evaluations

8    -- the psychological evaluations and considers everything

9    that's happened today -- the testimony as well as the

10   evidence of the life crime -- that Mr. Basile still

11   presents an unpredictable risk which I submit would be

12   unacceptable at this time.  I would ask that he be

13   denied.  Thank you.

14          **PRESIDING COMMISSIONER BRYSON:**  Thank you.  And

15   now, Counsel, I'd like to invite you to make a closing

16   statement.

17          **ATTORNEY FOX:**  Thank you.  I respectfully disagree

18   with my honorable colleague from Santa Clara County.  Mr.

19   Basile should be found suitable because he is, and I'd

20   like to correct one point that was brought up by the

21   district attorney.  He referred in his closing to I

22   believe it was Page 7 of the transcript of the last

23   hearing where Ms. Fisher -- Commissioner Fisher -- asked

24   a question and part of that is -- let's see, if we start

25   at Line 10 and then go down to Line 15 get the full

102

1    flavor of that, it states, "Okay, and your participation

2    in this was that you went there with him.  Is that

3    correct?  And you said you put your hands around her

4    neck."  Inmate:  "Yes."  Presiding Commissioner Fisher:

5    "In a strangulation hold.  But you said you left before

6    she died."  So that's the relevant part.  But then when

7    the inmate is asked to give a narrative at Page 9 down at

8    the bottom, Commissioner Fisher at Line 25 -- again

9    that's Page 9 of the transcript -- Presiding Commissioner

10   Fisher asked, "Did you tie her with the bandana?" Line 27

11   -- inmate Basile:  "Oh, no -- no.  I had my arm around

12   her neck so all that other stuff was after I had left."

13   So in response to the question that was given or asked by

14   Commissioner Fisher --

15        **INMATE BASILE:**  (Inaudible)

16        **ATTORNEY FOX:**  It meant yes -- okay. (Inaudible)

17   he was answering yes to, "And your participation in this

18   is that you went there with him.  Is that correct?"  And

19   he answers that question before the transcriber has the

20   answer down -- Commissioner Fisher gets halfway through

21   her questions.  So I think there's -- it is internally

22   consistent and he's been consistent throughout his

23   testimony that he put his arm around her, and turning to

24   the unique training that someone who is a soldier in the

25   army has it would have been very simple to break her

103

1    neck.  If you're going to kill her why not just break her

2    neck?  That didn't happen.  What he says makes perfect

3    sense.  He abandoned this attempt because it sickened

4    him, quite frankly.  So we're not here to retry the facts

5    of the case.  So turning to the Board report that is

6    supportive -- he has a brother who is supportive of him.

7    He has viable, verifiable residential plans that are down

8    in Canyon Country, Los Angeles County which provide --

9    it's a residential plan which provides a comprehensive

10   residential recovery program.  The psychological report

11   is supportive.  Mr. Basile enjoys a Global Assessment of

12   Functioning of 90 which is outstanding in the inmate

13   community and remarkable, quite frankly.  He has grappled

14   for years with the causative factors of the crime and his

15   conduct and he has accepted full responsibility for his

16   conduct.  And then I think it's a bit misplaced and to

17   challenge the motives for meeting with the victims.  No

18   one can make the victim come to prison -- she does that

19   of her own volition and she will leave of her own

20   volition as well.  Regarding Mr. Basile's priors before

21   coming into the institution this time around they were

22   nonviolent.  Although burglaries are serious in these

23   incidences they were not violent.  And interestingly

24   enough after Toni had expired Mr. Basile left -- he left

25   the jurisdiction, went down to Los Angeles and of his own

104

1    volition returned.  I think that's remarkable as well.

2    Turning to -- oh, then as I said the -- I'm a little

3    truncated here because of --

4         **DEPUTY COMMISSIONER SHIELDS:**  Well, just take a

5    minute.

6         **ATTORNEY FOX:**  -- I'm on different pages.  Turning

7    to the parole plans they are realistic -- as I said

8    verifiable and he has marketable skills which -- and four

9    vocations -- again, that's a remarkable accomplishment.

10   And then my observation of his demeanor here today, and I

11   respond to the district attorney's.  In contrast to the

12   observation of the district attorney I'm sitting right

13   behind -- right beside Mr. Basile and I must say he's

14   emphatic when he must correct any erroneous information

15   and he gesticulates.  He is Italian.  At no time did I

16   feel frightened or scared or anything like that.  I just

17   saw it for what it was.  He has learned dispute

18   resolution skills.  He maintained his space and yet he

19   was emphatic in getting his communication across, and I

20   think he did that.  So I think it would be appropriate to

21   set a date for Mr. Basile for his release.  I'll submit

22   on that unless you'd like to make further comments.

23        **INMATE BASILE:**  Yes, I would.

24        **PRESIDING COMMISSIONER BRYSON:**  Sir, I'd like to

25   ask you, are you suitable for parole?

105

```
 1        INMATE BASILE:  I'm very suitable for parole
 2   because I've applied myself for years -- decade plus
 3   years and the rehabilitating myself when these prisons
 4   offered no rehabilitation, I found my way through a path
 5   that led me up to where I'm at today.  Nobody twisted my
 6   arm or put a gun to my head.  I did this on my own
 7   volition.  Mr. Rico is right when I say it for the record
 8   that I admitted being a dope fiend and -- but he didn't
 9   put it in context -- it was starting a narrative that
10   yeah, for a long time I was a dope fiend but I'm not a
11   dope fiend no more -- haven't been one for 12 years and
12   proud of it.  I get up every morning clean and sober and
13   happy about it.  I go down and I work and I work hard.
14   I'm diligent about what I do.  I'm a responsible person
15   to be trusted.  It was another thing that he brought up
16   about honor -- I value the honor of my word.  I believe
17   about being impeccable with my word.  No longer will I
18   make assumptions.  I'll be the best that I can in
19   anything that I do to the best of my ability and this was
20   all brought about by me.  Look around -- there's people
21   leaving these prisons every day that come here and do
22   vocational sun tanning and vocational physical training.
23   They don't stop to do anything to change their life
24   around.  They go back out to the same neighborhood, they
25   get caught up in the same trouble and they come right
```

106

1    back, and I see this every day in R & R, and I know that

2    if I had the opportunity and was found suitable that I

3    would leave this place and I would not come back.

4         **PRESIDING COMMISSIONER BRYSON:**  Thank you.  We'll

5    now recess for deliberations.  The time is 1930.

6                          **R E C E S S**

7                          --o0o--

107

1        CALIFORNIA BOARD OF PAROLE HEARINGS

2                D E C I S I O N

3        **DEPUTY COMMISSIONER SHIELDS:**  We're back on the

4    record.  Okay, Commissioner.

5        **PRESIDING COMMISSIONER BRYSON:**  And we (inaudible)

6    for the decision in the matter of David Basile, CDC No. C

7    Charles, 70016 and the time is 2016, and I should note

8    that the district attorney has vacated this hearing at

9    this point and we do have everyone else having returned

10   to the room.  Sir, the Panel deliberated and reviewed all

11   information received from the public and from you and

12   relied on the following circumstances in concluding that

13   you are not suitable for parole and would pose an

14   unreasonable risk of danger to society and a threat to

15   public safety if released from prison.  This offense was

16   carried out especially cruelly and callously in that on

17   September 22nd of 1982 the victim, Toni Rae McCaffrey, a

18   19-year-old live-in girlfriend of your brother, Robert

19   Basile -- she was a 5'6", 107 pound female.  She was

20   particularly vulnerable.  She was a slight woman in her

21   own home and she knew and trusted the inmate as uncle to

22   her daughter.  Under the guise of shooting her with

23   heroin the inmate carried out a plan he formulated with

24   his brother Robert, the victim's husband -- common law

25   **DAVID BASILE    C-70016    DECISION    PAGE 1    8/02/07**

108

1    husband.   Robert Basile had purchased the $100,000 life

2    insurance policy for the victim and had solicited

3    numerous individuals to kill her to collect the money.

4    The inmate was convicted of the victim's strangulation

5    death in the living room of her residence at 12522

6    Fisher, Avenue #7 in Sunnyvale.   This offense was carried

7    out in a dispassionate manner.   The inmate had previously

8    injected her with heroin.   Witness Robert Johanson

9    testified the inmate claimed after the murder, "I took

10   care of it and I got it out of the way" and that the

11   inmate held the victim down, covering her face with a

12   pillow for 12 to 18 minutes, then used the bandana around

13   her neck to ensure she died.   This victim was abused

14   during this offense.   Autopsy showed evidence of

15   intravenous injection on the victim's arm and lab

16   analysis of the victim's bile tested positive for cocaine

17   and morphine.   Sir, you do have a history of narcotics

18   violations, attempted burglary, receiving stolen

19   property.   You did suffer juvenile time in jail and adult

20   probation (inaudible) parole time, time in county jail

21   and prior to prison.   Your time in prison, sir, has been

22   minimal programming.   Currently you're a clerk in R&R and

23   you've received exceptional work reports.   You have four

24   vocations (inaudible) you have over 55 laudatory

25   **DAVID BASILE    C-70016    DECISION    PAGE 2    8/02/07**

109

1    chronos in your file.  You've been engaged in Bible study

2    since 2004.  You know your clean and sober date as of

3    January 1995, which you represented today to this Panel.

4    You have been involved in AA since 1989 and NA since 1999

5    through 2004.  You've been involved in the Love Lifted Me

6    Up program.  You've had anger management, had the Impact

7    program, the VOEG program, and you've been involved in

8    additional workshops for self-help.  Sir, you have five

9    115s, the most recent in 1993 for tattooing.  The

10   psychological report dated April 19th of 2007 by Dr.

11   Richard Starrett supports parole and gives you a low risk

12   of violence for recidivism and a Global Assessment of

13   Functioning of 90.  You do appear to have viable

14   residential plans in the Bible Tabernacle, Canyon Country

15   in Los Angeles, a residential recovery program.  And

16   Penal Code 3042 responses indicate opposition to a

17   finding of parole suitability, specifically by the

18   district attorney of Santa Clara County and Sunnyvale

19   Police Department.  In a separate decision the hearing

20   Panel finds it is not reasonable to expect that parole

21   will be granted in a period during the following three

22   years.

23          INMATE BASILE:  Three years?

24          PRESIDING COMMISSIONER BRYSON:  The specific

25   DAVID BASILE   C-70016   DECISION PAGE 3   8/02/07

110

1    reason for this finding are as follows.

2           **INMATE BASILE:**  I can't even believe it.

3    .    **PRESIDING COMMISSIONER BRYSON:**  Sir, you're going

4    to be asked to leave the room if you don't be quiet.

5    This offense was carried out especially cruelly and

6    callously in that on September 22nd of 1982 the victim,

7    Toni Rae McCaffey, 19 year old female was particularly

8    vulnerable.  She was a slight woman in her own home and

9    she knew and trusted you as an uncle to her daughter and

10   her daughter was Mikaela (phonetic) Basile, a five—month

11   old who was in her crib down the hallway from the place

12   of her mother's murder.  Under the guise of shooting her

13   with heroin, you carried out a plan you formulated with

14   your brother, Robert, the victim's common law husband.

15   Robert Basile had purchased a $100,000 life insurance

16   policy for the victim and had solicited numerous

17   individuals to kill her to collect the money.  The inmate

18   was convicted of the strangulation death of the victim

19   and murdering her in her residence at 12522 Fisher

20   Avenue, #7, in Sunnyvale.  This offense was carried out

21   dispassionately.  You had previously injected her with

22   heroin.  Witness Robert Johanson testified that you

23   claimed after the murder that "you took care of it, and

24   that you indeed smothered her and then used the bandana

25   **DAVID BASILE    C-70016    DECISION PAGE 4    8/02/07**

111

1    to strangle her."  This victim was abused during this

2    offense.  Autopsy showed the evidence of an intravenous

3    injection on the victim's arm and lab analysis of the

4    victim's bile tested positive for cocaine and morphine.

5    This offense was carried out in a manner demonstrating

6    exceptionally callous disregard for human suffering.

7    Reports indicated the victim struggled for many minutes

8    before she died.  You had many opportunities to cease

9    including after you put her under a headlock.  The motive

10   for this crime sir, this panel finds simply inexplicable

11   because you supposedly were her friend.  According to

12   your testimony today you did put the victim in a headlock

13   with your arm and then released her because you were so

14   reviled your actions.  Sir, your testimony today is not

15   supported by the evidence, the testimony at trial or the

16   jury's findings.  If you were so reviled by your actions,

17   you did nothing to ensure that she would live.  You let

18   her fall to the floor, and you left the scene. Then you

19   lied about the offense, including to your own mother.

20   And sir, today we had a lot of challenges just getting

21   through this hearing physically.  And this panel felt

22   that you showed your true colors here today -- that you

23   showed a considerable amount of latent anger.  And we

24   don't know the exigent circumstances going on in your

25   **DAVID BASILE    C-70016    DECISION PAGE 5    8/02/07**

112

1   family or what has gone on in your family.  We can't

2   delve into that at a hearing of this length and scope.

3   So if you object to anything in today's hearing, you have

4   a right to go directly to court, but all we can to is use

5   the evidence that has been presented to us and that we

6   have put together (inaudible) together our understanding

7   of this crime.  And frankly, it seems incredible that in

8   fact, she died the way you say she did.  We have to go

9   with what the evidence has shown, but also you come to

10  the table today in a way that showed us that there is a

11  lot of latent anger there for probably many reasons and

12  we can't take the chance that they are for the wrong

13  reasons and that you are going to go out and express that

14  anger sometime and hurt someone. That's (inaudible).  And

15  we want you to continue to program well.  You said that

16  (inaudible) was good experience for you so that's good.

17  You are obviously contributing in that way.  And we hope

18  that you will continue to take more anger management.

19  Well, whatever you have to do, you have to do, sir.

20         ATTORNEY FOX:  I'd like the record to be clear

21  that the physical challenges surrounding getting through

22  this hearing had nothing to do with him.

23         PRESIDING COMMISSIONER BRYSON:  That's correct,

24  they had absolutely nothing, but the hearing was

25  DAVID BASILE    C-70016    DECISION PAGE 6    8/02/07

113

1  protracted and it's very late in the evening.  So we

2  understand all that, but nevertheless, we felt that at

3  your age, and with the training you've had and the

4  presence that we felt that you displayed, which in

5  truthfulness probably is lazy (inaudible).

6      **INMATE BASILE:**  (inaudible) explain my dismay over

7  the fact that you take this in black and white, you take

8  it for granted –

9      **PRESIDING COMMISSIONER BRYSON:**  No, sir, wait.

10      **MALE:**  That's enough, the hearing's over.  Listen

11  to the Commissioner.

12      **PRESIDING COMMISSIONER BRYSON:**  Okay.  I have some

13  important information I want to --

14      **ATTORNEY FOX:**  (Inaudible).

15      **PRESIDING COMMISSIONER BRYSON:**  I'll turn it over

16  to Commissioner Shields for her remarks.

17      **DEPUTY COMMISSIONER SHIELDS:**  Okay, thank you,

18  Commissioner, sorry to take over there.  You know, I

19  really agree with what the Commissioner said, but what I

20  want to focus on with you is that a lot of my decision

21  was based on just the sense I got of you as a person

22  sitting through a rather lengthy hearing.  And what I see

23  you as is someone who wants to avoid paying and escape

24  responsibility and it makes a lot of sense.  Many times

25  **DAVID BASILE    C-70016    DECISION PAGE 7    8/02/07**

114

1    addicts are people who are like that.  Many times based

2    on your childhood, you know that may be a (inaudible)

3    mechanism.  But it's not something that's going to serve

4    you while you are in here or out there and you know, I

5    think and example to me that is not relevant to this

6    matter at all except that I felt it kind of showed who

7    you were because you inherited money and you put it in a

8    trust, so it doesn't count.  So, it's totally for you.

9            **INMATE BASILE:**  Okay.

10           **DEPUTY COMMISSIONER SHIELDS:**  You have public

11   defenders so obviously whatever funds you have, you

12   haven't disclosed those as far as paying for your own

13   defense.

14           **INMATE BASILE:**  Okay.

15           **DEPUTY COMMISSIONER SHIELDS:**  Okay, that's fine.

16   And I think the other thing that you need to know is that

17   part of the length of our deliberation was we discussed

18   all the possibilities of giving you a date, but you need

19   to be aware that most of our focus was on giving you an

20   even longer amount of time.

21           **INMATE BASILE:**  I don't know what purpose it's

22   going to serve.

23           **DEPUTY COMMISSIONER SHEILDS:**  Well, so now that's

24   (inaudible).

25   **DAVID BASILE    C-70016    DECISION PAGE 8    8/02/07**

115

1          **PRESIDING COMMISSIONER BRYSON:**  That concludes

2    this hearing. The time is now 2020 hours.

3          **MALE:**  All right, let's go.

4                    **A D J O U R N M E N T**

5                       --o0o--

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21    PAROLE DENIED THREE YEARS

22    THIS DECISION WILL BE FINAL ON: November 30, 2007

23    YOU WILL BE PROMPTLY NOTIFIED, IF PRIOR TO THAT

24    DATE, THE DECISION IS MODIFIED.

25    DAVID BASILE   C-70016  DECISION PAGE 9    8/02/07

116

**CERTIFICATE AND**

**DECLARATION OF TRANSCRIBER**

I, GITA SCHMITZ, a duly designated transcriber, FOOTHILL TRANSCRIPTION COMPANY, INC., do hereby declare and certify under penalty of perjury that I have transcribed the audio recording which covers a total of pages numbered 1 - 115, and which recording was duly recorded at SAN QUENTON STATE PRISON, SAN QUENTIN, CALIFORNIA, in the matter of the SUBSEQUENT PAROLE CONSIDERATION HEARING of DAVID BASILE, CDC No. C-70016, on AUGUST 2, 2007, and that the foregoing pages constitute a true, complete, and accurate transcription of the aforementioned audio recording to the best of my ability.

I hereby certify that I am a disinterested party in the above-captioned matter and have no interest in the outcome of the hearing.

Dated SEPTEMBER 14, 2007 at Sacramento County, California.


_Gita Schmitz_

_____
Gita Schmitz, Transcriber
**Foothill Transcription Company, Inc.**

**LIFE PRISONER EVALUATION REPORT**
**SUBSEQUENT PAROLE CONSIDERATION HEARING**
**JANUARY 2007 CALENDAR**

I.    **COMMITMENT FACTORS:**

    A.    **Life Crime:**

| | |
|---|---|
| **Commitment Offense:** | 1st Degree Murder (PC 187) |
| **County of Commitment:** | Santa Clara County |
| **Case Number:** | SCL93965 |
| **Received to CDCR:** | November 16, 1984 |
| **Sentence:** | 25 years to Life |
| **MEPD:** | December 2, 1999 |
| **Weapon:** | Blue Bandana |
| **Victim:** | Toni Rae Mahaffey, age 19 years old |

    1.    **Offense Summary:**

On September 22, 1982, Robert Basile, brother of Subject and common-law husband of the victim, contacted the Sunnyvale Department of Public Safety and requested that police and an ambulance respond to his residence at 1352 Kingfisher Avenue #7, Sunnyvale, California. The arriving officers discovered the victim lying on the living room floor. The responding personnel attempted to find a pulse on the victim's wrist and noted that the trunk of her body was turned slightly, at which time they noticed that rigor mortis had set in on the upper arms and facial area. They also observed a blue bandana wrapped around the victim's neck and it appeared to be tied tightly with a knot.

Dr. John Hauser testified during the course of the preliminary examination held for the defendant that 19-year-old Toni Rae Mahaffey died as a result of strangulation by ligature. Evidence of intravenous injection was observed on the victim's arm and it was noted that the laboratory analysis of the victim's blood was presumptively positive for cocaine, cocaine metabolite and morphine. Subsequent investigation revealed that Robert Basile had purchased a $100,000.00 life insurance policy in the name of the victim. It was further noted that Robert Basile had solicited numerous individuals to kill his wife so he could collect the insurance money. This ultimately led to Robert Basile's arrest for killing his wife. Among those testifying against Robert Basile was Thomas Burchfield. Eventually, Burchfield was also charged with participating in the murder of Toni Rae Mahaffey due to certain inconsistencies in his explanation as to his whereabouts on the evening of the murder. During the course of the preliminary examination witness, Gary Nix, testified that Subject, David Basile, had admitted to him that he was responsible for the strangulation death of the victim. It was further noted that the witness indicated that David Basile had previously attempted to kill the victim by injecting her with a spoon of heroin two weeks earlier.

BASILE, D          C-70016          CSP-SQ          JANUARY 2007

Witness Robert Johanson testified that he had been solicited by David Basile to participate in the murder of the victim. He went on to testify that in September of 1982, David Basile arrived at his residence and stated "I took care of it, got it over with." Johanson stated that David Basile held the victim down and covered her face with a pillow for 12 to 18 minutes. Johanson further testified that David Basile told him he had used a bandana around the victim's neck to make sure she was dead (Information obtained from the P.O.R.).

2.    **Prisoner's Version**:

My initial reaction to the news that my brother Bob wanted to kill his girlfriend Toni by hiring Daryl Nix and paying him $10,000.00 was ridiculously amusing, then seriously blunt and to the point NO, it's not going to happen.

To find myself, one month later, personally involved, to this day still has me wondering what kind of weak minded person I was.

My involvement was not predicated on any animosity, loathing, fear, or distrust for Toni. Quite the contrary; Toni and I actually got along fine, which makes my perception of this crime even more unusual than the norm.

One month had passed since I first heard of Bob's initial solicitation to kill Toni, at which point I was dead set against it. At this time my life consisted of a five year period on methadone maintenance and shooting heroin. On this day, I missed my dose of methadone in the morning and was out with Gary Nix, looking for a house to burglarize to get money in order to buy some heroin. Instead, I found myself in the county jail sick and beginning withdrawals.

I called my father with the hopes of making bail and who should answer the phone? Bob....Now Bob seldom misses an opportunity to exploit me when he needs something done. After telling me that my father was in Reno on vacation, he tells me he will post my bail if I kill Toni. I told him several times no, just bail me out. I see that by now Bob was not going to bail me unless I agreed. I told Bob what he wanted to hear in order for him to bail me out. I did so believing that once I was out what did it matter, I was out. He couldn't send me back, right?

I was out by 8:00 pm and the first thing I did was go and get a fix. Saturday, I had to see Bob again to borrow $90.00 so I could get my car out of the impound lot. Once again, I find myself needing something from him, and once again there is a price to pay. Sunday passed without any mention of Toni.

On Monday, Bob was calling and insisting that I live up to our agreement. I told him over and over how stupid this was and knew that there had to be another way. I was exhausted explaining to him how unnecessary this was. At that time I did not really understand what Bob's motive was. I knew he was seeing another girl, but in my mind all he had to do was just tell Toni to go back to L.A. It wasn't until seventeen

BASILE, D          C-70016          CSP-SQ                    JANUARY 2007

113

years later that I figured out why Bob wanted Toni dead, money and custody of his daughter.

When Tuesday came, once again Bob was on me, telling me how it had to happen now. I told him to give me some money so I could get loaded, then to meet me at his place. Once I got the dope, I went to his place and got loaded, giving Toni some also. Once Bob arrived he kept motioning to me with his eyes to get busy. At this time, I put Toni into a chokehold and applied pressure until I got her to the floor. All I could think of is how crazy this was and how I wanted no part in this. I was so overwhelmed by these thoughts that I removed my arm from Toni, and got up hearing her gasp for air. I looked at Bob in his eyes and told him "I ain't doing this", and proceeded out the front door.

My perception of this act would be like anyone's. It was stupid, baseless, and completely out of my character.

**B.**     **Aggravating/Mitigating Circumstances:**

  **1.**     **Aggravating Circumstances:**

  **a.)**     Inmate conspired with others in the commission of the crime.
  **b.)**     Inmate had the opportunity to cease, but continued the crime.
  **c.)**     Nature of crime exhibited viciousness, cruelty or callousness.
  **d.)**     Victim was particularly vulnerable.

  **2.**     **Mitigating Circumstances:**

  There appears to be no mitigating factors.

**II.**     **PRECONVICTION FACTORS:**

**A.**     **Juvenile Record:**

  02-01-69: Arrested for Suspected Burglary-Juvenile Petition filed

**B.**     **Adult Convictions and Arrests:**

| DATE | CHARGE | DISPOSITION |
|---|---|---|
| 09-26-70 | PC 484-Petty Theft; PC 240 Assault; PC 242 Battery | |
| 07-26-71 | Transport/Import Manufacturing or Sale of Dangerous Drugs | Guilty-(07-26-72)     Proceedings Suspended;    3    year    formal probation; $250 fine<br>Probation Terminated 05-18-77 |

BASILE, D           C-70016           CSP-SQ               JANUARY 2007

| 08-09-71 | Bench Warrant for charges on 09-26-70 PC 484-Petty Theft and PC 242 Battery; and PC 415 | Dismissed-PC 242 & PC 415 Juvenile Conviction of PC 484. Guilty-10 days Co. Jail Credit time Served. Subject Released |
| 03-15-73 | PC 182 Criminal Conspiracy; H & S 11360 Possession of Marijuana for Sale | (See outcome below) |
| 03-15-73 | Violation Federal Narcotics Laws | 3 years probation (stay til 09-04-73); On charge of Conspiracy/Possession within to Distribute Controlled Substance |
| 03-15-73 | Conspiracy to Sell Marijuana | Received 36 months Probation |
| 04-11-75 | Conspiracy to Distribute Non-Narcotic | Received 4-6 years, 5010-B |
| 03-04-75 | Violation Probation | |
| 07-09-77 | PC 245 (A) Assault with a deadly weapon | Subject not arraigned (Complainant refuses to prosecute). Detained only |
| 06-25-80 | PC 496 Receiving Stolen Property | Guilty-24 months probation; 5 months jail time; and fine |
| 05-05-81 | PC 4573.6 Possession of Drugs in Prison | Dismissed |
| 09-17-82 | PC 664/459 Attempted Crime/Burglary; PC 466 Possession of Burglary Tools Warrant-PC 594(A) Vandalism; PC 602J Trespassing to Injure | (See outcome below) |
| 07-08-83 | PC 664/459 Attempted Burglary | |
| 07-26-83 | PC 664/459 Attempted Burglary | California Department of Corrections Time Served 1 year; Paroled to Santa Clara County |

C.   **Personal Factors:**

**Family History:** Basile was born from the union of Joseph and Gloria Basile. He is one of three children and was born on February 21, 1952 in San Jose, California.

**Education:** Basile obtained a GED and an Associate in Science (A/S) Degree through Excelsior College while incarcerated at Mule Creek State Prison.

**Military:** He entered the U.S. Army in 1969 and achieved the rank of E-3 before being honorably discharged in 1971.

**Employment:** From 1981 to 1983, Basile worked as a technician for arcade games. He married Maria Basile and this union resulted in one son named Marcello Basile.

**Medical:** None noted

**Substance Abuse:** None noted

## III.    POSTCONVICTION FACTORS:

### A.    Special Programming/Accommodations:

No special accommodations for the purposes of effective communication were required per the Armstrong Remedial Plan (ARP).

### B.    Custody History:

| | |
|---|---|
| 11-16-84 | Received at Northern Reception Center at California Medical Facility (CMF) |
| 12-26-84 | Transferred to California Training Facility (CTF-C) |
| 12-28-84 | UCC-Initial Review: Clo B custody and placed on the Support Services waiting list |
| 01-06-86 | UCC-Annual Review: continue present program |
| 01-22-86 | FCC-Retain Clo B and continue present program |
| 07-11-86 | UCC-Program Review: Refer to CSR for transfer and continue present program |
| 11-20-86 | UCC-Annual Review: continue present program |
| 01-21-87 | FCC-retain Clo B custody and continue present program |
| 09-24-87 | FCC-30 day review: Retain in Ad/Seg pending completion of Investigation |
| 10-20-87 | FCC-30 day review: Retain in Ad/Seg and refer to CSR for 30 day extension to hear RVR #III-8-5-87-63 |
| 11-18-87 | FCC-30 day review: Retain in Ad/Seg and refer to CSR for transfer to Folsom (Level IV) SHU placement |
| 12-17-87 | FCC-30 day review: Retain in Ad/Seg pending BPH hearing 12-21-87. Folsom SHU endorsed |
| 01-06-88 | FCC-30 day review: Post Board classification; retain in Ad/Seg pending transfer |
| 02-03-88 | FCC-30 day review: Retain in Ad/Seg pending transfer to Folsom SHU |
| 03-03-88 | FCC-30 day review: Retain in Ad/Seg pending transfer to Folsom SHU |
| 03-18-88 | Transferred to CSP-Sacramento |
| 03-23-88 | UCC-Program Review: Retain in Ad/Seg; Max A custody; cleared for SHU yard |
| 06-03-88 | ICC-Program Review: Released to General Population/C; Clo B custody |
| 06-29-88 | C Initial-Removed from orientation; Clo B custody; Support Services waiting list; WG/PG: A2/B |
| 10-14-88 | ICC-Program Review: credit restoration for RVR #III-9-87-43 Div. B 37 days |
| 12-29-88 | ICC-Program Review: credit restoration for RVR #III-9-87-43 IBC Div. B 113 Days |
| 06-15-89 | UCC-Annual Review; continue present program and refer to CSR to recommend to retain or transfer to CMF SOL WG/PG: A1/A |

BASILE, D             C-70016         CSP-SQ                JANUARY 2007

| | |
|---|---|
| 09-06-89 | C-Initial-Remove from orientation; Clo B custody; PIA; WG/PG: A1/A |
| 11-30-89 | C-Initial-Annual Review: Refer to CSR for Folsom Retention |
| 01-08-90 | UCC-Remove from orientation; Clo B custody; placed on the PIA waiting list; WG/PG: A1/A; classification score 31 |
| 07-11-90 | ICC-Program Review: Removed from assignment and placed on the support services waiting list |
| 11-15-90 | UCC-Post Board Review: 3 year denial; continue present program and referred to CSR for possible transfer; classification score 25 |
| 06-06-91 | UCC-Annual Review: referred to CSR for retention |
| 08-01-91 | UCC-Program Review: referred to CSR for Level III placement; classification score 19 |
| 08-26-91 | Transferred to Mule Creek State Prison |
| 08-30-91 | UCC-Initial Review: Removed from orientation; placed on support services waiting list; Med A custody; WG/PG: A1/A |
| 09-19-91 | UCC-Program Review: held in absentia; placed on vocational electronics waiting list and continue present program |
| 12-19-91 | UCC-Annual Review: Refer to CSR for transfer due to classification score now 15 |
| 07-02-92 | UCC-Program Review: Refer to CSR to retain in MCSP III or alternate SCC I due to classification score now 11 |
| 01-07-93 | UCC-Annual Review: continue present program; classification score 7 |
| 07-09-93 | UCC-Program Review: reduce RVR #A-5-93-090 to Administrative |
| 07-19-93 | ICC-Program Review: 150 days work time credit loss for RVR #a-6-93-006; non-contact visits and substance abuse control program for 4 months; classification score 13 |
| 11-03-93 | UCC-Annual/Post Board Review: BPH gave 3 year denial-stay disciplinary free, self-help therapy programs and upgrade academically/vocationally; continue present program; classification score 7 |
| 06-06-94 | ICC-Program Review: restore 75 days of work credit for RVR #A-6/93-006 |
| 12-07-94 | UCC-Annual Review: continue present program; classification score 0 |
| 06-06-95 | ICC-Program Review: restore remaining 75 days of work credit for RVR #A-6/93-006 |
| 10-20-95 | UCC-Program Review: placed on the support services waiting list; requesting transfer to C yard |
| 10-27-95 | UCC-Initial Review: placed on support services and pre-vocational waiting list |
| 12-26-95 | UCC-Annual Review: referred to ICC for approval to work in R & R |
| 01-09-96 | ICC-Program Review: Approved to work in R & R |
| 10-16-96 | UCC-Post Board Review: BPH gave 3 year denial-stay disciplinary free, self-help therapy programs and upgrade academically/vocationally; continue present program |
| 12-11-96 | UCC-Annual Review: continue present program |
| 08-21-97 | ICC-Initial Review: restore contact visits; Custody change to Max A; WG/PG: A2/B |

BASILE, D          C-70016          CSP-SQ          JANUARY 2007

| 08-26-97 | UCC-Program Review: Ad/Seg release/Orientation release to General Population; Custody change to Med A; Place on Support Services and Clerk waiting list |
| 09-08-97 | UCC-Program Review: Remove off Clerk waiting list & place on PIA waiting list; WG/PG: A1/A |
| 12-29-97 | UCC-Annual Review: RVR #B08-97-094 dismissed; continue present program |
| 10-23-98 | UCC-Post Board Review: 3 year denial-stay disciplinary free, self-help therapy programs and upgrade academically/vocationally; continue present program |
| 12-15-98 | UCC-Annual Review: continue present program |
| 12-07-99 | UCC-Annual Review: retaining at Mule Creek State Prison and continue present program |
| 01-09-01 | UCC-Annual Review: continue present program |
| 02-20-02 | UCC-Annual/Post Board Review: BPH gave 2 year denial-stay disciplinary free, self-help therapy programs and upgrade academically/vocationally; continue present program |
| 12-03-02 | UCC-Annual Review (absentia): continue present program; classification score was adjusted to 19 points as a result of the new score system which applies to all LIFER inmates |
| 12-09-03 | UCC-Annual Review (absentia): continue present program |
| 04-23-04 | UCC-Post Board Review: BPH gave 1 year denial-stay disciplinary free, self-help therapy programs and upgrade academically/vocationally; continue present program |
| 06-08-04 | UCC-Program Review (absentia): continue present program |
| 12-08-04 | UCC-Annual Review (absentia): continue present program |
| 01-24-05 | UCC-Program Review; refer to CSR to transfer to SOL II alternate CMC-E III override |
| 02-28-05 | Transferred to Correctional Training Facility (Soledad) |
| 03-15-05 | UCC-Initial Review: Remove from orientation; Med A custody; place on support services waiting list (clerk); WG/PG: A1/A |
| 06-22-05 | UCC-Program Review: received patio clearance; placed on medical/dental clerk waiting list; continue present program |
| 12-14-05 | UCC-Annual/Post Board Review: BPH gave 1 year denial-stay disciplinary free, self-help therapy programs and upgrade academically/vocationally; continue present program; referred to CSR for non-adverse transfer to SQ II or SOL II; continue present program |
| 01-11-06 | UCC-Program Review: Rescinded request from 12-14-05 UCC; re-refer to CSR for transfer to SQ II or DVI II; continue present program |
| 02-02-06 | Transferred to San Quentin State Prison |
| 02-08-06 | UCC-Initial Review: Remove from orientation; Med A custody; PIA waiting list; WG/PG: A1/A |

## C.  Therapy & Self Help Activities:

| 06-30-90 | Alcoholics Anonymous |
| 06-30-90 | Narcotics Anonymous |

BASILE, D                C-70016            CSP-SQ                    JANUARY 2007

| | |
|---|---|
| 09-23-90 | Narcotics Anonymous |
| 12-30-90 | Narcotics Anonymous |
| 04-15-91 | Narcotics Anonymous |
| 07-15-91 | Narcotics Anonymous |
| 09-12-91 | Narcotics Anonymous |
| 02-02-92 | Narcotics Anonymous |
| 04-10-92 | Narcotics Anonymous |
| 06-23-92 | Narcotics Anonymous |
| 03-23-93 | Narcotics Anonymous |
| 06-22-93 | Narcotics Anonymous |
| 10-12-93 | Narcotics Anonymous |
| 01-20-94 | Narcotics Anonymous |
| 08-31-95 | Narcotics Anonymous |
| 08-20-96 | Sponsor for Juvenile Diversion Program |
| 08-22-96 | Sponsor for Juvenile Diversion Program |
| 11-05-96 | S.T.O.P. program |
| 11-20-96 | Narcotics Anonymous |
| 01-14-97 | S.T.O.P. program |
| 01-14-97 | S.T.O.P. program |
| 06-16-97 | S.T.O.P. program |
| 03-31-98 | Narcotics Anonymous |
| 09-22-98 | Narcotics Anonymous |
| 03-26-99 | Narcotics Anonymous |
| 05-28-99 | Communication Skills Course |
| 09-14-99 | Narcotics Anonymous |
| 09-26-99 | 10 session course "Seven Habits of Highly Effective People" |
| 02-18-00 | Participant-"Life Without a Crutch" course |
| 03-16-00 | Narcotics Anonymous |
| 06-21-00 | S.T.O.P. program |
| 07-18-00 | Participant -"T'ai Chi Chih" course |
| 09-12-00 | Narcotics Anonymous |
| 10-02-00 | Participant -"T'ai Chi Chih" course |
| 03-14-01 | Narcotics Anonymous |
| 03-28-01 | Participant-"Emotional Literacy" course |
| 09-11-01 | Narcotics Anonymous |
| 10-11-01 | S.T.O.P. program |
| 11-02-02 | Narcotics Anonymous |
| 04-25-03 | Narcotics Anonymous |
| 05-19-03 | Sponsor for Juvenile Diversion Program |
| 07-01-03 | Narcotics Anonymous |
| 10-01-03 | Narcotics Anonymous |
| 01-02-04 | Narcotics Anonymous |
| 03-31-04 | Narcotics Anonymous |
| 06-30-04 | Narcotics Anonymous |
| 08-23-04 | Anger Management |

BASILE, D          C-70016          CSP-SQ                JANUARY 2007

| 09-30-04 | Narcotics Anonymous |
|----------|---------------------|
| 03-27-06 | IMPACT Program |
| 04-17-06 | IMPACT Program |
| 05-22-06 | IMPACT Program |
| 06-19-06 | IMPACT Program |
| 10-06-06 | Anger Management |

Laudatory Chrono from supervisors (see CDCR 128-B dated 05-20-85, 12-25-86, 07-02-86, 07-10-86, 04-02-87, 11-03-88, 08-23-91, 06-02-92, 02-14-93, 01-23-96, 08-22-96, 08-23-96, 08-24-96, 06-20-00, 01-30-06 and 10-31-06). Also received a letter from Steve Beane (Superintendent II Maintenance & Repair-Mule Creek State Prison) dated 12-30-04

Education Progress Reports (CDCR 128-L) dated 11-03-95, 10-28-99, 08-20-01, 09-17-01, 04-23-02, and 09-10-02). Also received his GED certification 04-06-93. Completed his Associate in Science through the Excelsior College.

Work Supervisor's Reports (CDCR 101) show continuous employment beginning 04-14-95 with the last one dated 02-01-06.

Certificate of Attendance – Narcotics Anonymous dated 09-01-93 through 09-01-96; Certificate of Appreciation dated 12-16-94 for the Juvenile Diversion Program; Certificate of Completion – Consumer Electronics dated 08-26-95; Certificate of Achievement –Substance Abuse Program "7 Habits of Highly Effective People" dated 09-10-96; Certificate of Achievement – Improving Relationships dated 12-17-96; Certificate of Achievement – Effective Parenting Skills dated 04-15-97; Certificate of Achievement – A Framework for Recovery dated 09-10-96; Certificate of Attendance – Narcotics Anonymous dated 09-01-97 through 09-01-98; Certificate of Award for the STOP Program – Communication Skills & Feelings dated 05-20-99; Certificate of Achievement dated September 1997 through September 2000 for Narcotics Anonymous; Certificate of Achievement –Substance Abuse Program "7 Habits of Highly Effective People" dated 08-25-99; Certificate of Completion – PC Repair dated 09-03-99; Certificate of Attendance – Narcotics Anonymous dated 09-28-99; Certificate of Award – S.T.O.P. Program dated 05-20-99; Certificate of Achievement – Substance Abuse Program dated 08-25-99; Certificate of Completion – "Life Without a Crutch" dated 01-26-00; Certificate of Completion – ASE Refrigerant Recovery & Recycling dated 07-11-00; Certification of Completion – Tai Chi Chih dated 06-12-00 and 10-01-00; Certificate of Achievement–Narcotics Anonymous dated September 1997 through September 2000; Certificate of Participation – Anger Management dated 01-15-01; Certificate of Participation for a Personal Development Course – The Four Agreements dated 10-11-01; Certification of Attendance – Narcotics Anonymous dated September 2002 through September 2003 and September 2003 through 2004; Certification of Completion – The 12 Step Program dated 08-14-04.

**D.**     **Disciplinary History:**

*CDC 115's (serious):*

| 09-19-87 | Narcotics Trafficking; Guilty; 150 days Loss of Credits |
|----------|---------------------------------------------------------|
| 05-14-93 | Positive Urinalysis-Morphine;Guilty;150 days Loss Credits-MCSP |

BASILE, D        C-70016       CSP-SQ        JANUARY 2007

*CDC 115's (administrative):*

| | |
|---|---|
| 11-28-83 | Conduct (obeying order); Guilty; Reduced to Administrative 115 – SQ |
| 08-21-87 | Refused to Submit Urinalysis; Guilty; Reduced to Administrative 115 – CTF-C |
| 05-14-93 | Tattooing; Guilty; Assessed 30 Loss of Credits; Reduced to Administrative 115 in UCC - MCSP |

*CDC 128 As:*

| | |
|---|---|
| 04-09-85 | Wall Coverings |
| 02-10-90 | Violation of Workcenter Posted Rules (Concerning Lockers) – CSP Folsom |
| 06-18-93 | Violation of Gym Rules |
| 10-19-02 | Responsibility for Counts |

## IV.    FUTURE PLANS:

**A.    Residence/Employment:** Based upon the letter received from The Bible Tabernacle placement will be available for Mr. Basile. This location is at the New Life Institute in Canyon Country, Los Angeles, California. The business telephone number (310) 823-8786. This program provides a recovery program, adjusting to re-entry back into society and future employment.

## VI.    SUMMARY:

**A.** This report is based an extensive review of the Central File and a personal interview with Inmate Basile.

**B.** The prisoner was afforded the opportunity to examine his Central File and did so on 11-03-06 (see CDC 128-B located in the General Chrono section of the central File).

**C.** No special accommodations were required per the Armstrong vs. Davis BPH Parole Proceedings Remedial Plan (ARP) for effective communication.

# LIFE PRISONER: POSTCONVICTION PROGRESS REPORT

- ☐ DOCUMENTATION HEARING
- X PAROLE CONSIDERATION HEARING
- ☐ PROGRESS HEARING

## INSTRUCTIONS

TO CDC STAFF:  DOCUMENT EACH 12-MONTH PERIOD FROM THE DATE THE LIFE TERM STARTS TO PRESENT.

TO BPH STAFF:  FOR EACH 12-MONTH INCREMENT APPLY THE GUIDELINES UNDER WHICH THE PAROLE DATE WAS ORIGINALLY ESTABLISHED, i.e., 0-2 MONTHS FOR PBR AND 0-4 MONTHS FOR BPH.  SEE BPH §§2290 - 2292, 2410 AND 2439.

| YEAR | POSTCONVICTION CREDIT | | REASONS |
|------|------|------|---------|
| | BPH | PBR | |
| 12-11-04 to 12-10-05 | | | **Placement:** Mule Creek State Prison (From 12-11-04 to 02-27-05 then transferred to Correctional Training Facility on 02-28-05) <br><br> **Custody/Classification:**  Remained Med A with 19 points <br><br> **Academics:** None noted for this report period <br><br> **Work Record:** Exceptional work noted on Work Supervisor's Reports (CDCR 101) dated 01-05-05, 08-03-05, 05-11-05 <br><br> **Group Activities:** None noted this report period <br><br> **Psychiatric Treatment:**  None noted this report period <br><br> **Prisoner Behavior:**  Remained disciplinary free this period <br><br> **Other:** None |
| 12-11-05 To Present (11-06-06) | | | **Placement:** Correctional Training Facility (From 12-11-05 to 02-01-06 then transferred to San Quentin State Prison) <br><br> **Custody/Classification:**  Remained Med A with 19 points <br><br> **Academics:** None noted for this report period <br><br> **Work Record:** Exceptional work noted on Work Supervisor's Report (CDCR 101) dated 02-01-06 <br><br> **Group Activities:** Continues to participate in the IMPACT Program (see CDCR 128-B's dated 03-27-06, 04-17-06, 05-22-06, and 06-19-06) and Anger Management (see CDCR 128-B dated 10-06-06) <br><br> **Psychiatric Treatment:**  None noted this report period <br><br> **Prisoner Behavior:**  Remained disciplinary free this period <br><br> **Other:** None |

CORRECTIONAL COUNSELOR SIGNATURE

DATE  11-06-06

## ORDER:

- ☐ **BPH date advanced by** _____ **months.**
- ☐ **PBR date advanced by** _____ **months.**
- ☐ **BPH date affirmed without change.**
- ☐ **PBR date affirmed without change.**

## SPECIAL CONDITIONS OF PAROLE:

- ☐ **Previously imposed conditions affirmed.**

ASILE, D                C-70016            CSP-SQ                    JANUARY 2007

L.J.TAFOYA

Correctional Counselor I (A)

K.P. HILLIARD

Correctional Counselor II (A)

C. BELSHAW, C & PR

PSYCHOLOGICAL EVALUATION
FOR THE BOARD OF PAROLE HEARINGS
JULY 2007 SUBSEQUENT CALENDAR
FORENSIC ASSESSMENT UNIT
SAN QUENTIN STATE PRISON

## I. IDENTIFYING INFORMATION

| | |
|---|---|
| **Inmate Name:** | **Basile, David** |
| **CDC Number:** | **C-70016** |
| **DOB (*Current Age*):** | **02-21-1952 (*currently 55 years old*)** |
| **Controlling Offenses:** | **PC §187 Murder First Degree** |
| **Date of Offenses (*Age at time*):** | **09-22-1982 (*then age 31*)** |
| **Sentence:** | **25-L** |
| **County of Commitment:** | **Santa Clara County** |
| **Date Entered into CDCR:** | **11-16-1984** |
| **Date Received at San Quentin State Prison:** | **02-02-2006** |
| **Classification Score:** | **19** |
| **CDCR Forensic Evaluator:** | **Richard Starrett, Ph.D., Ph.D.** |
| **Date of Evaluation:** | **04-19-2007** |

## II. SOURCES OF INFORMATION

The inmate's Central File (C-File) and Unit Health Record (UHR) were reviewed. He was interviewed for the purpose of the current evaluation on 4-19-2007. He was informed that the interview was not confidential and that a report with the results of the evaluation would be submitted to the Board of Parole Hearings (BPH) to assist in determining his suitability for parole. The inmate appeared to understand the nature and purpose of the evaluation, and the possible consequences of the interview to the best of the inmate's ability. Unless otherwise indicated, the inmate agreed to participate in the interview. For reasons not limited to the possibility that an individual may have a mental disability or condition, which may qualify under the Americans with Disabilities Act, the evaluation was conducted by a licensed psychologist. Also, it is the conclusion of the undersigned examiner that it was not necessary to provide auxiliary aids or assistance to achieve effective communication. This evaluator is not responsible for any inaccurate statements, or subsequently changed opinions, expressed by the inmate.

This current report is an addendum for update to the BPH, and only information relevant to the current assessment, and more recent to prior reports, will be addressed. The Life Term Mental Health Evaluation dated December 16, 2003, written for the BPH Subsequent Hearing should be consulted for any questions or concerns regarding background information unless clarified otherwise below.

### III.   QUESTIONS POSED BY MOST RECENT (2005) BPH

After the inmate's 2005 BPH hearing, the panel subsequently submitted BPH Form 1000(a) on January 30, 2007 requesting an updated psychological assessment of the inmate to include:
1) The prisoner's violence potential in the free community;
2) The significance of alcohol/drugs as it relates to the commitment offense and an estimate of the prisoner's ability to refrain from the use/abuse of same when released;
3) The extent to which the prisoner has explored the commitment offense and come to terms with the underlying causes; and,
4) The inmate's extensive drug history contributes to his assessment for risk considering it was a factor in the instant offense.
5) The evaluation of the inmate's level of responsibility and understanding of his relationships to family and friends and how it may have impacted the life. Are there any residual relationship issues that could impact his success in the future?

### IV.    INTERVIEW INFORMATION

At the outset of the interview for the purpose of this report to the Board of Parole Hearings, the planned focus was to update any information relative to the most recent full evaluation, as well as to deal with any unexamined issues relative to intrapersonal functioning at the time of the index offense.

Mr. Basile is a 55-year-old divorced Caucasian male of Christian faith. The inmate was oriented to person, place and time. He was alert and cooperative. His simple registration was intact, along with his short-term memory. His simple abstract thinking was weak. His mathematical ability and complex attention and concentration were intact. His complex problem solving was impaired. He did not appear to understand proverbs.

At the current time, he denies any problems with depression, anxiety, mood swing, or symptoms of a mood disorder. He denies any auditory or visual hallucinations, and evidenced no symptoms of either delusional or paranoid thinking. He denies any eating or sleeping problems. He denies any mental health problems as a child. He denies any suicidal or homicidal thinking.

INSTITUTIONAL PROGRAMMING: The inmate entered California Department of Corrections on November 16, 1984. He has served approximately 23 years of a Life sentence. The inmate's classification score, as of February 15, 2007 was 19. The inmate's points dropped to 25 in 1991 and have been low since. The inmate has received five (5) CDC-115 disciplinaries, with the most recent in 1993. He has received three (3) CDC-128 Counseling Chronos, with the most recent in 1992. The inmate received three (3) CDC substance abuse related Chronos over the years, with the most recent in 1993. He has never had a CDC-115 for weapons, violent or threatening behavior, or sex offenses. The inmate received his GED and some college courses in the community. The inmate received a GED while incarcerated and his AS degree in 2002. The inmate has completed vocational training in terms of electronics, furniture upholstery, PC repair, and air conditioning and refrigeration. His current work assignment is a clerk. The inmate has worked as a machinist and an

assistant dental technician. The inmate's work ratings have always been above average and excellent. The inmate has been active in NA since 1989 for approximately 18 years. He continues to be active in that. The inmate is active in the impact program and victim offender education and has been for the last two years. The inmate started doing self-help groups in 1995. He has completed approximately 15 programs in this area. The inmate is spiritual, reads his bible, and gets spiritual advisement through his pastor. He does not attend church.

INSIGHT / SELF ASSESSMENT: The inmate's self-reported personal strengths are that he is driven and has strong work ethic. He empathizes with others and offers advice. He is compassionate and he can now recognize high-risk situations. The inmate states his weaknesses are that he needs to be alert to feel like he is alone and he is always alert to interact with a positive peer group. In the past, negative peer groups have influenced him. The inmate states his biggest accomplishment is his college degree, his self-esteem and reaching out to his niece and son. The biggest change in the inmate's life has been his self-esteem. Now he has positive self-worth and can contribute.

PAROLE PLANS IF GRANTED A RELEASE: The inmate states his parole plans are the same as the last Board. He plans to parole to Canyon Country to the Bible Tabernacle. He has housing, shelter, job, alcohol and self-help there. There is no time limit on how long he can be there and he is not setting himself a time to get out. The inmate has made community contact through this bible tabernacle and they can take care of all his community needs. The inmate's goals upon release are to continue to be clean and sober, work and complete his BA degree. The inmate's parole plans appear to be feasible and appropriate.

INMATE UNDERSTANDING OF LIFE CRIME: The inmate was charged with PC §187, Murder First Degree.

Summary of the Crime: On September 22, 1982, Robert Basile, brother of Subject and common-law husband of the victim, contacted the Sunnyvale Department of Public Safety and requested that police and an ambulance respond to his residence at 1352 Kingfisher Avenue #7, Sunnyvale, California. The arriving officers discovered the victim lying on the living room floor. The responding personnel attempted to find a pulse on the victim's wrist and noted that the trunk of her body was turned slightly, at which time they noticed that rigor mortis had set in on the upper arms and facial area. They also observed a blue bandana wrapped around the victim's neck and it appeared to be tied tightly with a knot.

Dr. John Hauser testified during the course of the preliminary examination held for the defendant that 19-year-old Toni Rae Mahaffey died as a result of strangulation by ligature. Evidence of intravenous injection was observed on the victim's arm and ti was noted that the laboratory analysis of the victim's blood was presumptively positive for cocaine, cocaine metabolite and morphine. Subsequent investigation revealed that Robert Basile had purchased a $100,000.00 life insurance policy in the name of the victim. It was further noted that Robert Basile had solicited numerous individuals to kill his wife so he could collect the insurance money. This ultimately led to Robert Basile's arrest for killing his wife. Among those testifying against Robert Basile was Thomas Burchfield. Eventually, Burchfield was

also charged with participating in the murder of Toni Ray Mahaffey due to certain inconsistencies in his explanation as to his whereabouts on the evening of the murder. During the course of the preliminary examination witness, Gary Nix, testified that Subject, David Basile, had admitted to him that he was responsible for the strangulation death of the victim. It was further noted that the witness indicated that David Basile had previously attempted to kill the victim by injecting her with a spoon of heroin two weeks earlier.

Witness Robert Johanson testified that he had been solicited by David Basile to participate in the murder of the victim. He went on to testify that in September of 1982, David Basile arrived at his residence and stated, "I took care of it, got it over with." Johanson stated that David Basile held the victim down and covered her face with a pillow for 12 to 18 minutes. Johanson further testified that David Basile told him he had used a bandana around the victim's neck to make sure she was dead (Information obtained from the P.O.R.).

Prisoner's Version: My initial reaction to the news that my brother Bob wanted to kill his girlfriend Toni by hiring Daryl Nix and paying him $10,000.00 was ridiculously amusing, then seriously blunt and to the point NO, it's not going to happen.

To find myself, one month later, personally involved, to this day still has me wondering what kind of weak-minded person I was.

My involvement was not predicated on any animosity, loathing, fear, or distrust for Toni. Quite the contrary; Toni and I actually got along fine, which makes my perception of this crime even more unusual than the norm.

One month had passed since I first heard of Bob's initial solicitation to kill Toni, at which point I was dead set against it. At this time my life consisted of a five-year period on methadone maintenance and shooting heroin. On this day, I missed my dose of methadone in the morning and was out with Gary Nix, looking for a house to burglarize to get money in order to buy some heroin. Instead, I found myself in the county jail sick and beginning withdrawals.

I called my father with the hopes of making bail and who should answer the phone? Bob...Now Bob seldom misses an opportunity to exploit me when he needs something done. After telling me that my father was in Reno on vacation, he tells me he will post my bail if I kill Toni. I told him several times no, just bail me out. I see that by now Bob was not going to bail me unless I agreed. I told Bob what he wanted to hear in order for him to bail me out. I did so believing that once I was out what did it matter, I was out. He couldn't send me back, right?

I was out by 8:00 pm and the first thing I did was going and get a fix. Saturday, I had to see Bob again to borrow $90.00 so I could get my car out of the impound lot. Once again, I find myself needing something from him, and once again there is a price to pay. Sunday passed without any mention of Toni.

On Monday, Bob was calling and insisting that I live up to our agreement. I told him over and over how stupid this was and knew that there had to be another way. I was exhausted explaining to him how unnecessary this was. At that time I did not really understand what Bob's motive was. I knew he was seeing another girl, but in my mind all he had to do was just tell Toni to go back to L.A. It wasn't until seventeen years later that I figured out why Bob wanted Toni dead, money and custody of his daughter.

When Tuesday come, once again Bob was on me, tell me how it had to happen now. I told him to give me some money so I could get loaded then to meet me at his place. Once I got the dope, I sent to his place and got loaded, giving Toni some also. Once Bob arrived he kept motioning to me with his eyes to get busy. At this time, I put Tone into a chokehold and applied pressure until I go her to the floor. All I could think of is how crazy this was and how I wanted no part in this. I was so overwhelmed by these thoughts that I removed my arm from Toni, and got up hearing her gasp for air. I looked at Bob in his eyes and told him "I ain"t doing this" and proceeded out the front door. She was alive when I left.

My perception of this act would be like anyone's. It was stupid, baseless and completely out of my character.

In the current interview, the inmate states he started getting into trouble around the age of 8 or 9. He started using alcohol and drugs around the age or 12 and 15 respectively. He was arrested and in juvenile hall at the age of 17. He was not getting into trouble at school. He has never been in Youth Authority and no placements.

When asking the inmate why he was getting into trouble as a young person, the inmate states that he was anger and in a lot of pain. He was experiencing feeling of abandonment and not being loved as a child. He said he used drugs to cover up his pain. He said it was especially bad around holidays. He said, "My mom left us when we were between the ages of 3 and 5 to pursue an acting career." He said he did a lot of self-destructive behavior and heroin numbed the pain.

The inmate was given the opportunity to read the summary of the Probation Officer's Report and his prior account. The inmate states they are the same. The inmate states that his case has been in appeals for a number of years. In 1998, the status was still pending. By 2001, the case had been resolved at the Supreme Court level. The inmate states in 2001, he gave his first full account of his version, as written. He said he accepts the Probation Officer's Report as a version.

When asking the inmate why he got involved in this crime, the inmate states that he was in jail prior to this time and had called home to talk to his father. His brother answered and basically told him that he would not post bail for him unless he helped him kill his wife. The inmate states that his brother could always manipulate him and had a lot of control and influence over him. The inmate finally gave, thinking that he would say what he needed to say to get out of jail. He said it was a bad decision. He said, "I was strung out and easily influenced."

When asking the inmate about his dysfunctional relationship with his brother, he said he always did things to please others. If he did not, he would feel unloved again. He felt like he had to keep his promise to his brother or it would disappoint him and again, he would not be liked.

When discussing the dysfunctional relationship with his brother and the causes of it, the inmate states, "When mom left, it affected both of us differently. I closed up and wouldn't allow myself to get hurt again. My brother was the opposite. He acted out and had a lot of behavior manifestations. My brother was always jealous over any relationship I had with my mom and my father. I was protected by the needle, but he wasn't." He feels at the current crime that his brother's motive was, in part, driven by greed and not wanting to pay child support.

When asking the inmate how he has resolved these issues that he has from the past, the inmate states that he had to accept the pain and work through it and move on. "In the inmate's current group his sponsor and himself were trying to contact his brother, so I could talk to him." He said, "Through the group, I've been able to forgive my brother. We were trying to find him, but he had passed away in November of 2006. I wish that I'd had the opportunity to speak to him and tell him that I have forgiven him."

When asking the inmate about his feeling about loss of the victim's life and the effect it has had on the family, the inmate states it has been devastating. The victim has not ever seen her daughter or my niece grow up. The niece was raised by my brother and she experienced a lot of abuse as a consequence. He said, "I have missed out on both seeing my niece and son growing up. I'm trying to reach out to both my niece and my son and my older brother, Loue, my niece and my son are all coming up to visit."

When asking the inmate about restitution, the inmate states that he is working on putting the family relationships back together. He said, "There has been a lot of loss. His father died and left him some money. He made sure that his niece got $50,000.00 of it." The inmate states, "My brother was keeping it from her what had happened and I told her what had happened." The inmate goes on to say that "I would like to be able to give my niece back her birthright in the form of the family contact that my brother was keeping her away from. I tried to contact my cousins and family members and let them know that she's out there alone by herself."

When asking the inmate what has changed about him so that something like this would not happen again, the inmate states, "I've grown and accomplished a lot. I've also lost a lot and wasted a lot of time. I've discovered myself and found that I'm capable of doing greater and better things. I understand the American dream now. I remain connected to my family and family connectedness is now important to me."

<u>MENTAL HEALTH CONCERNS OR PERSONALITY DISORDERS</u>: The inmate does not have a severe mental disorder; however, the inmate would meet the diagnostic criteria for Opiate Dependence, in institutional remission. The inmate began using heroin around the age of 17 and used it, off and on, through 1995. The inmate has been in remission since that

time. The inmate would also meet the diagnostic criteria for Adult Antisocial Behavior. The inmate began getting into trouble and arrested in his late teens and his arrest history cumulated through early adult hood and culminated in his controlling offense.

## V.    DIAGNOSTIC IMPRESSION

| Axis I:   | 304.00  | Opioid Dependence, in institutional remission. |
|-----------|---------|------------------------------------------------|
|           | V71.01  | Adult Antisocial Behavior.                     |
| Axis II:  | V71.09  | No Diagnosis.                                  |
| Axis III: | 799.9   | Diagnosis Deferred.                            |
| Axis IV:  |         | Incarceration for life term.                   |
| Axis V:   |         | GAF: 90                                        |

## VI.    PREVIOUS EVALUATION SUMMARIES

A Life Term Mental Health Evaluation dated December 16, 2003 does not diagnose the inmate with any clinical or personality disorders. The author concludes the assessment of dangerousness, if released to the community at this time, is seen as below average in comparison to other inmates.

A Psychosocial Assessment dated August 24, 1998 diagnosed the inmate with Opiate Dependence, in institutional remission, Adult Antisocial Behavior. The author concludes that based on this score, his level of dangerousness within a controlled setting is viewed as below average if released to the community, the current level of dangerousness is below average also.

A Psychiatric Evaluation dated August 16, 1990 diagnosed the inmate with Opiate Dependence, in partial remission, Adult Antisocial Behavior. No risk assessment was conducted. The author does state in a less controlled setting, such as return to the community, the inmate is considered likely to hold his present gains unless he returns to his heroin use.

A Psychiatric Evaluation dated September 8, 1987 diagnosed the inmate with Heroin Addiction, by history, and Antisocial Personality Disorder. The author concludes, as he does not admit guilt to his current offense, it is difficult to assess his potential for violence.

## VII.    VIOLENCE RISK ASSESSMENT/CONCLUSIONS

The Board of Parole Hearings' questions will be addressed for each issue presented, as noted in an earlier section of this report.

1) *The prisoner's violence potential in the free community;*

The current research literature indicates that an empirically based approach to is the most reliable and valid method for assessing risk of future violence. In the present evaluation, two separate assessment guides were used to help estimate this individual's risk for future

violence in the community: the Psychopathy Check List – Revised (PCL-R) and the History – Clinical – Risk Management – 20 (HCR-20). The Level of Service/Case Management Inventory (LS/CMI) was utilized as an objective assessment of the inmate's likelihood for general recidivism. The data for scoring these instruments were obtained from information derived in both the inmate interview and the files reviewed. These measures are widely used and are supported by years of research in the risk assessment field. They have been cross validated with various forensic populations, including United States males in correctional settings; however, the following results need to be regarded with some level of caution since some individuals may possess idiographic differences that could limit the applicability of these instruments. The evaluator has taken these factors into consideration in determining how much weight to allot each of the measures and in formulating an overall estimate of risk for future violence in the community. Estimates of risk for violence will be presented categorically: low, moderate, or high.

PCL-R: The PCL-R was used to rate the inmate's records and current interview on the level of psychopathy. The inmate's overall level of psychopathy is low and at the 13th percentile. The only factor one, which is personality characteristics, the percentile is 1.4. Factor two, which represents past Antisocial Traits is at 50.8 percentile.

HCR-20: The HCR-20 was used to rate the inmate's records and current interview for level of risk for future violence.

Historical: In rating the inmate on the historical factors that contribute to future violence, the inmate would rate in the low end of the moderate range in his propensity for future violence. The inmate's elevations on this scale are due to his age at the time, being involved in unstable relationships, being a substance abuser, having a prior criminal record and to a lesser extent, early maladjustment problems.

Clinical/Insight: The inmate would rate in the low range of the clinical insight factor. The inmate does not have a negative attitude, has no active mental health symptoms, and is not impulsive. The inmate has had a good response to treatment. His insight on acceptance of responsibility seem appropriate.

Risk Management: The inmate would also rate in the low range on this factor. The inmate has been able to handle stress, compliance and destabilizers well while in the institutional setting. The inmate's parole plans appear very feasible.

The inmate's overall propensity for future violence is in the low range when compared to similar inmates.

LS/CMI: The inmate was administered the LS-CMI level of service, case management inventory, section 1, general risk. The inmate's overall rating general recidivism is in the low range when compared to similar incarcerated inmates. The inmate's major elevations are due to his criminal history.

<u>OVERALL RISK ASSESSMENT:</u>  The inmate's level of psychopathy is low when compared to the inmate population.  The inmate's propensity for future violence is in the low range when compared to similar inmates.  The inmate's general recidivism is in the low range when compared to similar incarcerated inmates.

2).  *The significance of alcohol/drugs as it relates to the commitment offense and an estimate of the prisoner's ability to refrain from the use/abuse of same when released;*

The inmate openly acknowledges that his use of heroin is a major factor in the committing offense.  The inmate had been using heroin, off and on, since 1969.  The inmate had been in the county jail prior and was beginning to go through withdrawals.  The inmate recognizes that as a consequence, he was easily influenced by his brother.  The inmate acknowledges that most of his criminal behavior was influenced by his drug use and addictive lifestyle.  The inmate acknowledges substance abuse as a major life problem.  He understands the life-long need for treatment.  The inmate has worked the steps.  The inmate has been clean and sober for 12 years.  The inmate has been in treatment for 18 years.  It is recommended that he continue in ongoing substance abuse treatment as a condition of parole.

3).  *The extent to which the prisoner has explored the commitment offense and come to terms with the underlying causes;*

The inmate clearly admits that for years, he did not talk about his crime upon attorney's advice and that he was appealing his case.  The inmate recognizes the role of his addictive behavior in the controlling case.  He recognizes the roll of the dysfunctional relationship with his brother.  He can identify causal factors in his general criminal behavior; such as the anger and pain he was feeling from abandonment and not being loved by his mother.  The inmate has spent 12 to 15 years involved in self-help programs to understand underlying causes of his criminal behavior.  It is unlikely that a requirement for further exploration of the instant offense will produce more significant behavioral changes of a positive or prosocial nature in the inmate.

4.)  *The inmate's extensive drug history contributes to his assessment for risk considering it was a factor in the instant offense.*

The inmate readily admits that his heroin addiction played a role in the controlling offense.  The risk assessment instrument used, especially the HCR-20, considers drug and alcohol addiction as a component along with the others.  The inmate scored in the low end of the moderate range on the historical factors that predict future violence.  The inmate has had significant gains as reflected in the clinical and risk management factor, making his overall propensity for future violence low even considering his past use behavior.  Alcohol and drug use is also a factor in the CSCMI.  The inmate's overall rating for general recidivism is low when compared to similar inmates even after considering his drug use.  The inmate's risk factor and his recidivism risk would increase if he would return to the use of alcohol, drugs, or old lifestyle.

*5) The evaluation of the inmate's level of responsibility and understanding of his relationships to family and friends and how it may have impacted the life. Are there any residual relationship issues that could impact his success in the future.*

The inmate thoroughly discussed his relationship with his brother that was involved in the crime. The inmate has a good understanding of the dysfunctional relationship with his brother. He can identify the dynamics of that relationship and has forgiven his brother. The inmate can also discuss the dynamics of his relationship with his niece and son. The relationship with his older brother seems positive. It appears that all family members are coming up for a visit, which should be a healing experience. The inmate has taken a number of self-help programs or components of programs that deal with family issues. The inmate appears to have the appropriate coping mechanisms. The inmate can identify strategies that he would use in case he would have relationship problems with family members once he gets out. It is unlikely the requirement of further exploration in this area will produce more significant behavior changes of a positive or prosocial nature in the inmate.

| | 4-19-2007 |
|---|---|
| Richard Starrett, Ph.D.,Ph.D., CA License # PSY-13628 | Date Submitted |
| Contract Forensic Psychologist | |
| Forensic Assessment | |
| Unit/Board of Parole Hearings | |
| California Department of Corrections and Rehabilitation | |

CONFIDENTIALITY NOTICE: This communication with its contents may contain confidential and/or legally privileged information. It is solely for the use of the intended recipient(s). Unauthorized interception, review, use, or disclosure is prohibited and may violate applicable laws including the Electronic Communications Privacy Act and the Health Insurance Portability and Accountability Act (HIPAA). If you are not the intended recipient, please contact the sender and destroy all copies of this communication.

# EXHIBIT B

BOARD OF PRISON TERMS                                                    STATE OF CALIFORNIA

# LIFE PRISONER: DOCUMENTATION HEARING (BPT §2269.1)

BPT REPRESENTATIVE
*C. Carey*

## SENTENCE INFORMATION

| OFFENSE (CODE SECTION AND TITLE) | | CASE NUMBER | COUNT NUMBER |
|---|---|---|---|
| P-187 MURDER 1ST. | | SCL 93695 | 01 |

| DATE RECEIVED CDC | MIN. ELIG. PAROLE DATE | EARLIEST MIN. ELIG. PAROLE DATE |
|---|---|---|
| 11-16-84 | 7-27-99 | |

| INITIAL HRG. SCHEDULED | PERIOD COVERED BY THIS HEARING | PRIOR DOCUMENTATION HEARING DATES |
|---|---|---|
| 11/95  6/88 | | |

## INFORMATION CONSIDERED

### CDC 115 CHRONOS

11/28/83 - Conduct

☐ DISCIPLINARY FREE

☒ MAJOR DISCIPLINARY (SERIOUS) 8/21/87 - Refused to submit to urinalysis refused to admin. or

☐ MINOR DISCIPLINARY (ADMIN.) 10/2/87

9/19/87 - Narcotics Trafficking

### LAUDATORY CHRONOS

| DATE | CIRCUMSTANCES |
|---|---|
| 3/20/85 | attitude |
| 7/2/86 | Outstanding worker |
| 7/10/86 | Demeanor |
| 12/25/86 | Children's Christmas Party |
| 4/2/87 | Helpful to staff |

### CDC 128 CHRONOS (NEGATIVE)

| DATE | CIRCUMSTANCES |
|---|---|
| | |
| | |
| | |
| | |
| | |
| | |

### CHRONOS — WORK, EDUCATIONAL, VOCATIONAL, ETC.

| DATE | CIRCUMSTANCES |
|---|---|
| | Many positive work reports |
| | All 1's - Dated 8/26/85 |
| | through 3/24/87 - |

## INSTRUCTIONS TO CDC STAFF

DOCUMENTS STILL REQUIRED: _____

PSYCHIATRIC: _____

REFER TO CATEGORY _____

COMPLETE PRIOR TO _____

PLACE ON APPROPRIATE:

☒ LIFE PRISONER DOCUMENTATION CALENDAR  *Place on 11/90 Doc Calendar*

☐ LIFE PRISONER PAROLE CONSIDERATION HEARING CALENDAR

OTHER _____
_____
_____
_____

| NAME | CDC NUMBER | INSTITUTION | CALENDAR | HEARING DATE |
|---|---|---|---|---|
| BASILE, DAVID | C-70016 | CTF | 12/87 | 12/21/87 |

1

BPT 1009 (REV 4/86)                                            PERMANENT ADDEND

AFTER REVIEWING WITH THE PRISONER THE FACTORS WHICH MIGHT BE OF CONCERN AT HIS/HER INITIAL PAROLE HEARING, THE PANEL MADE THE FOLLOWING EVALUATIONS AND FUTURE RECOMMENDATIONS:

RE: VOCATIONAL TRAINING _Has electronics and computer background. Would eventually like further training and perhaps certification in one of these fields_

RE: ACADEMICS _Has GED and approximately 72 hrs of College credit. Will try to put the credits together and add to them to get A.A. degree —_

RE: WORK RECORD _Work reports as clerk are extremely positive_

RE: GROUP ACTIVITIES _N.A. or A.A. if N.A. is unavailable. —_

RE: PSYCHIATRIC TREATMENT _None indicated at this time_

RE: PRISON BEHAVIOR _Become disciplinary free —_

RE: OTHER

REPRESENTATIVE SIGNATURE _C. Carey_

DATE _12/21/87_

NAME _____ CDC NUMBER _____ INSTITUTION _____ CALENDAR _____ HEARING DATE

PERMANENT ADDENDA

BOARD OF PRISON TERMS                                                    STATE OF CALIFORNIA

# LIFE PRISONER: DOCUMENTATION HEARING (BPT §2269.1)

BPT REPRESENTATIVE

## SENTENCE INFORMATION

| OFFENSE (CODE SECTION AND TITLE) | CASE NUMBER | COUNT NUMBER |
|---|---|---|
| P187    MURDER 1ST | SCL 93695 | 01 |

| DATE RECEIVED CDC | MIN. ELIG. PAROLE DATE | EARLIEST MIN. ELIG. PAROLE DATE |
|---|---|---|
| 11-16-84 | 11-16-2000 | 12-22-99 |

| INITIAL HRG. SCHEDULED | PERIOD COVERED BY THIS HEARING | PRIOR DOCUMENTATION HEARING DATES |
|---|---|---|
| 11-98 | 12-21-87  -  11-6-90 | 12-21-87 |

## INFORMATION CONSIDERED

| CDC 115 CHRONOS | | LAUDATORY CHRONOS | |
|---|---|---|---|
| | | DATE | CIRCUMSTANCES |
| ☑ DISCIPLINARY FREE *Since 1987* | | 6/80 | Upholstery/Furt. Fac. |
| ☐ MAJOR DISCIPLINARY (SERIOUS) | | 11/83 | "      "      " |
| ☐ MINOR DISCIPLINARY (ADMIN.) | | 11/88 | Lifers Assoc./Chairman |

| CDC 128 CHRONOS (NEGATIVE) | | CHRONOS — WORK, EDUCATIONAL, VOCATIONAL, ETC. | |
|---|---|---|---|
| DATE | CIRCUMSTANCES | DATE | CIRCUMSTANCES |
| | | 7/-9/90 | Dining Rm 2½Mo.'s 1ST & 2's |
| | | 5/90 | PIA/Furt. 23Mo.'s 1's SE |

## INSTRUCTIONS TO CDC STAFF

DOCUMENTS STILL REQUIRED: _____

PSYCHIATRIC: _____

REFER TO CATEGORY _____

COMPLETE PRIOR TO _____

PLACE ON APPROPRIATE:
☑ LIFE PRISONER DOCUMENTATION CALENDAR   *Place on 11/93 Doc #3 Calendar*

☐ LIFE PRISONER PAROLE CONSIDERATION HEARING CALENDAR

OTHER _____

| NAME | CDC NUMBER | INSTITUTION | CALENDAR | HEARING DATE |
|---|---|---|---|---|
| BASILE, DAVID | C-70016 | CSP-NF | 11-90 | 11-6-90 |

BPT 1009 (REV. 4/86)                                                    PERMANENT ADDENDA

AFTER REVIEWING WITH THE PRISONER THE FACTORS WHICH MIGHT BE OF CONCERN AT HIS/HER INITIAL PAROLE HEARING, THE PANEL MADE THE FOLLOWING EVALUATIONS AND FUTURE RECOMMENDATIONS: *Prior To Prison Term*          *Prior To Prison Term*

RE: VOCATIONAL TRAINING  Elect. + Computer skills noted in the community — however expressed interest in both of these areas + would like to train to Tone if custody + CDC permits, at a later date. Considerations —

RE: ACADEMICS  Read GED + College 3yrs. (1976-79), RX upgrade ASAP, toward AA degree + above.

RE: WORK RECORD  Excellent prior work in Fwt. Fac. 23 mo.'s w/ 3⬤. Now in Clean-up Dining Rm — 1-2 + 3's.

RE: GROUP ACTIVITIES  Participant in NA 7/90 — 9/90 (active) w/Marion Chronis Extensive Drug history + related to life crime. RX — Continue in NA — ⬤⬤⬤⬤⬤⬤⬤⬤⬤⬤ as he his NOW.

RE: PSYCHIATRIC TREATMENT  No RX's other than drug Treatment.

RE: PRISON BEHAVIOR  Overall good since "1987 — No CDC-115's recid — however no longer in positive. PIA Job in Fwt. Fac. + Work grade have fallen; moved to Close B Custody, due to New Fed policy that moved him from Job assgn.

RE: OTHER  married 1987 — w/ 2 children w/ stable marriage.

RX Voc. Trade ASAP — or Custody + possible trans. to obtain same. Very positive attitude + should do well in future if he continues on same path as now.

BPT REPRESENTATIVE SIGNATURE  R. Ramirez

DATE  11/6/90          Fol (N)

| NAME | CDC NUMBER | INSTITUTION | CALENDAR | HEARING DATE |
|---|---|---|---|---|
| BASILE, DAVID | C-70016 | CSP-NF | 11-90 | 11-6-90 |

BPT 1009 (REV. 4/86)          4          PERMANENT ADDENDA

BOARD OF PRISON TERMS                                                                STATE OF CALIFORNI.

# LIFE PRISONER: DOCUMENTATION HEARING (BPT §2269.1)

BPT REPRESENTATIVE  *EG Bulloil*

## SENTENCE INFORMATION

| OFFENSE (CODE SECTION AND TITLE) | | CASE NUMBER | COUNT NUMBER |
|---|---|---|---|
| PC 187 Murder 1st | | SCL 93695 | 01 |

| DATE RECEIVED CDC | MIN ELIG PAROLE DATE | | EARLIEST MIN ELIG PAROLE DATE |
|---|---|---|---|
| 7/26/83 | 4/3/2000 | | |

| INITIAL HRG SCHEDULED | PERIOD COVERED BY THIS HEARING | PRIOR DOCUMENTATION HEARING DATES |
|---|---|---|
| 3/99 | 11/90 – 10/93 | 11/6/90 |

## INFORMATION CONSIDERED

| CDC 115 CHRONOS | LAUDATORY CHRONOS | |
|---|---|---|
| | DATE | CIRCUMSTANCES |
| ☒ DISCIPLINARY FREE | | |
| ☒ MAJOR DISCIPLINARY (SERIOUS) | | *See Progress Report 7/20/93* |
| ☐ MINOR DISCIPLINARY (ADMIN ) | | |

| CDC 128 CHRONOS (NEGATIVE) | | CHRONOS — WORK, EDUCATIONAL, VOCATIONAL, ETC. | |
|---|---|---|---|
| DATE | CIRCUMSTANCES | DATE | CIRCUMSTANCES |
| | *See Progress Report 7/20/93* | | *See Progress Report 7/20/93* |

## INSTRUCTIONS TO CDC STAFF

DOCUMENTS STILL REQUIRED  _____

PSYCHIATRIC  _____

REFER TO CATEGORY  _____

COMPLETE PRIOR TO  _____

PLACE ON APPROPRIATE

☒ LIFE PRISONER DOCUMENTATION CALENDAR

☐ LIFE PRISONER PAROLE CONSIDERATION HEARING CALENDAR

OTHER  _____

| NAME | CDC NUMBER | INSTITUTION | CALENDAR | HEARING DATE |
|---|---|---|---|---|
| BASILE, DAVID | C-70016 | MCSP | 10/93 | 10/13/93 |

COPY TO INMATE
VIA CC-1  10-21-9301

BPT 1009 (REV  86)                              5                              PERMANENT ADDENDA

AFTER REVIEWING WITH THE PRISONER THE FACTORS WHICH MIGHT BE OF CONCERN AT HIS/HER INITIAL PAROLE HEARING, THE PANEL MADE THE FOLLOWING EVALUATIONS AND FUTURE RECOMMENDATIONS:

RE: VOCATIONAL TRAINING    _Completed No. Vocations._

RE: ACADEMICS    _Continuing education at the college level. Completed G.E.D. in order to get the certificate. Hopes to complete necessary college courses to get B.A._

RE: WORK RECORD    _Has established a good work record._

RE: GROUP ACTIVITIES    _Active/willing in NA_

RE: PSYCHIATRIC TREATMENT    _No recommendation_

RE: PRISON BEHAVIOR    _Need to clean up his disciplinary record_

RE: OTHER    _____

| BPT REPRESENTATIVE SIGNATURE | DATE |
|---|---|
| _[signature]_ | 10/13/93 |

| NAME | CDC NUMBER | INSTITUTION | CALENDAR | HEARING DATE |
|---|---|---|---|---|
| BASILE, DAVID | C-70016 | MCSP | 10/93 | 10/13/93 |

BOARD OF PRISON TERMS

STATE OF CALIFORNIA

# LIFE PRISONER: DOCUMENTATION HEARING (BPT §2269.1)

BPT REPRESENTATIVE

## SENTENCE INFORMATION

| OFFENSE (CODE SECTION AND TITLE) | | CASE NUMBER | COUNT NUMBER |
|---|---|---|---|
| P187 MURDER 1st | | SCL 93695 | 1 |

| DATE RECEIVED CDC | MIN ELIG PAROLE DATE | EARLIEST MIN ELIG PAROLE DATE |
|---|---|---|
| 11/16/84 | 12/2/99 | |

| INITIAL HRG SCHEDULED | PERIOD COVERED BY THIS HEARING | PRIOR DOCUMENTATION HEARING DATES |
|---|---|---|
| 1/99 | 10/12/93 – 10/96 | 10/12/93 |

## INFORMATION CONSIDERED

| CDC 115 CHRONOS | LAUDATORY CHRONOS | |
|---|---|---|
| | DATE | CIRCUMSTANCES |

☐ DISCIPLINARY FREE

☒ MAJOR DISCIPLINARY (SERIOUS)

☐ MINOR DISCIPLINARY (ADMIN.)

See 1004 of
8/27/96

| CDC 128 CHRONOS (NEGATIVE) | | CHRONOS — WORK, EDUCATIONAL, VOCATIONAL, ETC. | |
|---|---|---|---|
| DATE | CIRCUMSTANCES | DATE | CIRCUMSTANCES |

## INSTRUCTIONS TO CDC STAFF

DOCUMENTS STILL REQUIRED

PSYCHIATRIC

REFER TO CATEGORY

COMPLETE PRIOR TO

PLACE ON APPROPRIATE

☐ LIFE PRISONER DOCUMENTATION CALENDAR

☒ LIFE PRISONER PAROLE CONSIDERATION HEARING CALENDAR  11/98

OTHER

| NAME | CDC NUMBER | INSTITUTION | CALENDAR | HEARING DATE |
|---|---|---|---|---|
| BASILE, DAVID | C-70016 | MCSP/IONE | 10/96 | 10/10/96 |

7

PERMANENT ADDR

BPT 1009 (REV 4/86)

AFTER REVIEWING WITH THE PRISONER THE FA... ...HICH MIGHT BE OF CONCERN AT HIS/HER INITI... ...LE HEARING, THE PANEL MADE THE FOLLOWING EVALUATIONS AND FUTURE RECOMMENDATIONS:

RE: VOCATIONAL TRAINING  Elect Tech / auto mechan

RE: ACADEMICS  G.E.D.    + working on AA

RE: WORK RECORD  Ro R works

RE: GROUP ACTIVITIES  Participated in N/A    + STOP

RE: PSYCHIATRIC TREATMENT

RE: PRISON BEHAVIOR  Needs to remain disc free

RE: OTHER

BPT REPRESENTATIVE SIGNATURE

E Wolf

DATE

10/10/96

| NAME | CDC NUMBER | INSTITUTION | CALENDAR | HEARING DATE |
|------|------------|-------------|----------|--------------|

BOARD OF PRISON TERMS                                                                          STATE OF CALIFORNIA

# LIFE PRISONER DECISION FACE SHEET

## PERIOD OF CONFINEMENT

*(RECORDS OFFICER USE ONLY)*

|  | YR | MO | DAY |
|---|---|---|---|
| Adjusted Period of Confinement ................................................ | | | |
| Date Life Term Begins ................................................ + | | | |
| At Large Time *Original 3 yrs. Place on* + | | | |
| PAROLE DATE *10/2001 Cal. for Sub # 1* = | | | |

## MISCELLANEOUS

*Denied 3 year*

Panel Recommendations And Requests:
_____Become ✓ Remain Disciplinary Free.
_____Work Towards Reducing His/Her Custody Level.
✓ Upgrade _____Vocationally _____Educationally,
✓ Participate in ✓ Self-Help (and) ✓ Therapy.
_____Transfer To _____Cat. X _____Cat. T.

PENAL CODE SECTION 3042 NOTICES    ☒ SENT    (Date) SEPTEMBER 2, 1998

COMMITMENT OFFENSE

| P187 | | MURDER 1ST | |
|---|---|---|---|
| (Code Section) | | (Title) | |
| SCL 93695 | | 1 | |
| (Case Number) | | (Count Number) | |

| Date Received by CDC | Date Life Term Begins | Controlling MEPD | |
|---|---|---|---|
| 11-16-84 | 1-16-84 | 12-2-99 | |

| Type of Hearing | If Subsequent Hearing, Date of Last Hearing |
|---|---|
| ☒ INITIAL    ☐ SUBSEQUENT (Hearing No.) _____ | |

| Department Representative | |
|---|---|
| KARI FOUNTAIN | |

| Counsel for Prisoner | Address |
|---|---|
| RHONDA SKIPPER-DOTTA | P.O. BOX 542, GALT, CA. 95632 |

| District Attorney Representative | County |
|---|---|
| | SANTA CLARA CO. |

## PAROLE HEARING CALENDAR

*This form and the panel's statement at the conclusion of the hearing constitute a proposed decision and order of the Board of Prison Terms. The decision becomes effective when issued following the decision review process.*

By:

| | Date |
|---|---|
| Presiding (Name) | |
| Concurring (Name) | Date OCT 15 1998 |
| Concurring (Name) A. F. Van Court | Date |

| NAME | CDC NUMBER | INSTITUTION | CALENDAR | HEARING DATE |
|---|---|---|---|---|
| BASILE, DAVID | C-70016 | MCSP/IONE | 11/98 | OCT 15, 1998 |

9

BPT 1001 (REV. 1/91)                                                          PERMANENT ADDENDA

BOARD OF PRISON TERMS                                                    STATE OF CALIFORNIA

LIFE PRISONER: PAROLE CONSIDERATION
PROPOSED DECISION  (BPT §2041)

I. . [√]  PAROLE DENIED  *3 years*

     If this proposed decision denying parole is approved, the Board will send you a copy of the approved decision, including the reasons for denial of parole, within 30 days of the hearing.

II.  [ ]  PAROLE GRANTED

    A.  Base Period of Confinement . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . _____ Months

        Case No. _____   Count No. _____   Offense _____

    B.  Firearm Enhancement . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .+ _____ Months

    C.  Other Crimes Total . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .+ _____ Months

        Case No. _____   Count No. _____   Offense _____        _____ mos.

        Case No. _____   Count No. _____   Offense _____        _____ mos.

        Case No. _____   Count No. _____   Offense _____        _____ mos.

    D.  Total Term . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .= _____ Months

    E.  Postconviction Credit From _____ To _____ — _____ Months
                         (Date)        (Date)

    F.  Total Period of Confinement . . . . . . . . . . . . . . . . . . . . . . . . . . = _____ Months

    The period of confinement indicated is a tentative decision proposed by this panel. The decision will be reviewed pursuant to BPT §2041, and, if approved, a copy of the approved decision will be sent to you within 30 days. At that time appropriate pre-prison credits will be applied and a parole release date computed.

    You will not engage in any conduct specified in BPT §2451. Such conduct may result in rescission or postponement of your parole date.

III.  If the proposed decision denying or granting parole is disapproved, you will receive a copy of the proposed decision and the reasons for disapproval. You will then receive a copy of the modified decision or will be scheduled for a new hearing, as appropriate.

---

**PANEL HEARING CASE**

| Name | Date |
|---|---|
| *Emeling* | *Oct 15, 1998* |
| Name | Date |
| *McGilop* | |
| Name | Date |
| *A. F. VanKort* | |

| NAME | CDC NUMBER | INSTITUTION | HEARING DATE |
|---|---|---|---|
| BASILE, DAVID | C-70016 | MCSP/IONE | OCT 15, 1998 |

10

Distribution:  White—C. File
Canary—BPT
Pink—Prisoner

BPT 1005 (Rev. 8/1/81)

1              CALIFORNIA BOARD OF PRISON TERMS

2                   D E C I S I O N

3       PRESIDING COMMISSIONER WILLIAMS: Okay. We're

4 back on the record. It's 2:55 p.m. Mr. Basile, the

5 Panel has unanimously decided to deny your parole for

6 three years. The Panel reviewed all the information

7 received from the public and relied on the following

8 circumstances in concluding that you're not suitable

9 for parole and you'd pose an unreasonable risk of

10 danger to society and a threat to public safety if

11 released from prison. Number one is the commitment

12 offense. The offense was carried out in an especially

13 cruel and callous manner. It was carried out in a

14 manner which exhibits a callous disregard for the life

15 and the suffering of another. These conclusions are

16 drawn from the Statement of Facts wherein you

17 strangled the wife of your brother, allegedly, to

18 collect a $100,000 insurance policy. Your previous

19 record, you have an escalating pattern of criminal

20 conduct, a persistent pattern of tumultuous

21 relationships and criminal behavior which began at an

22 early age. You failed at previous grants of parole,

23 both at the federal and state level. And you had an

24 unstable social history and criminal conduct which

25 includes extensive violations of the narcotics laws.

26 Institutional behavior, you've failed to upgrade

27 DAVID BASILE    C-70016    DECISION PAGE 1    10/15/98

1  sufficiently educationally and vocationally.  You've

2  not participated sufficiently in self-help and therapy

3  programs.  And you have several very serious 115s.

4  The Panel makes the following findings:  The prisoner

5  needs therapy in order to face, discuss, understand

6  and cope with stress in a nondestructive manner.

7  Therapy in a controlled setting is needed, but

8  motivation and amenability are recent if nothing else.

9  The prisoner's gains are recent.  He must demonstrate

10  an ability to maintain gains over an extended period

11  of time.  Nevertheless, the prisoner should be

12  commended for extensive participation in NA, a perfect

13  understanding of the 12 Steps and vocational

14  programming in three years.  The denial is for three

15  years.  The Panel further finds that it's not

16  reasonable to expect that parole would be granted at a

17  hearing during the next three years.  The commitment

18  offense, again, was committed in an especially cruel

19  manner.  A longer period time is required to evaluate

20  your suitability in view of the prisoner's long

21  history of criminal conduct including these sentences

22  in state and federal prison.  The Panel recommends

23  that you remain disciplinary-free, you continue to

24  upgrade vocationally and educationally, you continue

25  to participate in self-help and therapy programming.

26  That's the conclusion of the reading.  It's

27  DAVID BASILE    C-70016    DECISION PAGE 2    10/15/98

1    approximately 3:00 p.m.  Any statement, Commissioner

2    Ortega?

3              COMMISSIONER ORTEGA:  No.  Good luck.

4              INMATE BASILE:  Thank you.

5              PRESIDING COMMISSIONER WILLIAMS:  Okay.  Good

6    luck.

7                          --oOo--

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25    PAROLE DENIED THREE YEARS           NOV 1 0 1998

26    EFFECTIVE DATE OF DECISION_____

27    DAVID BASILE   C-70016   DECISION PAGE 3   10/15/98

                              13

BOARD OF PRISON TERMS                                                           STATE OF CALIFORNIA

# LIFE PRISONER DECISION FACE SHEET

## PERIOD OF CONFINEMENT

*(RECORDS OFFICER USE ONLY)*

|  | YR | MO | DAY |
|---|---|---|---|

Adjusted Period of Confinement ................................................ _____  ___  ___

Date Life Term Begins ............................................................ + _____

At Large Time *Denied 2 years, Please* ................................ + _____

PAROLE DATE *Mr. 2/2004 Cal for Sub# 2* ........................ = _____

## MISCELLANEOUS

*2-year denial*

Panel Recommendations And Requests:
_____ Become __X__ Remain Disciplinary Free.
_____ Work Towards Reducing His/Her Custody Level.
_____ Upgrade _____ Vocationally _____ Educationally,
__X__ Participate in __X__ Self Help (and) __X__ Therapy.
_____ Transfer To ____ Cat. X ____ Cat. T.

PENAL CODE SECTION 3042 NOTICES    ☒ SENT    (Date) ___12-21-01___

COMMITMENT OFFENSE

P187                              MURDER 1ST
(Code Section)                    (Title)

SCL 93695                         1
(Case Number)                     (Count Number)

| Date Received by CDC | Date Life Term Begins | Controlling MEPD |
|---|---|---|
| 11-16-84 | 11-16-84 | 12-2-99 |

| Type of Hearing | If Subsequent Hearing, Date of Last Hearing |
|---|---|
| ☐ INITIAL  ☒ SUBSEQUENT (Hearing No.) ___1___ | 10-15-98 |

Department Representative    KARI FOUNTAIN    BPT DESK

Counsel for Prisoner    WAIVED    | Address

District Attorney Representative    | County    SANTA CLARA

## PAROLE HEARING CALENDAR

*This form and the panel's statement at the conclusion of the hearing constitute a __proposed__ decision and order of the Board of Prison Terms. The decision becomes effective when issued following the decision review process.*

By:

| Presiding (Name) | Date 2-6-02 |
|---|---|
| Concurring (Name) | Date 11 |
| Concurring (Name) | Date |

| NAME | CDC NUMBER | INSTITUTION | CALENDAR | HEARING DATE |
|---|---|---|---|---|
| BASILE, DAVID | C-70016 | MCSP | 10-01 | 2/6/02 |

14

BPT 1001 (REV. 1/91)    PERMANENT ADDENDA

1       CALIFORNIA BOARD OF PRISON TERMS

2               D E C I S I O N

3       PRESIDING COMMISSIONER HEPBURN:   All right.

4   Parties have returned to the room.   It's 9:45 a.m.

5   Mr. Basile, we did deny your parole for two years.

6   Let me read the decision to you.   The Panel

7   reviewed all information received and relied on the

8   following circumstances in concluding that the

9   prisoner is not yet suitable for parole and would

10  pose an unreasonable risk of danger to society or a

11  threat to public safety if released from prison.

12  Number one was the timing and gravity of the

13  commitment offense, which was really an extremely

14  brutal and cruel crime in which the victim was

15  attacked, at least it would appear from the facts

16  of the case, for purposes of monetary gain.   She

17  was choked.   Ligature was placed around her throat.

18  She was also drugged at some time, either prior to

19  or during the commission of the offense, and died

20  as a result of being choked to death.   Nineteen

21  year old victim.   Regarding Mr. Basile's previous

22  record, it was significant.   We did have a self-

23  admitted problem with drugs for an extended period

24  of time.   Led to lifetime involvement in a number

25  of crimes including possession of sales of LSD,

26  petty theft, receiving stolen property, possession

27  DAVID BASILE      C-70016      DECISION PAGE 1    2/06/02

1   for sales and conspiracy, for which he received a

2   term in Federal Institution in Lompoc.  He also had

3   a previous felony conviction for attempted burglary

4   for which he received a CDC term, and was paroled

5   from that just prior to being arrested on the life

6   offense.  Regarding his institutional behavior,

7   he's done very well since his last hearing.  He's

8   remained disciplinary free.  He should be commended

9   for that.  He's upgraded himself educationally, and

10   he has made a lot of efforts to improve himself

11   through self-help programs.  Although he hasn't

12   been in NA, he said, for about six months, he was

13   in it for an extended period of time from about

14   1989 on.  He also completed a number of other self-

15   help programs including Communication Skills, Seven

16   Habits of Highly Effective People, Life Without a

17   Crutch, among others, and some self-study programs.

18   He should be commended for all those positive

19   aspects of his programming.  He's put together some

20   fairly decent parole plans, both in Santa Clara

21   County and Los Angeles County.  He appears to have

22   a realistic view of the difficulties that he would

23   have to adjusting to getting outside the

24   institution.  Because of that, he's researched some

25   treatment facilities, live-in treatment facilities,

26   which would probably be the best thing for him when

27   DAVID BASILE    C-70016    DECISION PAGE 2    2/06/02

16

1   he is released on parole.  The latest psychological

2   report was completed in 1998 by Dr. Macomber.  It's

3   a little dated.  We are going to ask that there be

4   a new one prior to your next hearing, Mr. Basile.

5   It's going to be important regarding to be

6   seriously considered for parole.  You need to have

7   an updated report that you can hang your hat on.

8   But the report from 1998 was fairly positive.  It

9   said that his current level of dangerousness if

10  released to the community was below average, at

11  least at that point.  I have no reason to believe

12  that it's changed, apparently.  In response to 3042

13  notices, we had a representative from the DA's

14  Office, Santa Clara County, who was present and

15  voiced opposition to parole.  As I indicated, it is

16  a two year denial.  In a separate decision, the

17  Hearing Panel finds that the prisoner has been

18  convicted of murder.  It's not reasonable to expect

19  that parole would be granted at a hearing during

20  the next two years.  And the specific reasons for

21  this finding are as follows.  The commitment -- The

22  timing and gravity of the commitment offense

23  itself, which was carried out in a very brutal and

24  cruel manner, in which the victim was attacked, a

25  19 year old victim.  She was strangled.  A ligature

26  was placed around her throat, and she was strangled

27  DAVID BASILE    C-70016    DECISION PAGE 3    2/06/02

17

1    to death.  Mr. Basile does have a history of

2    criminality, a long standing problem with

3    narcotics, a variety of convictions as an adult,

4    including two prior prison terms, one in federal

5    prison and one in state prison.  And he hasn't

6    completed necessary programming which is essential

7    to his adjustment.  And, really, that's just more

8    of what he has been doing.  We want you just to

9    continue your program, Mr. Basile.  There is no

10   reason to indicate that you're not doing all the

11   positive things that you need to do to get yourself

12   ready for parole.  So, our recommendation prior to

13   your next hearing is going to be that you just

14   remain disciplinary free and continue your present

15   programming, participating in self-help and therapy

16   programs to the extent that they're available,

17   which I think you indicated to us today you intend

18   to do.  Would you mind handing that to him, please?

19   All right.  Good luck to you, Mr. Basile.

20             INMATE BASILE:  Thank you.

21             PRESIDING COMMISSIONER HEPBURN:  And that

22   will conclude this hearing at 9:50 a.m.

23                      --o0o--

24

25   PAROLE DENIED TWO YEARS

26   EFFECTIVE DATE OF THIS DECISION_____MAR 1 2 2002_____

27   DAVID BASILE    C-70016    DECISION PAGE 4    2/06/02

18

BOARD OF PRISON TERMS                                  STATE OF CALIFORNIA
LIFE PRISONER HEARING DECISION FACE SHEET

| | Records Use Only |
|---|---|
| [ ] PAROLE GRANTED – (YES)<br>CDC: Do not release prisoner before<br>Governor's review. | Parole Release Date _____<br>　　　　YR　　MO　　DAY |
| [X] PAROLE DENIED – (NO) *one (1) year* | Attach Prison Calculation Sheet |

*Denied one 1 yr. Pt on 4/2005 Cal for Sub #23*

[ ] AGREED UNSUITABLE (Attach 1001A Form) FOR: _____ YEAR(S)
[ ] HEARING POSTPONED/REASON: _____

## PANEL RECOMMENDATIONS AND REQUESTS

The Board Recommends:

| | | |
|---|---|---|
| [ ] No more 115's or 128A's | [ ] Stay discipline free | |
| [ ] Work to reduce custody level | [ ] Learn a trade* | [ ] Earn positive chronos |
| [ ] Get self-help* | [ ] Get therapy* | [ ] Get a GED* |

[ ] Recommend transfer to _____
[ ] Other_____
These programs are recommended if they are offered at your prison and you are eligible/able to participate.

Penal Code 3042 Notices　　　[X] Sent　　Date: __2-29-04__

Commitment Offense(s) _____P187_____　　　　MURDER 1ST.
　　　　　　　　　　　　Code(s)　　　　　　　　　　Crime(s)

　　SCL　　93695　　　　　　　　　　1
　　　　　　　　　　Case #(s)　　　　　　　Count#(s)

| Date Inmate Came to CDC | Date Life Term Began | Minimum Eligible Parole Date |
|---|---|---|
| 11-16-84 | 11-16-84 | 12-2-99 |

[ ] Initial Hearing　　[X] Subsequent (Hearing No.) __2__　　Date of Last Hearing __2-6-02__

CDC Representative　__DELORES CHAVIER, BPT DESK__

Attorney for Prisoner　__WAIVED__　　　　Address

D.A. Representative　　　　　　County __SANTA CLARA__

This form and the Board's decision at the end of the hearing is only <u>proposed</u> and NOT FINAL. It will not become final until it is reviewed.

Chair　　　　　　　　　　Date
Panel Member　　　　　　　Date　　4-16-04
Panel Member　　　　　　　Date

| NAME | CDC # | PRISON | CALENDAR | DATE |
|---|---|---|---|---|
| BASILE, DAVID | C-70016 | MCSP-IONE | 2-2004 | 4-16-04 |

PT 1001 (REV. 08/03)

*4 tapes*

19

1    CALIFORNIA BOARD OF PRISON TERMS

2      D E C I S I O N

3   **DEPUTY COMMISSIONER DININNI:**  We are back on

4 the record.

5   **PRESIDING COMMISSIONER WELCH:**  Okay.

6 Mr. Basile, we have a decision.  The Panel

7 reviewed all information received from the public

8 and relied on the following circumstances in

9 concluding that the prisoner is not suitable for

10 parole and poses an unreasonable risk of danger to

11 society or a threat to public safety if released

12 from prison.  One, we feel that the offense was

13 carried out in an especially cruel and callous

14 manner.  The offense was carried out in a

15 dispassionate and calculated manner.  Not to say

16 that we feel that this was -- it looks like an

17 execution style murder.  The victim was abused.

18 The (indiscernible) factors (indiscernible) to

19 conclude that.  The offense was carried out in a

20 manner that showed a total callous disregard for

21 ~~another human being.  And this is someone that~~

22 both -- that you knew; your brother's wife, that

23 you had a relationship with.  The conclusion is

24 drawn from the Statement of Facts, wherein on

25 November [sic] 22nd, 1982, the brother of -- the

26 prisoner's brother contacted the Sunnyvale

27 **DAVID BASILE  C-70016  DECISION PAGE 1   4/16/04**

1    Department of Public Safety and requested a

2    (indiscernible) ambulance to respond to the

3    residence in Sunnyvale.  When the bottom line is

4    the wife of the prisoner's brother was found and

5    she was deceased.  Rigamortis had set in.  The

6    investigation determined that the prisoner was

7    responsible for this, and he was tried and

8    convicted and sentenced to 25 years to life for

9    this offense.  Now the prisoner had an escalating

10   pattern of criminal conduct.  He had an extensive

11   arrest record.  He had a history of unstable

12   relationships and involved in those kinds of

13   things.  He failed previous grants of probation.

14   He failed previous grants of parole.  Failed to

15   profit from society's previous attempts to correct

16   his criminality.  That included parole and prior

17   jail time, prior prison terms.  Under unstable

18   social history, certain at the top of the list of

19   unstable social factors would be his drug use,

20   continuous use of drugs.  He has failed, based on

21   ~~his own testimony, failed in his attempt to serve~~

22   his country via the United States Army because of

23   his drug use.  So certainly drugs had an unstable

24   -- was an unstable social factor.  The prisoner in

25   recent times has programmed in a commendable

26   factor -- fashion.  We certainly need to commend

27   **DAVID BASILE  C-70016  DECISION PAGE 2   4/16/04**

1    him for that.  He has upgraded.  By the way, you

2    did a good job in your closing in articulating

3    your achievements.  And however, I really felt at

4    the beginning that you needed a lawyer, but in

5    your closing, you did okay.  So I think you did

6    pretty good for yourself.  And not only that, but

7    I feel that you're programming and that you're

8    able to put together what you did in prison and I

9    think it's pretty good.  Doctor Greenstone did a

10   psychological report dated 12/16/03, and noted

11   that the prisoner's level of dangerousness in a

12   structured environment as well as an unstructured

13   environment is reduced and that he's making

14   progress in terms of his suitability for parole as

15   it relates to a threat to the community.  Recent

16   parole plans, the Panel feel that maybe a house --

17   a halfway house may be a better option for you.

18   And it appears from the letters that you would be

19   (indiscernible) to the Bible Tabernacle Halfway

20   House, and it appears that you have some support

21   there.  And that appears to be a good option for

22   you.  Certainly we think that you ought to work on

23   your employment plans.  A job would certainly go a

24   long ways in terms of suitability.  You went a

25   long ways in terms of developing marketable skills

26   and we feel that that will also lead you.  The

27   **DAVID BASILE   C-70016   DECISION PAGE 3    4/16/04**

1    Hearing Panel notes that in response to Penal Code

2    3042 notices, indicating opposition to a finding

3    of suitability, that the Deputy District Attorney

4    from Santa Clara County spoke in opposition of a

5    finding of suitability at this time.  The Panel

6    makes the following findings:  The Panel finds

7    that the prisoner needs to continue to involve

8    himself in positive kinds of programs; the kinds

9    that will enable him to be able to face, discuss,

10    understand, and cope with stress in a non-

11    destructive manner.  Nevertheless, there's an

12    array of things we want to commend him for.  ~~Self~~-

13    help programs, certainly the NA, the Christian

14    Twelve Step Program that he's involved in, the

15    Bible Tabernacle organization, the AA, Stay Out of

16    Prison group that he was involved in, the work

17    with the kids in order to deter kids from

18    involving themselves in criminality.  Anger

19    Management, Life Without a Crutch, all of these

20    things we think is commendable.  However, at this

21    ~~time it does not outweigh the factors of~~

22    unsuitability.  You're going to receive a one year

23    parole denial.  Your parole is going to be denied

24    for one year.  And the Panel recommend that you

25    remain disciplinary free and continue to

26    participate in positive kinds of programs, and you

27    **DAVID BASILE   C-70016   DECISION PAGE 4    4/16/04**

23

1    continue to make progress.  And I forgot your --

2    You have an AA.  Is that correct?

3        INMATE BASILE:  Associate in Science.  Yes.

4        PRESIDING COMMISSIONER WELCH:  Yes.  Yes.

5    Yes.  And I forgot to mention that.  We think

6    that's commendable and the Universal

7    (Indiscernible) Refrigerants.  And some of these

8    you did on your own and we realize how difficult

9    it is in a prison setting with the money situation

10   being the way it is for prisoners to avail

11   themselves to those things.  So a lot of these

12   programs that you've participated in that cost you

13   money that came out of your pocket.

14       INMATE BASILE:  Sure did.

15       PRESIDING COMMISSIONER WELCH:  And we want to

16   commend you for that and let you know that the

17   Board recognizes that and encourages you to

18   continue to participate in self-help programs.

19   But at the top of the list, the reason for the

20   denial was certainly for your crime and the

21   inconsistencies and your untruthfulness and how

22   the crime came about.  And what I'm talking about

23   started at the Initial Hearing and the changes in

24   the stories.  It certainly gives the Board some

25   concern about how much you've come to terms with

26   the crime and accepted responsibility.  But your

27   DAVID BASILE  C-70016  DECISION PAGE 5  4/16/04

1    prison program, we certainly feel that you're

2    making progress. So we encourage you to continue

3    with the self-help, continue with the vocational

4    and educational programs as they become available

5    to you. That concludes the reading of the

6    decision. Commissioner?

7        **DEPUTY COMMISSIONER DININNI:** You might

8    consider -- We gave you the benefit of the doubt

9    as far as the parole plans go. I don't know how

10   another Panel would consider that, so you might

11   want to get an up-to-date more personal letter. I

12   agree with the Commissioner that it sounds to me

13   like that's an excellent idea to go to the

14   residential program. Now if they allow you to go

15   outside for employment while you live there, you

16   might want to get employment letters because

17   you've done such an outstanding job in preparing

18   yourself for employment. So I want to commend you

19   on that. I also want to commend you on the

20   closing as did Commissioner Welch. You tied

21   together all your case factors and made it very

22   relevant. And clearly you didn't need an attorney

23   to assist you. But I also want to recommend that

24   just my own personal history and logic is two

25   heads are better than one. You still could drive

26   the car with the closing and the case factors, but

27   **DAVID BASILE   C-70016   DECISION PAGE 6   4/16/04**

1    you could have an attorney that might help you.

2    They might not help you, but they certainly won't

3    hurt you.  So it's just food for thought.  You

4    certainly didn't need one today.  You did an

5    outstanding job and I wish you the best of luck.

6         **PRESIDING COMMISSIONER WELCH:**  Okay.  Thank

7    you.

8         **DEPUTY DISTRICT ATTORNEY RICO:**  Good luck,

9    Mr. Basile.

10        **INMATE BASILE:**  Thank you.

11        **DEPUTY COMMISSIONER DININNI:**  The time?

12        **PRESIDING COMMISSIONER WELCH:**  The time is

13    10:15.

14                         --oOo--

15

16

17

18

19

20

21

22

23    **PAROLE DENIED ONE YEAR**

24    **THIS DECISION WILL BE FINAL ON:** AUG 1 4 2004

25    **YOU WILL BE PROMPTLY NOTIFIED IF, PRIOR TO THAT**

26    **DATE, THE DECISION IS MODIFIED.**

27    **DAVID BASILE  C-70016  DECISION PAGE 7   4/16/04**

| | Records Use Only |
|---|---|
| ] PAROLE GRANTED - (YES) | |
| CDC: Do not release prisoner before | Parole Release Date |
| Governor's review | YR    MO    DAY |
| ◁] PAROLE DENIED - (NO) *One (1) year* | |
| *Place on 11/06 calendar* | Attach Prison Calculation Sheet |

] AGREED UNSUITABLE (Attach 1001A Form) FOR:_____ YEAR(S)

] HEARING POSTPONED/REASON:_____

## PANEL RECOMMENDATIONS AND REQUESTS

**The Board Recommends:**

- [X] No more 115's or 128A's
- [X] Stay discipline free
- [X] Earn positive chronos
- [ ] Work to reduce custody level
- [ ] Learn a trade*
- [X] Get self-help*
- [X] Get therapy*
- [ ] Get a GED*

] Recommend transfer to_____

] Other_____

*These programs are recommended if they are offered at your prison and you are eligible/able to participate.

| Penal Code 3042 Notices | [ X ] Sent   Date: *09/27/05* |
|---|---|

| Commitment Offense(s) | *P187* | *MURDER 1ST* |
|---|---|---|
| | Code(s) | Crime(s) |
| | *SCL 93695* | *1* |
| | Case #(s) | Count #(s) |

| Date Inmate Came to CDC *11/16/84* | Date Life Term Began *SAME* | Minimum Eligible Parole Date *12/2/99* |
|---|---|---|
| [ ] Initial Hearing | [ X ] Subsequent (Hearing No.) 3 | Date of Last Hearing 4/16/04 |

| CDC Representative | |
|---|---|
| Attorney for Prisoner | Address |
| D.A. Representative | County   SANTA CLARA |

This form and the Board's decision at the end of the hearing is only <u>proposed</u> and NOT FINAL. <u>It will not become</u> <u>final until it is reviewed.</u>

| Chair | Date   11/ |
|---|---|
| Panel Member | Date   8/ |
| Panel Member | Date   05 |

| NAME | CDC # | PRISON *CTF* | CALENDAR | DATE |
|---|---|---|---|---|
| BASILE, DAVID | C70016 | | NOV. 05 | 11/8/05 |

BPT 1001 (REV. 08/03)

1    CALIFORNIA BOARD OF PAROLE HEARINGS

2    D E C I S I O N

3    PRESIDING COMMISSIONER FISHER:    All right.

4    I want to state for the record that everyone who was

5    in the room and identified themselves have returned to the

6    room.  Mr. Basile, the panel reviewed all the information

7    received from the public, and relied on the following

8    circumstances in concluding that you're not yet suitable

9    for parole and would pose an unreasonable risk of danger to

10   society or a threat to public safety if released from

11   prison.  This really -- it's a one-year denial.  It really

12   is primarily based on the criminal offense.  I'm

13   certainly -- we also considered Mr. Basile's prior criminal

14   history -- (indiscernible)  --  So factor in this decision,

15   but the main reason would be -- that we weren't in full

16   possession of the facts and -- and it has been kind of an

17   evolving story starting with the statements that were made

18   to the -- in the probation officer's report.  The comments

19   that were made about the fact that you had tried to shoot

20   her up with heroin prior to that evening that she just

21   nodded off.  The fact that there was, according to the

22   coroner's report, something that's called paradermia --

23   bleeding on the side of the vein, next to the vein as it,

24   you know -- (indiscernible)  -- and just a lot of questions

25   and that -- it leads -- it leads to an insecurity as to

26   whether or not you are accepting full responsibility.

27   DAVID BASILE C-70016    DECISION    PAGE 1  11/08/05

28

1    And that leads to questions about insight -- I'm sorry,

2    that leads to questions about changed behavior.  So, you

3    know, it may be that this is -- this is -- that these are

4    the answers that we're going to get.  But at this point,

5    there are just too many other people making comments that

6    leave us with questions related to your insight in this

7    particular case.  I want to commend you, though, you're

8    doing a tremendous job.  And you have a - (indiscernible)

9    -- rehabilitating yourself -- (indiscernible)  -- the

10   prison doesn't rehabilitate you.  You rehabilitate

11   yourself.  And we just encourage you to continue your --

12   (indiscernible) -- we know that -- Commissioner -- in your

13   last hearing talked to you about other -- (indiscernible) -

14   - I don't think that that's something that would be

15   necessary -- (indiscernible) skills. You also note and it

16   says that you had submitted applications to something

17   called Jobs Plus.

18        **INMATE BASILE:**  Oh, Yes, Yes.  I got manpower card.

19   I got all kinds of stuff.

20        **PRESIDING COMMISSIONER FISHER:**  All right.  So I

21   think that you've addressed that issue from the last

22   hearing. I would just encourage you to keep up your good

23   program.  And just encourage you to as you prepare for your

24   hearing next year, do a review on your Olson file -- or do

25   an Olson review on your central file and -- and look at

26   what we're looking at and see if you can't help us come to

27   DAVID BASILE C-70016     DECISION     PAGE 2   11/08/05

1    a different decision.

2         INMATE BASILE:    All right.  You've given me some

3    insight as to just particularly what you're looking at, and

4    I appreciate being open about this.  This -- I have things

5    in my own possession that I think I can address the panel

6    next year. That would be very helpful.

7         PRESIDING COMMISSIONER FISHER:    That's it.  Like I

8    said, I want -- (indiscernible) continue what you've been

9    doing and I'm just going to note a few of the things for

10   the records. Just since your last hearing, you've continued

11   to participate in NA group and involvement in anger

12   management.  During the past year you've been involved in

13   juvenile diversion program, Framework for Recovery,

14   and Seven Habits of Effective People, improving

15   relationships.  You've done a lot of work, and you need to

16   continue with that.  I just encourage you to keep up your

17   programming and you're going to work your way out of here.

18        INMATE BASILE:    Thank you.

19        PRESIDING COMMISSIONER FISHER:    Do you have any

20   comments?

21        DEPUTY COMMISSIONER HARMON:    Nothing further. You

22   did a good job.  Good luck to you, sir.

23        INMATE BASILE:    Thank you.

24        PRESIDING COMMISSIONER FISHER:    Thank you.

25                        ---o0o---

26   //

27   DAVID BASILE C-70016    DECISION    PAGE 3  11/08/05

**30**

1     //

2     //

3     //

4     //

5     //

6     //

7     //

8     //

9     //

10    //

11    //

12    //

13    //

14    //

15    //

16    //

17    //

18    //

19    //

20    //

21    //

22    //

23    PAROLE DENIED ONE YEAR

24    THIS DECISION WILL BE FINAL ON _____ MAR 18 2006

25    YOU WILL BE PROMPTLY NOTIFIED IF, PRIOR TO THAT DATE, THE

26    DECISION IS MODIFIED.

27    DAVID BASILE C-70016     DECISION     PAGE 4  11/08/05

Exhibit C

**F I L E D**

DEC 2 4 2007

KIRI TORRE
Chief Executive Officer
Superior Court of County of Santa Clara
BY _BRET MORROW_____ DEPUTY

## SUPERIOR COURT OF CALIFORNIA

## COUNTY OF SANTA CLARA

|  |  |
|---|---|
| In re | No.: 93695 |
|     DAVID M. BASILE, | ORDER |
| On Habeas Corpus | |

The habeas corpus petition of DAVID M. BASILE is denied.  The instant petition presents a close case.  Petitioner has spent a very substantial amount of time incarcerated and he has programmed and behaved appropriately.  Petitioner has trained in four vocations and has had only two serious disciplinary violations with the most recent being in  1993.

Nevertheless, the crime itself was aggravated and that fact alone is enough to support a parole denial, if the Board exercised its discretion in an honest and unbiased manner.  There is nothing in this record to suggest that the Board failed to do so.

To the extent Petitioner challenges the fact that he received a three year denial, his petition must also be denied.  Pursuant to the

1  only Court of Appeal authority on this issue, there is no basis for

2  meaningful review.  The Third District in *In re Burns* (2006) 136

3  Cal.App.4th 1318, held that the same reason given for the parole

4  denial can support any length of denial.  If the parole denial was

5  justified in the first instance there are no different criteria to

6  measure how long it should be.

7      All requested relief or action is denied.

8

9

10  DATED: _Dec 21_____, 2007.  _signature_

11                              LINDA R. CONDRON
                               JUDGE OF THE SUPERIOR COURT

12  cc:  Petitioner
        District Attorney
13      Research (10-23A)
        CJIC

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

Exhibit D

H032490

David M. Basile
CDC:C70016
San Quentin State Prison
San Quentin, CA 94974

Party Role Code:   pet



IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SIXTH APPELLATE DISTRICT

Court of Appeal - Sixth App. Dist.

**FILED**

MAY 7 - 2008

MICHAEL J. YERLY, Clerk

By _____
                    DEPUTY

In re DAVID M. BASILE,

on Habeas Corpus.

H032490
(Santa Clara County
 Super. Ct. No. 93695)

BY THE COURT:

The petition for writ of habeas corpus is denied.

(Bamattre-Manoukian, Acting P.J., Mihara, J., and McAdams, J.,

participated in this decision.)

Dated _____ **MAY 7   2008** _____   **BAMATTRE-MANOUKIAN, J.** _____ Acting P.J.

Exhibit E

Court of Appeal, Sixth Appellate District - No. H032490
**S163576**

# IN THE SUPREME COURT OF CALIFORNIA

**En Banc**

In re DAVID M. BASILE on Habeas Corpus

The petition for review is denied.

SUPREME COURT
FILED

JUL - 9 2008

Frederick K. Ohlrich Clerk

—————————————
Deputy

—————————————
Chief Justice

# SFO

## GSO

1-800-322-5555
www.gso.com

**CPS**

SAN FRANCISCO

**94102**    1 lb    1/ZA3

**T**

**D94102A**

64838055    0807161743    CSL-06





GSO

1-800-322-5555
www.gso.com

**CPS**

Package 1 of 1

45876

GSO TRACKING NUMBER
450762319777

GSO TRACKING NUMBER
450762319777

Wgt:1

CSL-32

SAN QUENTIN WAGE
SAN QUENTIN  94964
CALIFORNIA

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF CALIFORNIA
450 GOLDEN GATE AVENUE, BOX 36060

SAN FRANCISCO
CA - 94102

450762319777

C O D    N/A
Notes

Ref #  BASILE C70016

10 x 13