1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

**United States District Court**
For the Northern District of California

IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| DAVID MICHAEL BASILE,<br><br>          Petitioner,<br><br>v.<br><br>ROBERT L. AYERS, JR.,<br><br>          Respondent.<br>_____ | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) |

No. C 08-03503 SBA (PR)

**ORDER DENYING PETITION FOR WRIT OF HABEAS CORPUS**

**INTRODUCTION**

Petitioner David Michael Basile, an inmate at San Quentin State Prison, filed this pro se petition for a writ of habeas corpus, pursuant to 28 U.S.C. § 2254, in which he challenges the denial of parole by the California Board of Parole Hearings (BPH) in 2007. The matter is now submitted for the Court's consideration of the merits of the petition. For the reasons discussed below, the petition is DENIED.

**PROCEDURAL BACKGROUND**

In 1984, Petitioner was convicted by a jury in Santa Clara County Superior Court of first-degree murder. (Pet. Ex. A at 1.) The trial court sentenced him to a state prison term of twenty-five years to life. (Id.) On August 2, 2007, the BPH conducted a parole consideration hearing, after which it found that Petitioner was not suitable for parole because he would pose an unreasonable risk of danger to society or a threat to public safety if released from prison. (Id. at 107.)

Petitioner filed a habeas petition in the Los Angeles County Superior Court, which was denied on December 24, 2007. (Pet. Ex. C.) Thereafter, Petitioner filed a habeas petition in the state appellate court, which was summarily denied on May 7, 2008. (Pet. Ex. D.) Petitioner then filed a petition for review in the state supreme court, which was summarily denied on June 9, 2008. (Pet. Ex. E.)

Petitioner filed the instant petition on July 22, 2008. Petitioner claims that the BPH violated his right to due process by: (1) denying parole based on a policy of always denying parole to

prisoners sentenced to a life term based solely on their commitment offense; (2) there was no evidence to support denying parole for three years; (3) there was not at least "some evidence" that Petitioner poses a current threat to society if released; and (4) the BPH denied parole solely based on the facts of the commitment offense and his conduct prior to imprisonment.  The Court ordered Respondent to show cause why the petition should not be granted based on Petitioner's claims.  Respondent has filed an answer, along with a supporting memorandum and exhibits, and Petitioner has filed a traverse.

## STANDARD OF REVIEW

### I.      AEDPA

Under the Antiterrorism and Effective Death Penalty Act (AEDPA), a district court may grant a petition challenging a state conviction or sentence on the basis of a claim that was "adjudicated on the merits" in state court only if the state court's adjudication of the claim: "(1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding."  28 U.S.C. § 2254(d).  Section 2254(d) applies to a habeas petition from a state prisoner challenging the denial of parole.  See Sass v. Cal. Bd. of Prison Terms, 461 F.3d 1123, 1126-27 (9th Cir. 2006).

A state court has "adjudicated" a petitioner's constitutional claim "on the merits" for purposes of § 2254(d) when it has decided the petitioner's right to post-conviction relief on the basis of the substance of the constitutional claim advanced, rather than denying the claim on the basis of a procedural or other rule precluding state court review on the merits.  Lambert v. Blodgett, 393 F.3d 943, 969 (9th Cir. 2004).  It is error for a federal court to review de novo a claim that was adjudicated on the merits in state court.  See Price v. Vincent, 538 U.S. 634, 638-43 (2003).

### A.      Section 2254(d)(1)

Challenges to purely legal questions resolved by the state court are reviewed under § 2254(d)(1), under which a state prisoner may obtain habeas relief with respect to a claim

United States District Court
For the Northern District of California

adjudicated on the merits in state court only if the state court adjudication resulted in a decision that was "contrary to" or "involved an unreasonable application of" "clearly established Federal law, as determined by the Supreme Court of the United States." Williams (Terry) v. Taylor, 529 U.S. 362, 402-04, 409 (2000).  While the "contrary to" and "unreasonable application" clauses have independent meaning, see id. at 404-05, they often overlap, which may necessitate examining a petitioner's allegations against both standards.  See Van Tran v. Lindsey, 212 F.3d 1143, 1149-50 (9th Cir. 2000), overruled on other grounds; Lockyer v. Andrade, 538 U.S. 63, 70-73 (2003).

### 1.   Clearly Established Federal Law

"Clearly established federal law, as determined by the Supreme Court of the United States" refers to "the holdings, as opposed to the dicta, of [the Supreme] Court's decisions as of the time of the relevant state-court decision." Williams, 529 U.S. at 412.  "Section 2254(d)(1) restricts the source of clearly established law to [the Supreme] Court's jurisprudence." Id.  "A federal court may not overrule a state court for simply holding a view different from its own, when the precedent from [the Supreme] Court is, at best, ambiguous." Mitchell v. Esparza, 540 U.S. 12, 17 (2003).  If there is no Supreme Court precedent that controls on the legal issue raised by a petitioner in state court, the state court's decision cannot be contrary to, or an unreasonable application of, clearly-established federal law.  See, e.g., Stevenson v. Lewis, 384 F.3d 1069, 1071 (9th Cir. 2004).

The fact that Supreme Court law sets forth a fact-intensive inquiry to determine whether constitutional rights were violated "obviates neither the clarity of the rule nor the extent to which the rule must be seen as 'established'" by the Supreme Court. Williams, 529 U.S. at 391.  There are, however, areas in which the Supreme Court has not established a clear or consistent path for courts to follow in determining whether a particular event violates a constitutional right; in such an area, it may be that only the general principle can be regarded as "clearly established." Andrade, 538 U.S. at 64-65.  When only the general principle is clearly established, it is the only law amenable to the "contrary to" or "unreasonable application of" framework.  See id. at 73.

Circuit decisions may still be relevant as persuasive authority to determine whether a particular state court holding is an "unreasonable application" of Supreme Court precedent or to

3

assess what law is "clearly established." <u>Clark v. Murphy</u>, 331 F.3d 1062, 1070-71 (9th Cir.), <u>cert.</u> <u>denied</u>, 540 U.S. 968 (2003); <u>Duhaime v. Ducharme</u>, 200 F.3d 597, 600 (9th Cir. 1999).

### 2.    "Contrary to"

"Under the 'contrary to' clause, a federal habeas court may grant the writ if the state court arrives at a conclusion opposite to that reached by [the Supreme] Court on a question of law or if the state court decides a case differently than [the Supreme] Court has on a set of materially indistinguishable facts." <u>Williams</u>, 529 U.S. at 413.  A "run-of-the-mill state-court decision" that correctly identifies the controlling Supreme Court framework and applies it to the facts of a prisoner's case "would not fit comfortably within § 2254(d)(1)'s 'contrary to' clause." <u>Id.</u> at 406. Such a case should be analyzed under the "unreasonable application" prong of § 2254(d). <u>See</u> <u>Weighall v. Middle</u>, 215 F.3d 1058, 1062 (9th Cir. 2000).

### 3.    "Unreasonable Application"

"Under the 'unreasonable application' clause, a federal habeas court may grant the writ if the state court identifies the correct governing legal principle from [the Supreme] Court's decisions but unreasonably applies that principle to the facts of the prisoner's case." <u>Williams</u>, 529 U.S. at 413.

"[A] federal habeas court may not issue the writ simply because that court concludes in its independent judgment that the relevant state-court decision applied clearly established federal law erroneously or incorrectly.  Rather, that application must also be unreasonable." <u>Id.</u> at 411; <u>accord</u> <u>Middleton v. McNeil</u>, 541 U.S. 433, 436 (2004) (per curiam) (challenge to state court's application of governing federal law must be not only erroneous, but objectively unreasonable); <u>Woodford v.</u> <u>Visciotti</u>, 537 U.S. 19, 25 (2002) (per curiam) ("unreasonable" application of law is not equivalent to "incorrect" application of law).

Evaluating whether a rule application was unreasonable requires considering the relevant rule's specificity; if a legal rule is specific, the range of reasonable judgment may be narrow; if it is more general, the state courts have more leeway.  <u>Yarborough v. Alvarado</u>, 541 U.S. 652, 664 (2004).  Whether the state court's decision was unreasonable must be assessed in light of the record that court had before it.  <u>Holland v. Jackson</u>, 542 U.S. 649, 651 (2004) (per curiam).

United States District Court
For the Northern District of California

**United States District Court**
For the Northern District of California

1  The "objectively unreasonable" standard is not a clear error standard.  Andrade, 538 U.S. at

2  75-76 (rejecting Van Tran's use of "clear error" standard); Clark, 331 F.3d at 1067-69

3  (acknowledging the overruling of Van Tran on this point).  After Andrade, "[t]he writ may not issue

4  simply because, in our determination, a state court's application of federal law was erroneous, clearly

5  or otherwise.  While the 'objectively unreasonable' standard is not self-explanatory, at a minimum it

6  denotes a greater degree of deference to the state courts than [the Ninth Circuit] ha[s] previously

7  afforded them."  Id.  In examining whether the state court decision was unreasonable, the inquiry

8  may require analysis of the state court's method as well as its result.  Nunes v. Mueller, 350 F.3d

9  1045, 1054 (9th Cir. 2003).

10  **B.**   **Section 2254(d)(2)**

11  A federal habeas court may grant the writ if it concludes that the state court's adjudication of

12  the claim "resulted in a decision that was based on an unreasonable determination of the facts in

13  light of the evidence presented in the State court proceeding."  28 U.S.C. § 2254(d)(2).  An

14  unreasonable determination of the facts occurs where the state court fails to consider and weigh

15  highly probative, relevant evidence, central to the petitioner's claim, that was properly presented and

16  made part of the state court record.  Taylor v. Maddox, 366 F.3d 992, 1005 (9th Cir. 2004).  A

17  district court must presume correct any determination of a factual issue made by a state court unless

18  the petitioner rebuts the presumption of correctness by clear and convincing evidence.  28 U.S.C. §

19  2254(e)(1).

20  

21  **II.**   **California Law Governing Parole for Murderers**

22  A BPH panel meets with an inmate one year before the prisoner's minimum eligible release

23  date "and shall normally set a parole release date . . . .  The release date shall be set in a manner that

24  will provide uniform terms for offenses of similar gravity and magnitude in respect to their threat to

25  the public, and that will comply with the sentencing rules that the Judicial Council may issue and

26  any sentencing information relevant to the setting of parole release dates."  Cal. Pen. Code §

27  3041(a).  Significantly, that statute also provides:  The panel shall set a release date,

28  unless it determines that the gravity of the current convicted offense or offenses,

5

United States District Court

For the Northern District of California

or the timing and gravity of current or past convicted offense or offenses, is such that consideration of the public safety requires a more lengthy period of incarceration for this individual, and that a parole date, therefore, cannot be fixed at this meeting.

Id. § 3041(b).

One of the implementing regulations, Title 15 of the California Code of Regulations, section 2401 provides: "A parole date shall be denied if the prisoner is found unsuitable for parole under Section 2402(c). A parole date shall be set if the prisoner is found suitable for parole under Section 2402(d). A parole date set under this article shall be set in a manner that provides uniform terms for offenses of similar gravity and magnitude with respect to the threat to the public." The regulation also provides that "[t]he panel shall first determine whether the life prisoner is suitable for release on parole. Regardless of the length of time served, a life prisoner shall be found unsuitable for and denied parole if in the judgment of the panel the prisoner will pose an unreasonable risk of danger to society if released from prison." 15 Cal. Code Regs. § 2402(a).

In making its determination, the parole board may consider "[a]ll relevant, reliable information available," including,

the circumstances of the prisoner's social history; past and present mental state; past criminal history, including involvement in other criminal misconduct which is reliably documented; the base and other commitment offenses, including behavior before, during and after the crime; past and present attitude toward the crime; any conditions of treatment or control, including the use of special conditions under which the prisoner may safely be released to the community; and any other information which bears on the prisoner's suitability for release. Circumstances which taken alone may not firmly establish unsuitability for parole may contribute to a pattern which results in finding of unsuitability.

Id. § 2402(b).

Circumstances tending to show unsuitability for parole include the nature of the commitment offense, and consideration of whether "[t]he prisoner committed the offense in an especially heinous, atrocious or cruel manner." Id. § 2281(c). This includes consideration of the number of victims, whether "[t]he offense was carried out in a dispassionate and calculated manner," whether the victim was "abused, defiled or mutilated during or after the offense," whether "[t]he offense was carried out in a manner which demonstrates an exceptionally callous disregard for human suffering," and

6

whether "[t]he motive for the crime is inexplicable or very trivial in relation to the offense." Id.
Other circumstances tending to show unsuitability for parole are a previous record of violence, an
unstable social history, previous sadistic sexual offenses, a history of severe mental health problems
related to the offense, and serious misconduct in prison or jail. See id.

Circumstances tending to support a finding of suitability for parole include no juvenile
record, a stable social history, signs of remorse, that the crime was committed as a result of
significant stress in the prisoner's life, a lack of criminal history, a reduced possibility of recidivism
due to the prisoner's present age, that the prisoner has made realistic plans for release or has
developed marketable skills that can be put to use upon release, and that the prisoner's institutional
activities indicate an enhanced ability to function within the law upon release. See id. § 2281(d).

The regulations also contain a matrix of suggested base terms that prisoners with
indeterminate sentences should serve before they are released on parole. The matrix provides three
choices of suggested "base terms" for several categories of crimes. See 15 Cal. Code  Regs. § 2403.
If, as in Petitioner's case, the base offense is one count of first-degree murder with the use of a
dangerous weapon (firearm), the matrix of base terms ranges from a low of 29-31 years, to a high of
30-32 years, depending on some of the facts of the crime.[1] See id. § 2403(b).  Although the matrix is
to be used to establish a base term, this occurs only once the prisoner has been found suitable for
parole. See id. § 2403(a).

The statutory scheme places individual suitability for parole above a prisoner's expectancy in
early setting of a fixed date designed to ensure term uniformity.  In re Dannenberg, 34 Cal.4th 1061,
1070-71 (2005).

---

[1] One axis of the matrix concerns the relationship between murderer and victim and the
other axis of the matrix concerns the circumstances of the murder.  The choices on the axis for the
relationship of murderer and victim are "participating victim," "prior relationship," "no prior
relationship," and "threat to public order or murder for hire."  The choices on the axis for the
circumstances of the murder are "indirect," "direct or victim contribution," "severe trauma," or
"torture."  Each of the choices are further defined in the matrix.  See CAL. CODE REGS. tit. 15,
§ 2403(b).

While subdivision (a) of section 3041 states that indeterminate life (i.e., life-maximum) sentences should "normally" receive "uniform" parole dates for similar crimes, subdivision (b) provides that this policy applies "*unless* [the Board] determines" that a release date cannot presently be set because the particular offender's crime and/or criminal history raise "*public safety*" concerns requiring further indefinite incarceration. (Italics added.) Nothing in the statute states or suggests that the Board must evaluate the case under standards of term uniformity before exercising its authority to deny a parole date on the grounds the particular offender's criminality presents a *continuing public danger*.

Id. at 1070 (emphasis, brackets and parenthesis in original). Indeed, the very regulation that includes the matrix states that "[t]he panel shall set a base term for each life prisoner who is found suitable for parole." 15 Cal. Code Regs. § 2403(a) (emphasis added). "[T]he Board, exercising its traditional broad discretion, may protect public safety in each discrete case by considering the dangerous implications of a life-maximum prisoner's crime individually." Dannenberg, 34 Cal. 4th at 1071 (emphasis added).

The California Supreme Court's determination of state law is binding in this federal habeas action. See Hicks v. Feiock, 485 U.S. 624, 629 (1988).

## DISCUSSION

### I.    Petitioner's Claims

Petitioner claims that the BPH violated his right to due process by: (1) denying parole based on a policy of always denying parole to prisoners sentenced to a life term based solely on their commitment offense; (2) there was no evidence to support denying parole for three years; (3) there was not at least "some evidence" that Petitioner poses a current threat to society if released; and (4) the BPH denied parole solely based on the facts of the commitment offense and his conduct prior to imprisonment. The last three claims all raise the issue of whether there was sufficient evidence under due process to find Petitioner unsuitable for parole, and so these claims will be addressed together in Section II.C., below. The first claim will be addressed separately.

### II.    Due Process

The Due Process Clause of the federal constitution protects an inmate's "liberty interest" in parole. Sass v. Cal. Bd. of Prison Terms, 461 F.3d 1123, 1125 (9th Cir. 2006). "In analyzing the procedural safeguards owed to an inmate under the Due Process clause, [a court] must look at two

8

distinct elements: (1) a deprivation of a constitutionally protected liberty or property interest, and (2) a denial of adequate procedural safeguards."  Biggs v. Terhune, 334 F.3d 910, 913 (9th Cir. 2003). The second prong of this test is satisfied if (1) the inmate has been afforded an opportunity to be heard and, if denied parole, informed of the reasons underlying the decision and (2) "some evidence" supports the decision to grant or deny parole.  See Sass, 461 F.3d at 1129 (adopting some evidence standard for disciplinary hearings outlined in Superintendent v. Hill, 472 U.S. 445, 454-55 (1985)).

### A.    Protected Liberty Interest

Respondent argues as an initial matter that Petitioner has no federally protected liberty interest in parole.  This argument has been rejected by the Ninth Circuit.  See Sass, 461 F.3d at 1125 ("California inmates continue to have a liberty interest in parole after In re Dannenberg.").  Thus, under Sass, Petitioner was entitled to the protections of due process at his 2007 parole suitability hearing.

### B.    Opportunity to Be Heard and Reasons for Denial

There is no dispute that Petitioner fully participated in his 2007 parole suitability hearing, as evidenced by the transcript of that hearing.  (Pet. Ex. A.)  Throughout the hearing, Petitioner was given the opportunity to make comments and/or objections in response to the BPH's statements, clarify any misunderstandings and provide statements regarding his parole eligibility.  (Id.)  In addition, the BPH laid out detailed reasons for denying Petitioner parole, which are discussed further below.  (Id.)  Consequently, the record is clear that the BPH did not violate Petitioner's due process right to have an opportunity to be heard and to be given the reasons for the denial of parole.

### C.    "Some Evidence"

A parole board's decision satisfies the requirements of due process if "some evidence" supports the decision.  Sass, 461 F.3d at 1128-29.  "To determine whether the some evidence standard is met 'does not require examination of the entire record, independent assessment of the credibility of witnesses, or weighing of the evidence.  Instead, the relevant question is whether there is any evidence in the record that could support the conclusion reached'" by the parole board.  Id. at 1128 (quoting Hill, 472 U.S. at 455-56).  The "some evidence standard is minimal, and assures that

United States District Court

For the Northern District of California

United States District Court
For the Northern District of California

1  'the record is not so devoid of evidence that the findings of the . . . board were without support or

2  otherwise arbitrary.'"  Id. at 1129 (quoting Hill, 472 U.S. at 457).

3       It is now established under California law that the task of the BPH is to determine whether

4  the prisoner would be a danger to society if he or she were paroled.  In. re Lawrence, 44 Cal. 4th

5  1181 (2008).  The constitutional "some evidence" requirement therefore is that there be some

6  evidence that the prisoner would be such a danger, not that there be some evidence of one or more of

7  the factors that the regulations list as factors to be considered in deciding whether to grant parole.

8  Id. at 1205-06.

9       In several cases the Ninth Circuit has discussed whether the "some evidence" standard can be

10  satisfied by evidence of the nature of the commitment offense and prior offenses.  In Biggs, the court

11  explained that the some evidence standard may be considered in light of the Board's decisions over

12  time.  The court reasoned that "[t]he Parole Board's decision is one of 'equity' and requires a careful

13  balancing and assessment of the factors considered . . . A continued reliance in the future on an

14  unchanging factor, the circumstance of the offense and conduct prior to imprisonment, runs contrary

15  to the rehabilitative goals espoused by the prison system and could result in a due process violation."

16  334 F.3d at 915-17. Although the Biggs court upheld the initial denial of a parole release date based

17  solely on the nature of the crime and the prisoner's conduct before incarceration, the court cautioned

18  that "[o]ver time, however, should Biggs continue to demonstrate exemplary behavior and evidence

19  of rehabilitation, denying him a parole date simply because of the nature of his offense would raise

20  serious questions involving his liberty interest."  Id. at 916.

21

22       The Sass court criticized the decision in Biggs: "Under AEDPA it is not our function to

23  speculate about how future parole hearings could proceed."  Sass, 461 F.3d at 1129.  Sass

24  determined that it is not a due process violation per se if the Board determines parole suitability

25  based solely on the unchanging factors of the commitment offense and prior offenses.  Id. (prisoner's

26  commitment offenses in combination with prior offenses amounted to some evidence to support the

27  Board's denial of parole).  However, Sass does not dispute the argument in Biggs that, over time, a

28  commitment offense may be less probative of a prisoner's current threat to the public safety.

The Ninth Circuit explained that all of the cases in which it previously held that denying parole based solely on the commitment offense comported with due process were ones in which the prisoner had not yet served the minimum years required by the sentence.  Id.  Also, noting that the parole board in Sass and Irons appeared to give little or no weight to evidence of the prisoner's rehabilitation, the Ninth Circuit stressed its hope that "the Board will come to recognize that in some cases, indefinite detention based solely on an inmate's commitment offense, regardless of the extent of his rehabilitation, will at some point violate due process, given the liberty interest in parole that flows from relevant California statutes."  Id. (citing Biggs, 334 F.3d at 917).  Even so, the Ninth Circuit has not set a standard as to when a complete reliance on unchanging circumstances would amount to a due process violation.

The BPH denied parole in this case based upon the cruel and callous nature of the commitment offense, Petitioner's prior criminal record, the opposition of the Santa Clara County District Attorney and Sunnyvale Police Department, and Petitioner's demeanor at the hearing.  (Pet. Ex. A at 107-112.)  These are factors that "tend to indicate unsuitability for parole" under California regulations.  15 Cal. Code Regs. § 2402.  The facts of the commitment offense as summarized in the probation report attached to the 2007 hearing transcript are as follows:

> [O]n September 22, 1982, Robert Basile, brother of [Petitioner] and common-law husband of the victim, contacted the Sunnyvale Department of Public Safety and requested that police and an ambulance respond to his residence at 1352 Kingfisher Avenue #7, Sunnyvale, California.  The arriving officers discovered the victim lying on the living room floor.  The responding personnel attempted to find a pulse on the victim's wrist and noted that the trunk of her body was turned slightly, at which time they noticed that rigor mortis had set in on the upper arms and facial area.  They also observed a blue bandana wrapped around the victim's neck and it appeared to be tied tightly with a knot.
> Dr. John Hauser testified during the course of the preliminary examination held for the defendant that 19-year-old Toni Rae Mahaffey died as a result of strangulation by ligature.  Evidence of intravenous injection was observed on the victim's arm and it was noted that the laboratory analysis of the victim's blood was presumptively positive for cocaine, cocaine metabolite and morphine.  Subsequent investigation revealed that Robert Basile had purchased a $100,000 life insurance policy in the name of the victim.  It was further noted that Robert Basile had solicited numerous individuals to kill his wife so he could collect the insurance money.  This ultimately led to Robert Basile's arrest for killing his wife.  Among those testifying against Robert Basile was Thomas Burchfield.  Eventually, Burchfield was also charged with participating in the murder of Toni Rae Mahaffey due to certain inconsistencies in his explanation as to his whereabouts on the evening of the murder.

United States District Court

For the Northern District of California

> During the course of the preliminary examination witness, Gary Nix, testified that [Petitioner], David Basile, had admitted to him that he was responsible for the strangulation death of the victim. It was further noted that the witness indicated that David Basile had previously attempted to kill the victim by injecting her with a spoon of heroin two weeks earlier. Witness Robert Johanson testified that he had been solicited by David Basile to participate in the murder oft the victim. He went on to testify that in September of 1982, David Basile arrived at his residence and stated "I took care of it, got it over with." Johanson stated that David Basile held the victim down and covered her face with a pillow for 12 to 18 minutes. Johanson further testified that David Basile told him he had used a bandana around the victim's neck to make sure that she was dead.

(Resp't. Ex. 1, Ex. A at 112-13.)

At the parole hearing, Petitioner claimed that his brother killed the victim, not him. (Pet. Ex. A at 32.)[2] He agreed that he choked the victim and "participated" in killing her, but claimed that he relented and left before she was dead, and that it was his brother who applied the ligature to strangle her. (Id. at 20-22, 35-38.) Petitioner's prior criminal record included drug convictions, attempted burglary and receiving stolen property, as well as juvenile time in jail, adult probation, and time in county jail. (Id. at 108.)

The BPH commended Petitioner's positive record in prison, which included a prison job at which he received "exceptional" reports, four vocations, over 55 positive reports, participation in bible and substance abuse programs, and completion of anger-management and victim awareness programs. (Id. at 108-09.) In addition, Petitioner had a positive psychological evaluation and good parole plans. (Id. at 109.)

The BPH reasonably concluded that these positive factors were outweighed by the factors indicating unsuitability for parole, however. The facts of the commitment offense are particularly egregious. The victim was a small, 19-year-old woman who trusted Petitioner because his brother was her common-law husband. (Id. at 107.)[3] Prior to choking her from behind, Petitioner had injected her with heroin in an attempt to cause her to overdose, and there had been testimony at trial that when he killed her, he smothered her with a pillow and then used the bandana around her neck

---

[2] Petitioner's brother was tried for the murder and found not guilty. (Id. at 32.)

[3] The victim was 5'6" and 107 pounds. (Id. at 107.)

12

to kill her.  (<u>Id.</u> at 108.)  This was a brutal crime planned in advance by Petitioner and his brother in which the victim would have been likely to suffer and have time to contemplate her imminent death. The motive that Petitioner offered at the parole hearing was that he wanted to get money from his brother for bail, for retrieving his car, and for more drugs.  Petitioner claimed at the hearing that he changed his mind while choking her and did not kill her, but the BPH reasonably found this claim lacking credibility because Petitioner did not attempt to call the police or get help for the victim, he lied to his mother the following day about what happened, and he did not testify at trial to relay this story.

In addition, the BPH found that Petitioner demonstrated "a lot of latent anger" at the hearing. (<u>Id.</u> at 111-12.)  He deflected blame for the murder to his brother, which also indicated that he had not fully accepted responsibility for his role in the crime.  (<u>Id.</u> at 20-22, 32, 35-38, 114.)  On one occasion, when Petitioner reacted so strongly in disbelief to the parole decision that he had to be warned that he would have to leave if he could not remain quiet.  (<u>Id.</u> at 110.)  The BPH reasonably cited the risk that Petitioner was "going to go out and express that anger sometime and hurt someone."  (<u>Id.</u> at 112.)

The record of the 2007 parole hearing demonstrates at least "some evidence" that Petitioner would pose a risk of harm to society if released and that parole should be denied.  Moreover, the concern expressed in <u>Biggs</u>, that after passage of enough time the facts of the commitment offense would cease to amount to "some evidence" on its own, is not triggered here for two reasons.  First, the BPH did not deny parole solely because of the unchanging factor of the nature of Petitioner's commitment offense and prior criminal history, but also cited other factors indicating unsuitability. Second, and perhaps most important, not enough time had passed to trigger the concern raised in <u>Biggs</u> in that the parole hearing was conducted before Petitioner had served his sentence's minimum term of twenty-five years in prison.  Accordingly, the state court's rejection of Petitioner's due process claims challenging the sufficiency of the evidence supporting the BPH's decision was not contrary to or an unreasonable application of federal law.

**D.**    **"No-Parole Policy"**

13

Petitioner contends that his due process rights were violated by the BPH's policy of denying parole for prisoners serving life sentences based solely on their commitment offense.  To begin with, as described above, the denial of parole in this case was not based solely on Petitioner's commitment offense and other pre-conviction factors.  Moreover, the record shows that the Board reviewed the evidence extensively and discussed it in detail with Petitioner and his attorney at the hearing.  (Id. at 13-114.)  The BPH's decision sets out facts specific to Petitioner upon which it relied in finding him not suitable for parole.  (Id. at 107-14.)  Both of these factors tend to negate the accusation that the parole was denied pursuant to a no-parole policy as opposed to the specific facts of Petitioner's case, and Petitioner has not provided any evidence that would show otherwise.  The state courts' rejection of this claim was not contrary to, nor an unreasonable application of, clearly-established Supreme Court authority.

**IV.    Certificate of Appealability**

The federal rules governing habeas cases brought by state prisoners have recently been amended to require a district court that denies a habeas petition to grant or deny a certificate of appealability (COA) in its ruling.  See Rule 11(a), Rules Governing § 2254 Cases, 28 U.S.C. foll. § 2254 (effective December 1, 2009).  However, the Ninth Circuit has made clear that a state prisoner challenging the BPT's administrative decision to deny a request for parole need not obtain a certificate of appealability.  See Rosas v. Nielsen, 428 F.3d 1229, 1232 (9th Cir. 2005).  Accordingly, any request for a COA is DENIED as unnecessary.

**CONCLUSION**

For the foregoing reasons, the petition for a writ of habeas corpus is DENIED.  In addition, any request for a COA is DENIED as unnecessary.  The Clerk of the Court shall enter judgment in accordance with this Order, terminate all pending motions, and close the file.

IT IS SO ORDERED.

DATED: 3/16/10

_Saundra B Armstrong_
SAUNDRA BROWN ARMSTRONG
United States District Judge

United States District Court
For the Northern District of California

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

**United States District Court**
For the Northern District of California

UNITED STATES DISTRICT COURT
FOR THE
NORTHERN DISTRICT OF CALIFORNIA

DAVID MICHAEL BASILE,

        Plaintiff,

  v.

ROBERT AYERS JR. et al,

        Defendant.

Case Number: CV08-03503 SBA

**CERTIFICATE OF SERVICE**

I, the undersigned, hereby certify that I am an employee in the Office of the Clerk, U.S. District

1    Court, Northern District of California.

2    That on March 18, 2010, I SERVED a true and correct copy(ies) of the attached, by placing said
     copy(ies) in a postage paid envelope addressed to the person(s) hereinafter listed, by depositing said
3    envelope in the U.S. Mail, or by placing said copy(ies) into an inter-office delivery receptacle
     located in the Clerk's office.
4

5

6

7    David Michael Basile C-70016
     California State Prison - San Quentin
8    San Quentin, CA 94974

9    Dated: March 18, 2010

10                                                Richard W. Wieking, Clerk
                                                  By: LISA R CLARK, Deputy Clerk
11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

**United States District Court**
For the Northern District of California